**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )    Civil Action No:
    v.    )
    )
AMERICAN HEALTH FOUNDATION,    )
INC.; AHF MANAGEMENT    )
CORPORATION;    )
AHF MONTGOMERY, INC. d/b/a/    )
CHELTENHAM NURSING AND    )
REHABILITATION CENTER; and    )    **JURY TRIAL DEMANDED**
AHF OHIO, INC. d/b/a THE    )
SANCTUARY AT WILMINGTON    )
PLACE and SAMARITAN CARE    )
CENTER AND VILLA,    )
    )
    Defendants.    )

## THE UNITED STATES' COMPLAINT

1.    The United States of America brings this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and federal common law theories of payment by mistake and unjust enrichment.  The United States brings this case against Defendants American Health Foundation, Inc. ("AHF"); AHF Management Corporation ("AHF Management"); AHF Montgomery, Inc., which does business as Cheltenham Nursing and Rehabilitation Center ("Cheltenham"); and AHF Ohio, Inc., which does business as The Sanctuary at Wilmington Place ("Wilmington Place") and Samaritan Care Center and Villa ("Samaritan").

2.    This action arises from the Defendants' provision of non-existent and grossly substandard nursing home services to Medicare and Medicaid beneficiaries at Cheltenham (from at least January 1, 2016, to December 31, 2018), Wilmington Place (from at least January 1, 2017, to December 31, 2018) and Samaritan (from at least October 1, 2016, to December 31,

1

2018).  As a result, the Defendants caused or risked causing serious physical and emotional harm to their residents, who were elderly, disabled, and otherwise highly vulnerable.

3.      Cheltenham, Wilmington Place, and Samaritan each failed to maintain adequate staffing levels and repeatedly failed to follow infection control protocols.

4.      Furthermore, Cheltenham housed its residents in a filthy, pest-infested building, where there was a glaring absence of activities or stimulation and residents' personal items were often lost or stolen.  Cheltenham also gave its residents unnecessary drugs (including powerful antipsychotics and other psychotropic medications) and subjected its residents to mockery and abuse.

5.      In addition, Cheltenham repeatedly failed to provide its residents with needed psychiatric care.  For example, Cheltenham admitted one resident with a history of self-harm, who then slashed his wrists while in the facility's care.  The resident was hospitalized, physically recovered, and returned to Cheltenham—only for the nursing home to again ignore additional warning signs and fail to provide him with needed psychiatric services.  Tragically, mere weeks after being readmitted to the facility, the resident committed suicide by hanging himself from a bedsheet in one of Cheltenham's shower rooms.

6.      Wilmington Place and Samaritan had their own serious shortcomings as well.  For example, Wilmington Place had repeated failures relating to resident medications, including the provision of unnecessary drugs, and persistently failed to create and maintain crucial resident care plans and assessments.  For its part, Samaritan also had repeated failures related to resident care plans and assessments, as well as a building and grounds that often were not safe and sanitary.

7.     The Defendants provided this grossly substandard care despite Pennsylvania and Ohio repeatedly citing Cheltenham, Wilmington Place, and Samaritan for deficiencies in surveys conducted by the states' health departments.

8.     Yet the state survey findings hardly captured the full extent of the problems at the Defendant facilities.  The facilities often had some sense of when a survey could occur, which gave the facilities a chance to prepare for scrutiny.  State health inspectors also provided notice when they arrived, so facility staff knew when they needed to be on their best behavior.

9.     For example, on July 26, 2017, which was less than a week after Pennsylvania had completed a survey of the facility, one Cheltenham employee sent an internal email with the message: "Ain't nobody faker than a nursing home when state is in the building . . . #Factz." Another employee replied with a picture of a person laughing and the caption, "I'm dead," indicating that she thought this was so funny she had died laughing.

10.     The state survey findings were addressed to the administrator of each facility and conveyed to executives at AHF and AHF Management.  But the Defendants' knowledge of the nonexistent and grossly substandard care in their facilities was far more extensive than those documented deficiencies in the state surveys.  Facility staff internally reported problems up to facility managers, who in turn often alerted executives and key individuals at AHF and AHF Management.  In addition, AHF Management personnel periodically visited the facilities to perform their own inspections and relay the results to facility managers and AHF and AHF Management executives.  Finally, external nursing home consultants hired by AHF Management also visited the facilities and flagged various problems for the Defendants.

11.     Despite getting regular reports detailing the grossly substandard care provided at Cheltenham, Wilmington Place, and Samaritan, the Defendants were primarily focused on their

finances and not on improving care quality at the nursing homes.  AHF Management executives regularly implored facility managers to increase the number of residents (or "census") at the nursing homes, while also simultaneously cutting costs.  Meanwhile, although the facilities often had difficulty attracting staff due to lower salaries than their competitors, AHF had a substantial amount of funds in reserve.  In December 2017, for example, this reserve fund was worth about $16.5 million, and AHF planned to invest 70 percent, or about $11.55 million, in various securities.

12.     Ultimately, the Defendants knowingly submitted or caused the submission of false and fraudulent claims for nursing home care by (a) providing services that were either non-existent or grossly substandard and (b) consistently violating the standards of care set forth in the Nursing Home Reform Act and its implementing regulations, 42 U.S.C. §§ 1395i-3, 1396r *et seq.*; and 42 C.F.R. §§ 483.1-483.95.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

14.     AHF, AHF Management, and Cheltenham transacted business and committed acts proscribed by 31 U.S.C. § 3729 in this District.  Therefore, venue is proper in this district under 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c).

15.     Due to the date of the Defendants' false claims and the date those claims were paid by Medicare and Medicaid, the causes of action alleged in this Complaint are timely brought by being within the six-year statute of limitation periods set forth at 31 U.S.C. § 3731(b)(1) and 28 U.S.C. § 2415(a).

16.     The Department of Justice first obtained relevant documents and materials from the Defendants on October 11, 2019.  Therefore, all the United States' FCA allegations are also timely brought under 31 U.S.C. § 3731(b)(2) by being within three years of when material facts were known or reasonably should have been known by the Department of Justice official charged with enforcing the FCA.

**PARTIES**

17.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and one of its operating divisions, the Centers of Medicare & Medicaid Services ("CMS") for losses that the United States incurred under the Medicare and Medicaid programs.  During the relevant periods, the United States provided approximately 52 percent of the funds paid by Pennsylvania Medicaid to providers and approximately 62 percent of the funds paid by Ohio Medicaid.

18.     Defendant AHF is an Ohio nonprofit corporation that is located at 5920 Venture Drive, Suite 100, Dublin, Ohio 43017.  Through its wholly owned subsidiaries, AHF establishes, acquires, owns, supervises, monitors, and directs nursing homes in different states around the country.

19.     Defendant AHF Management Corporation is an Ohio nonprofit corporation that is located at 5920 Venture Drive, Suite 100, Dublin, Ohio 43017.  AHF Management is a wholly owned subsidiary of AHF with a common board of directors, executives, and officers.  AHF Management handles the day to day activities of AHF.  AHF Management also oversees and exerts financial control over the nursing homes owned by AHF, including the Defendant facilities.

20.     Defendant AHF Montgomery is an Ohio nonprofit corporation that is located at 5920 Venture Drive, Suite 100, Dublin, Ohio 43017.  AHF Montgomery is a wholly owned subsidiary of AHF with a common board of directors, executives, and officers.  AHF Montgomery does business as Cheltenham Nursing & Rehabilitation Center, a 255-bed nursing home facility located at 600 W Cheltenham Ave, Philadelphia, Pennsylvania.  A substantial majority of the revenue accrued by Cheltenham comes from Medicare or Medicaid, and a substantial majority of the residents at this facility are Medicare or Medicaid beneficiaries.

21.     Defendant AHF Ohio is an Ohio nonprofit corporation that is located at 5920 Venture Drive, Suite 100, Dublin, Ohio 43017.  AHF Ohio is a wholly owned subsidiary of AHF with a common board of directors, executives, and officers.  AHF Ohio does business as four nursing homes, including The Sanctuary at Wilmington Place and Samaritan Care Center and Villa.  The Sanctuary at Wilmington Place is a 63-bed nursing home facility located at 264 Wilmington Avenue, Dayton, Ohio 45420.  Samaritan Care Center and Villa is a 56-bed nursing home facility located at 806 E Washington Street, Medina, Ohio 44256.  A majority of the revenue accrued by these facilities is from Medicare or Medicaid, and a majority of the residents at these facilities are Medicare or Medicaid beneficiaries.

## THE FALSE CLAIMS ACT

22.     The False Claims Act ("FCA") establishes liability for knowingly making, submitting, or causing false or fraudulent claims for federal funds.  31 U.S.C. § 3729(a)(1)(A).

23.     Under the FCA, "knowingly" means that a person has actual knowledge that information is false, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1)(A).

24.     No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  31 U.S.C. § 3729(b)(1)(B).

25.     Courts have held that only "material" false claims are actionable under the FCA. The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

26.     The FCA provides for a recovery of three times the damages sustained by the United States, plus a civil penalty for each violation of the FCA.  31 U.S.C. § 3729(a)(1).

27.     The FCA states that a civil penalty for a violation is to be not less than $5,500 and not more than $11,000.  31 U.S.C. § 3729(a)(1).  These penalties, however, are to be adjusted in accordance with the inflation adjustment procedures set forth in Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101-410.  *See* 28 C.F.R. § 85.3(a)(9). For all FCA violations occurring after November 2, 2015, the minimum penalty is $12,537 and the maximum penalty is $25,076.

28.     The United States may bring an action under the FCA within 6 years of the violation or within 3 years of when material facts were known or reasonably should have been known by the Department of Justice official charged with enforcing the FCA, whichever occurs last.  31 U.S.C. § 3731(b).

**NURSING HOME REIMBURSEMENT UNDER MEDICARE AND MEDICAID**

29.     In order to participate in and receive payments under the Medicare and Medicaid programs, a nursing home must execute a Health Insurance Benefit Agreement, Form CMS-1561.  *See* 42 U.S.C. § 1395cc.  By doing so, a provider expressly agrees to conform with the applicable code of Federal Regulations within Title 42, which includes the standard of care

regulations that implement the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396r *et seq*. *See* 42 C.F.R. §§ 483.1-483.95.

30.     In order to bill Medicare electronically, providers must execute an Electronic Data Interchange Enrollment Form, in which they agree to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents, and to "submit claims that are accurate, complete, and truthful."

31.     The standard form for Medicare and Medicare claims submitted by nursing homes is the UB-04 or CMS-1450.  This form requires the submitting party to represent that the billing information on the claim form is true, accurate, and complete.  The submitting party further certifies that it "did not knowingly or recklessly disregard or misrepresent or conceal material facts."

32.     The Medicare and Medicaid programs use a prospective payment system to pay for a bundle of nursing home services that facilities provide to eligible residents.  This means that payments are based on a predetermined, fixed amount.

33.     To receive reimbursement from Medicare and Medicaid, facilities are required to complete and submit a Minimum Data Set ("MDS") form to CMS for all residents.  42 C.F.R. § 483.315.  Facilities are required to complete MDS assessments for all residents upon admission and then quarterly thereafter.  42 U.S.C. § 1395i-3(b)(3)(C)(i)(I); 42 U.S.C. § 1395i-3(b)(3)(C)(ii).  Facilities must also examine each resident once per quarter and revise the resident's MDS assessment accordingly.  42 U.S.C. § 1395i-3(b)(3)(C)(ii).

34.     In the MDS form, facilities have to provide CMS with an accurate and comprehensive assessment of each resident's functional capabilities, identify health problems, and formulate a resident's individual plan of care.

8

35.     Ultimately, the medical condition, nursing care needs, and other information provided in the MDS form determine the Medicare and Medicaid reimbursement rate for each resident.

36.     Facilities must certify that their submitted MDS information is accurate, timely, and collected in accordance with applicable Medicare and Medicaid requirements.  Facilities must also acknowledge that they understand that (a) the MDS information is used as a basis for reimbursement with federal funds, (b) their continued participation in Medicare and Medicaid is conditioned on the accuracy and truthfulness of the submitted information, and (c) the submission of false information can lead to substantial criminal, civil, or administrative penalties.

### MEDICARE AND MEDICAID REQUIREMENTS FOR NURSING HOMES

37.     The Medicare and Medicaid programs require nursing homes to comply with rules and regulations relating to standards of care.  *See* 42 C.F.R. § 483.1(b).

38.     These rules stem from the Nursing Home Reform Act ("NHRA"), 42 U.S.C. §§ 1395i-3, 1396r *et seq*.  The NHRA's implementing regulations are set forth at 42 C.F.R. §§ 483.1-483.95 and provide more clarity as well as additional requirements for nursing homes.

39.     The NHRA defines a nursing home or "nursing facility" as an institution that is primarily engaged in providing skilled nursing care and related services, rehabilitation services, or "health related care and services" to people who require care that is "available to them only through institutional facilities and is not primarily for the care and treatment of mental diseases." 42 U.S.C. § 1396r(a).

40.     During the relevant periods, each of the Defendant facilities fit this definition and was thus covered by the NHRA.

41.     Under the NHRA, nursing homes must comply with federal and state requirements relating to the provision of services, as well as applicable professional standards and principles.  42 U.S.C. § 1396r(b); 42 U.S.C. § 1396r(d)(4)(A).

42.     Specifically, a nursing home "must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."  42 U.S.C. § 1395i-3(b)(1)(A).

43.     Along these lines, a nursing home must provide nursing services and medically-related social services "to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."  42 U.S.C. §§ 1395i-3(b)(4)(A)(i) and (ii).

44.     Nursing homes must also provide pharmaceutical, dietary, and dental services sufficient "to meet the needs of each resident."  42 U.S.C. §§ 1395i-3(b)(4)(A)(iii), (iv), and (vi).  Thus, facilities must help residents make dental appointments and arrange for their transportation.  42 C.F.R. § 483.55(a)(4).  Facilities must also provide nourishing, palatable, and balanced diets that meet the individual needs of residents.  42 C.F.R. § 483.60(d).

45.     In addition, nursing homes must provide a professionally-directed activities program "designed to meet the interests and the physical, mental, and psychosocial well-being of each resident."  42 U.S.C. § 1395i-3(b)(4)(A)(v).

46.     For residents with mental disorders, facilities must provide "appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being."  42 C.F.R. § 483.40(b)(1); *see also* 42 U.S.C. § 1395i-3(b)(4)(A)(vii) (requiring facilities to provide treatment and services required by mentally ill residents that is not otherwise supplied by the state).

47.     In general, nursing homes must be administered in a way that uses resources effectively and efficiently to attain and maintain the highest practicable well-being for residents. 42 C.F.R. § 483.70.  This includes maintaining medical records that complete, accurate, accessible, and organized.  42 C.F.R. § 483.70(i)(1).

48.     Nursing homes are required to discern the needs of each resident through assessments.  Facilities must conduct a comprehensive, accurate, and standardized assessment of the resident that describes the resident's functional abilities and identifies medical problems.  42 U.S.C. § 1395i-3(b)(3)(A).  This assessment must be completed within two weeks of a resident's admission and then "promptly after a significant change in the resident's physical or mental condition."  42 U.S.C. §§ 1395i-3(b)(3)(C)(i)(I) and (II).  Even if there are no obvious significant changes to a resident's condition, the facility must still assess the resident at least once per year. 42 U.S.C. § 1395i-3(b)(3)(C)(i)(III).  In addition to the more comprehensive annual assessment, the facility must examine each resident once per quarter and revise the resident's assessment accordingly.  42 U.S.C. § 1395i-3(b)(3)(C)(ii).

49.     The NHRA further directs nursing homes to create a written care plan for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met."  42 U.S.C. § 1395i-3(b)(2)(A).  Within 48 hours of a resident's admission, the facility needs to develop a "baseline care plan" that includes the minimum information needed to properly care for the resident.  42 C.F.R. § 483.21(a)(1).  Then, once the facility has completed its initial comprehensive assessment, it must develop a corresponding comprehensive care plan that includes measurable objectives and timeframes for meeting the resident's needs, as well as the services that are to be furnished to attain or maintain the resident's highest practicable well-being.  42 C.F.R. §§ 483.21(b)(1)(i) and (2)(i).  The nursing

home must then follow the care plan and provide the relevant services and activities for each resident.  42 U.S.C. § 1395i-3(b)(2)(A).  These care plans must be periodically reviewed and revised each time a resident is assessed. 42 U.S.C. § 1395i-3(b)(2)(C).

50.     The services provided by a nursing home must "meet professional standards of quality" and be provided by qualified personnel.  42 U.S.C. §§ 1395i-3(b)(4)(A) and (b).  The implementing regulations set forth in more detail what this entails at 42 C.F.R. § 483.25.  Some of the quality of care standards are as follows:

- Skin integrity.  The facility must ensure that residents receive care to prevent pressure ulcers (also referred to as pressure sores or bed sores), unless they are clinically unavoidable, and receive treatment for existing pressure ulcers "to promote healing, prevent infection, and prevent new ulcers from developing."  42 C.F.R. § 483.25(b).

- Accidents.  Facilities must be "as free of accident hazards as possible" and each resident must receive "adequate supervision and assistance devices to prevent accidents," like falls.  42 C.F.R. § 483.25(d).

- Respiratory care.  Facilities must ensure that residents needing respiratory care, including tracheostomy care, receive the care consistent with professional standards of practice.  42 C.F.R. § 483.25(i).

- Pain management.  Facilities must ensure that "pain management is provided to residents who require such services, consistent with professional standards of practice."  42 C.F.R. § 483.25(k).

51.     A nursing home must provide 24-hour licensed nursing services "which is sufficient to meet the nursing needs of its residents," as well as "a registered professional nurse at least 8 consecutive hours a day, 7 days a week."  42 U.S.C. § 1395i-3(b)(4)(C)(i).  This means

having sufficient numbers of licensed nurses and other nursing personnel "to provide nursing care to all residents in accordance with resident care plans," along with ensuring that the licensed nurses "have the specific competencies and skill sets necessary to care for residents' needs.  42 C.F.R. §§ 483.35(a)(1) and (3).  In addition, nursing aides, which are individuals who provide nursing or related services without being registered or licensed, must be trained and have demonstrated their competency.  42 U.S.C. §§ 1395i-3(b)(5)(A), (C), and (F).

52.     Furthermore, the NHRA has specific provisions related to infection control.  The facility must have an infection control program "designed to provide a safe, sanitary, and comfortable environment" and "to help prevent the development and transmission of disease and infection."  42 U.S.C. § 1395i-3(d)(2)(A).  This includes having a system for identifying potential outbreaks and following precautions to prevent the spread of infection and disease, such as the proper handling and storage of linens.  42 C.F.R. §§ 483.80(a) and (e).

53.     Nursing homes must also provide pharmaceutical services, including prescription medications, to meet the needs of each resident.  42 C.F.R. § 483.45(a).  In addition, the drug regimen for nursing home residents "must be free from unnecessary drugs," which includes drugs used in excessive doses, for excessive durations, without adequate monitoring, without adequate indications, or with adverse consequences.  42 C.F.R. § 483.45(d).  Nursing homes must further ensure that its medication error rate is less than 5 percent and residents are not subjected to "any significant medication errors."  42 C.F.R. § 483.45(f).  Medications must be labeled with accurate and complete information and be stored safely.  *See* 42 C.F.R. §§ 483.45(g) and (h).

54.     Psychotropic drugs—including antipsychotic, antidepressant, antianxiety, and hypnotic medications—have additional requirements when used in nursing homes.  42 C.F.R. §§

13

483.45(c)(3) and (e).  Facilities must ensure that residents only receive psychotropic drugs when "the medication is necessary to treat a specific condition" that is diagnosed and documented.  42 C.F.R. § 483.45(e)(1).  And unless clinically contraindicated, residents who receive psychotropic drugs must also receive gradual dose reductions and behavioral interventions "in an effort to discontinue these drugs."  42 C.F.R. § 483.45(e)(2).

55.     To help nursing homes employ appropriate pharmaceutical processes and practices, facilities must hire or retain a licensed pharmacist to, among other tasks, consult "on all aspects of the provision of pharmacy services in the facility."  42 C.F.R. § 483.45(b)(1).  A licensed pharmacist must review each resident's drug regimen at least once a month and "report any irregularities to the attending physician and the facility's medical director and director of nursing."  42 C.F.R. § 483.45(c)(4).  The facility must then act upon any reports of irregularities, which can include the identification of drugs that are unnecessary due to an excessive dose, excessive duration, inadequate monitoring, inadequate indications for use, or adverse consequences.  42 C.F.R. §§ 483.45(c)(4)(i) and (d)(4).

56.     In addition to clinical care, nursing homes must provide necessary care for each resident's "whole emotional and mental well-being," which includes the prevention and treatment for mental health disorders and substance abuse issues.  42 C.F.R. § 483.40.  The facilities must have "sufficient staff" with "appropriate competencies and skills," including "caring for residents with mental and psychosocial disorders" as well as "implementing non-pharmacological interventions."  42 C.F.R. § 483.40(a).  Facilities must also ensure that residents who display or are diagnosed with mental health issues receive "appropriate treatment and services to correct the assessed problem or to attain the highest practicable mental and psychosocial well-being," and that other residents do "not display a pattern of decreased social

interaction and/or increased withdrawn, angry, or depressive behaviors," unless it is clinically inevitable. 42 C.F.R. § 483.40(b); *see also* 42 U.S.C. § 1395i-3(b)(4)(A)(vii) (requiring facilities to provide treatment and services required by mentally ill residents that is not otherwise supplied by the state).

57.     Relatedly, nursing homes with more than 120 beds must also have at least one full time qualified social worker. 42 U.S.C. §§ 1395i-3(b)(7). And all facilities "must provide medically-related social services to attain or maintain the highest practicable . . . well-being of each resident." 42 C.F.R. § 483.40(d).

58.     Along with its other provisions, the NHRA also confers various rights on nursing home residents. For instance, residents have the right to choose their doctor, be fully informed, and participate in their care or treatment. 42 U.S.C. § 1395i-3(c)(1)(A)(i); *see also* 42 C.F.R. §§ 483.10(c) and (d). Nursing homes must also immediately inform a resident, and (if appropriate) his or her representative, as well as consult with the resident's physician when the resident is hurt in an accident, undergoes a significant change in physical or mental condition, has a need for significantly altered treatment, or is to be transferred or discharged from the facility. 42 C.F.R. § 483.10(g)(14).

59.     Nursing home residents also have the right to be free from abuse, as well as physical or chemical restraints that are not required by medical symptoms and are instead imposed for discipline or convenience. 42 U.S.C. § 1395i-3(c)(1)(A)(ii). As the regulations further state, residents also have the right to be free of mental or verbal abuse, as well as "neglect, misappropriation of resident property, and exploitation." 42 C.F.R. § 483.12(a)(1). Facilities must develop and implement policies to prohibit, prevent, promptly report, thoroughly investigate, and address such misconduct. 42 C.F.R. §§ 483.12(b) and (c).

15

60.     Residents also have the right to a safe and orderly transfer and discharge from a nursing home.  42 U.S.C. § 1395i-3(c)(2)(C).  Per the implementing regulations, this right means the facility "must provide and document sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility."  42 C.F.R. § 483.15(c)(7).  The nursing home must also "ensure that the transfer or discharge is documented in the resident's medical record and appropriate information is communicated to the receiving health care institution or provider."   42 C.F.R. § 483.15(c)(2).  The receiving provider must receive, at a minimum, the resident's care plan goals, contact information for the resident's representative, and all other necessary information and documentation "to ensure a safe and effective transition of care."  42 C.F.R. § 483.15(c)(2)(iii).

61.     The implementing regulations explain that the NHRA also requires a nursing home to "treat each resident with respect and dignity" and to "care for each resident in a manner and in an environment that promotes the maintenance or enhancement of his or her quality of life."  42 C.F.R. § 483.10(a)(1).  Accordingly, residents also have the right "to retain and use personal possessions," as long as there is sufficient space and the possessions do not endanger other residents or interfere with their rights.  42 C.F.R. § 483.10(e)(2).  And when residents have grievances, they have the right to voice them freely and have the facility "make prompt efforts" to resolve their concerns.  42 C.F.R. §§ 483.10(j)(1) and (2).

62.     The NHRA regulations further state, "Quality of life is a fundamental principle that applies to all care and services provided to facility residents."  42 C.F.R. § 483.24. Therefore, nursing homes "must provide the necessary care and services to ensure that a resident's abilities in activities of daily living do not diminish" unless it is clinically unavoidable. 42 C.F.R. § 483.24(a).  If, however, a resident is unable to perform certain activities of daily

living, the facility must provide "the necessary services to maintain good nutrition, grooming, and personal and oral hygiene." 42 C.F.R. § 483.24(a)(1). In addition, the facility must provide activities, directed by a qualified professional, that are "designed to meet the interests" and support the well-being of each resident, "encouraging both independence and interaction in the community." 42 C.F.R. § 483.24(c).

63.     Finally, the NHRA and its implementing regulations set forth requirements for the nursing home building and physical environment. Under the NHRA, a nursing home must be "equipped and maintained to protect the health and safety of residents, personnel, and the general public." 42 U.S.C. § 1395i-3(d)(2)(B). The implementing regulations further state that facilities must provide an environment that is "safe, clean, and comfortable," which includes exercising "reasonable care for the protection of the resident's property from loss or theft." 42 C.F.R. §§ 483.10(i)(1) and (ii). Nursing homes must also provide maintenance and housekeeping services "necessary to maintain a sanitary, orderly, and comfortable interior," as well as bed and bath linens that are clean and in "good condition." 42 C.F.R. §§ 483.10(i)(2) and (3). Moreover, the facility must have functional equipment and maintain an effective pest control system. 42 C.F.R. §§ 483.90(d) and (i)(4).

## GOVERNMENT SURVEYS AND SANCTIONS

64.     Each state is responsible for certifying nursing homes' compliance with the NHRA. 42 U.S.C. § 1395i-3(g)(1)(A). States check compliance by conducting on-site surveys of each nursing home.   These surveys are conducted for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid. 42 C.F.R. § 483.1(b).

65.     The surveys are generally either "standard" surveys that are conducted roughly once a year for all facilities or "complaint" surveys in which the state investigates alleged problems at a nursing home.  *See* 42 U.S.C. § 1395i-3(g)(2)(A); 42 U.S.C. § 1395i-3(g)(4)(A); 42 C.F.R. § 488.332.  Facilities are not supposed to receive any notice of these surveys.  42 U.S.C. § 1395i-3(g)(2)(A)(i).  However, because the standard surveys are to be conducted at roughly annual intervals, facilities often have some sense of when a standard survey may happen. *See* 42 U.S.C. § 1395i-3(g)(2)(A)(iii).

66.     The standard surveys examine a sample of residents to check the quality of care furnished, review care plans, audit assessments, and determine whether resident rights have been violated.  42 U.S.C. § 1395i-3(g)(2)(A)(ii).

67.     If the surveys reveal noncompliance, then CMS or the state can apply one or more administrative remedies.  42 C.F.R. § 488.402.  These remedies include the termination of the nursing home's provider agreement, payment denials, and civil monetary penalties, among others.  42 C.F.R. § 488.406.

68.     For example, if a state finds that a nursing home has violated the NHRA and the care deficiencies pose an immediate jeopardy to the health and safety of residents, then the state or CMS must terminate the facility's provider agreement, appoint a temporary manager to remove the immediate jeopardy, or both.  42 U.S.C. § 1395i-3(h)(4); 42 C.F.R. § 488.408(e)(2)(i); 42 C.F.R. § 488.410(a).  "Immediate jeopardy" is a situation where the provider's noncompliance has caused, or is likely to cause, "serious injury, harm, impairment, or death to a resident."  42 C.F.R. § 488.301.

69.     In addition, if CMS or a state finds that a facility has widespread NHRA deficiencies that pose less than immediate jeopardy but more than minimal harm, or one or more

18

deficiency that constitutes "actual harm" but not immediate jeopardy, then CMS can deny all payments to the facility, deny payments for new admissions, or issue civil penalties.  42 U.S.C. §§ 1395i-3(h)(2)(a) and (b); 42 C.F.R. § 488.408(d).

70.     CMS also *must* deny payments for all new admissions if a nursing home is found to be noncompliant with one of the NHRA's requirements and still is not in substantial compliance with the NHRA three months later.  42 U.S.C. § 1395i-3(h)(2)(D); 42 C.F.R. § 488.412(c); 42 C.F.R. § 488.417(b)(1).   This repeated noncompliance is for any of the NHRA's facility requirements and need not be for the exact same deficiency.  42 U.S.C. § 1395i-3(h)(2)(D).  "Substantial compliance" means that any NHRA violations "pose no greater risk to resident health or safety than the potential for causing minimal harm."  42 C.F.R. § 488.301.

71.     Similarly, if a facility has not obtained substantial compliance by six months after the last date of the survey, then CMS must either terminate the facility's provider agreement with Medicare or discontinue Medicare and federal Medicaid payments to the facility.  42 C.F.R. § 488.450(d).

72.     Finally, if a nursing home is "found to have provided substandard quality of care" in three consecutive standard inspection surveys, CMS is obligated to deny payments for all new admissions until the facility satisfactorily demonstrates its compliance.  42 U.S.C. § 1395i-3(h)(2)(E); 42 C.F.R. § 488.414(a); 42 C.F.R. § 488.417(b)(1).  This repeated noncompliance is based on an overall assessment of care and does not mean that the exact same deficiencies were repeated.  42 C.F.R. § 488.414(b).  "Substandard quality of care" means one or more violations of identified NHRA requirements which constitute immediate jeopardy to resident health or safety, a pattern of or widespread actual harm that is not immediate jeopardy, or widespread potential for more than minimal harm.  42 C.F.R. § 483.301.

19

## STATEMENT OF FACTS

73.     By virtue of the conduct alleged below, the Defendants knowingly submitted, or

caused the submission of, false claims to Medicare and Medicaid for nursing home care and

services that were grossly substandard or non-existent.  The Medicare and Medicaid programs

provided reimbursement for these claims, but these payments were by mistake because CMS did

not know the true and full extent of the Defendants' grossly substandard or nonexistent care.

Finally, having obtained reimbursement for these grossly substandard or nonexistent nursing

home services, the Defendants were unjustly enriched for placing their residents at risk and

subjecting them to mental and physical harm.

## I.   AHF'S CORPORATE STRUCTURE

74.     All of the non-AHF Defendants are wholly owned AHF subsidiaries.  In addition

to owning the other Defendants, AHF also held an operating fund in reserve.  AHF invested a

substantial portion of this fund to increase its assets.  For example, in December 2017, this

reserve fund was worth approximately $16.5 million and AHF planned to invest 70 percent, or

about $11.55 million, in various securities.

75.     AHF Management is a wholly owned AHF subsidiary that was formed to provide

management and support to AHF's nursing homes, including the Defendant facilities.  AHF and

AHF Management share office space, a common board of directors, corporate officers, and key

employees.

76.     AHF Montgomery and AHF Ohio are likewise wholly owned AHF subsidiaries

that were formed to establish, maintain, and operate nursing homes.  AHF Montgomery does

business as Cheltenham, while AHF Ohio does business as Wilmington Place and Samaritan, as

well as two nursing homes that are not defendants in this case.

77.     From 2016 to 2018, at least, all of the Defendants shared corporate leadership and a common board of directors.

78.     AHF Management handled the day to day activities of AHF, including the management and support of AHF's nursing homes.

79.     AHF Management also paid for the expenses that came from AHF's corporate headquarters in Dublin, Ohio, including office space and salaries.

80.     From 2016 to 2018, at least, nearly all of AHF Management's revenue came from the management fees it received from AHF's nursing homes, including the Defendant facilities. These fees were based on agreements that AHF Management established with the affiliated entities. The management fee agreements were not arm's length transactions where both sides acted independently and in their own self-interest, because both parties were owned and controlled by AHF.

81.     Cheltenham also had to pay management fees to another wholly owned AHF subsidiary, AHF Home Office. AHF Home Office shared office space, a common board of directors, corporate officers, and key employees with AHF and AHF Management. AHF Home Office had no expenses during the period at issue, and its only revenue came from the management fees it received from Cheltenham. As with AHF Management, these fees were based on an agreement that AHF essentially reached with itself, because it owned and controlled both parties.

82.     Cheltenham paid about $3.75 million in management fees to AHF Management from 2016 to 2018. These fees were equal to six percent of Cheltenham's revenue. Cheltenham also paid $183,600 to AHF Home Office during the same period. The AHF Home Office fees stemmed from a $20 monthly charge applied to each of Cheltenham's 255 beds. In 2016 and

2018, the fees that Cheltenham paid to AHF Management and AHF Home Office vastly exceeded the facility's losses.  In other words, but for the fees AHF imposed on the nursing home, Cheltenham would not have suffered losses.

83.    Wilmington Place and Samaritan paid AHF Management about $700,000 and $400,000 (respectively) in management fees in 2017 and 2018.  These fees were equal to five percent of the revenue of each facility.

84.    AHF Management's income was almost entirely dependent on the revenue of the facilities it managed.  For example, in 2017, AHF Management increased its revenue by $286,288.  Of this amount, $253,441 came from management fees that had increased because AHF's nursing homes had earned higher revenues.

## II.  <u>KEY INDIVIDUALS</u>

85.    Mark Haemmerle served as the president/secretary of AHF, AHF Montgomery, and AHF Ohio during the relevant 2016-2018 period.  Haemmerle was also the treasurer/secretary of AHF Management, which paid his entire salary.  In its tax returns, AHF Management claimed that Haemmerle worked 40 hours per week for that entity and did not spend any time working for related organizations, like AHF or the other Defendants.

86.    Suzanne "Sue" Lehman was president of AHF Management during the relevant 2016-2018 period.  In this role, Lehman was in charge of AHF's operations and functioned as co-CEO with Mark Haemmerle.  Lehman oversaw all of AHF's nursing homes.  Her responsibilities included, but were not limited to, the quality of care provided at the facilities, budgetary issues, plans of correction when a state survey uncovered care deficiencies, hiring and firing decisions for key roles, contract negotiations, union negotiations, and employee relations and policies.

87.   Brad Towns was the vice president of operations at AHF Management from the start of the relevant period through roughly June 2017.  Towns primarily oversaw the day-to-day administration of Cheltenham and periodically visited the facility.

88.   Matthew "Matt" Lehman, Sue Lehman's son, was the vice president of operations at AHF Management from June 2017 through the rest of the relevant period.  Although Lehman technically filled Towns' position, he was largely uninvolved with Cheltenham.  Instead, Lehman primarily oversaw the day-to-day operations of AHF's Ohio facilities, such as Wilmington Place and Samaritan.  This oversight included reviewing facility staffing, therapies, and programs.   Lehman also provided oversight for staffing decisions, union negotiations, and contracts with vendors and payers.

89.   Christina Lukezic was a registered nurse who worked for AHF Management from September 2017 through the rest of the relevant period.  Lukezic primarily provided oversight and assistance regarding assessments, medical records, and other administrative functions to Wilmington Place, Samaritan, and AHF's other Ohio facilities.  Lukezic also periodically obtained comparative quality measure data for the Ohio facilities.

90.   Colleen Johnson was a registered nurse who worked for AHF Management as a consultant during the relevant 2016-2018 period.  Johnson provided clinical oversight and assistance to Cheltenham, Wilmington Place, Samaritan, and other AHF facilities.  For example, Johnson periodically visited the facilities and flagged problems that might form the basis of a deficiency finding in a state survey.  Johnson also provided oversight when facilities developed plans of correction to address the deficiencies identified by state surveys.

91.     Robert Murray was Cheltenham's administrator from the start of the relevant period until October 2018.   He was thus responsible for supervising Cheltenham's clinical and administrative operations as well as all its departments.

92.     Robert "Bobby" Mayo was Cheltenham's assistant administrator from the start of the relevant period until October 2018, at which point he succeeded Murray as the facility administrator.  In this role, Mayo helped Murray supervise Cheltenham's operations and departments.

93.     Annie Jacob was Cheltenham's director of nursing from the start of the relevant period until April 2017.  Eileen Roberts replaced Jacob and served as Cheltenham's acting director of nursing from April 2017 to September 2017.  Mary Klinger succeeded Roberts and was Cheltenham's director of nursing from September 2017 through the end of the relevant period.  As directors of nursing, their responsibilities included, but were not limited to, overseeing and leading Cheltenham's nursing department, monitoring the nursing care providing, and ensuring that the facility's nursing practices complied with legal and regulatory standards.

94.     Richard "Rick" Cordonnier was Wilmington Place's administrator from the start of the relevant period until about June 2017.  Vicki Hickman replaced Cordonnier, but only served until October 2017.  Jeffrey Weiner succeeded Hickman as Wilmington Place's administrator in October 2017 and served through the end of the relevant period.  As facility administrators, these individuals were responsible for supervising the facility's clinical and administrative operations and overseeing all its departments.

95.     In 2017 and 2018, E.J. Boggs, Rhonda Holmes, and Janice Collins each held the position of administrator at Samaritan. They were responsible for supervising the facility's clinical and administrative operations and overseeing all its departments.

III. **AHF'S CONTROL AND OVERSIGHT OVER ITS FACILITIES**

96.     AHF, acting through AHF Management, exerted extensive control over the Defendant facilities.  For example, throughout the relevant period, AHF Management made budgetary decisions, picked facility leadership, certified financial statements, maintained possession of facility financial records, signed tax returns, established care policies and protocols, set compensation rates, oversaw union negotiations, and approved plans of correction for care deficiencies.  Facility staff even had to get approval from AHF Management to attend educational seminars.

97.     A July 16, 2018, email exchange between Matt Lehman, AHF's Management's vice president of operations, and Wilmington Place's human resources manager aptly demonstrated AHF's control.  The human resources manager had been helping Samaritan for the past few months and offered to go to the facility to provide further assistance because Samaritan was in its "survey window" (meaning the period where Ohio was likely to conduct an annual survey), but Lehman denied the offer because he felt "it is time they figure it out on their own." In addition, the Wilmington Place manager reported that she had been asked about possible wage increases for dietary and housekeeping staff at Wilmington Place, many of whom were only paid $9 and $9.50 an hour.  Lehmann responded, "We will review rates at some point, but financials need to improve before we can do anything more right now."

98.     AHF Management also had final approval over the types of residents the Defendant facilities could admit and the types of services the facilities could provide.  For example, in January 2018, Robert Murray, the administrator at Cheltenham, asked Lehman to allow the facility to accept residents with tracheostomies or dialysis needs.  Lehman responded, "It does no good to increase census with residents that will cost us more than the

reimbursement."   Similarly, in August 2018, Murray sought permission from Sue Lehman and Matt Lehman for Cheltenham to provide on-site dialysis services.

99.     AHF Management likewise had final approval over facility capital expenditures. For example, when Cheltenham wanted to paint its lobby in 2016, it had to get permission from AHF Management.  AHF Management also provided substantial input on which colors to use. Similarly, when Rhonda Holmes asked Matt Lehman in March 2018 if she could order business cards for Samaritan employees, Lehman told her, "Send the name of the person and position and I will get the cards ordered.  We are trying to limit cards to just the Admin, DON, and Admissions."

100.    In addition, AHF Management had final approval over the budgets at the Defendant facilities.  AHF Management required facilities to prepare budget proposals for review.  If AHF Management considered the initial proposal to be unsatisfactory, then it required facility managers to come to the AHF Management office in person to complete the budget under AHF Management's supervision.

101.    Notwithstanding their control over the Defendant facilities, AHF and AHF Management permitted these facilities to continually provide nonexistent or grossly substandard care without significant remedial actions or consequences.  As alleged in more detail below, AHF, acting through AHF Management, was routinely alerted to serious problems at the Defendant facilities throughout the relevant period.  Yet AHF Management's primary action to bolster resident care was simply to dispatch Colleen Johnson, a clinical nursing consultant, to the facilities to identify and fix care deficiencies.  AHF Management knew, however, that these visits often did not lead to improved resident care.  Johnson herself admitted in an email to Sue Lehman dated March 24, 2017, that most facility staff "don't take me as a serious threat."

Moreover, as alleged below, AHF and AHF Management knew that care deficiencies at the Defendant facilities—whether identified by Johnson, other consultants, facility staff, or state health inspectors—often lingered for months, if not years.

102.    Beyond their inaction, AHF and AHF Management repeatedly exhorted the Defendant facilities to do more with less by cutting costs while admitting more residents.  For example, when a consultant reviewed the compensation of AHF and AHF Management executives to ensure their salaries were within industry norms, evidence of Matt Lehman's value to the company included that he had helped to implement policies that increased facility occupancy rates and decreased nursing care hours "to levels that contain staffing costs."   Yet, as alleged in more detail below, the Defendant facilities were often understaffed and struggling to provide adequate care to their existing residents, which itself stemmed in large part from AHF Management setting wages at the facilities that were below the market rate.

103.    Moreover, the financial struggles at the Defendant facilities were often caused or exacerbated by the policies and management fees that AHF Management unilaterally imposed on the facilities.  For example, on January 26, 2017, Murray noted in an email to Brad Towns that Cheltenham facility would have been close to the budget that AHF Management had set, "[i]f not for financing issues and management fees."  Indeed, it did not have to pay management fees to AHF Management (and AHF Home Office), Cheltenham would not have suffered losses in 2016 and 2018.

104.    The grossly substandard care provided by the Defendant facilities was thus a natural consequence of this corporate environment that AHF and AHF Management created.

## IV. <u>CHELTENHAM NURSING AND REHABILITATION CENTER</u>

105.    From 2016 through at least 2018, Cheltenham Nursing and Rehabilitation Center provided its residents with grossly substandard care in a building that was regularly filthy, pest ridden, and foul smelling.  Cheltenham residents were often deprived of their dignity by the facility's failure to safeguard their personal items or address their concerns.  In addition, Cheltenham also had repeated problems with staffing, medications, and mental health care.

106.    Meanwhile, during this period AHF and AHF Management were typically more focused on Cheltenham's financial health than the actual health of Cheltenham's residents.

107.    For 2016 to 2018, Cheltenham paid AHF Management and AHF Home Office a combined $3.55 million in management fees, even though the facility was suffering losses in those years that totaled about $2.5 million.

108.    AHF Management and AHF Home Office had no such financial difficulties, as they accrued about $4 million in excess revenue during the same period.  AHF also possessed an operating reserve fund that was worth $16.5 million in December 2017.  Yet rather than reduce or restructure their management fees, AHF Management regularly pressed Cheltenham's facility management to cut costs and simultaneously increase the number of residents in the building (commonly referred to as the building's "census").  AHF Management even required Cheltenham to submit a bi-weekly payroll report to monitor the facility's costs.  Yet, as alleged in more detail below, even without a higher census, Cheltenham had struggled for years to field sufficient staff and provide adequate care for its residents.

109.    For example, in an email sent on March 1, 2018, Sue Lehman told Robert Murray, Cheltenham's administrator, that cutting expenses needed to be "an immediate priority, you do not have the luxury of taking time to [look] into this."  In another email from later in March

2018, Lehman characterized the facility's nursing budget as "deplorable" and directed Murray to reduce staffing expenses.  In April 2018, Lehman further instructed Murray that Cheltenham's resident census "needed" to average 234 to hit the facility's financial targets.

110.    On October 9, 2018, Lehman told Murray and other Cheltenham managers that the facility's census was still too low.  Lehman wrote, "I question if there is any sense of urgency with census . . . while we are in the 'people' business, it is still a business and needs to operate as such."

111.    In the same email, Lehman directed Murray to "tighten up and hold people accountable – no excuses, no exceptions," and to enact "a very aggressive plan starting immediately" to increase Cheltenham's census.  Lehman further instructed that this plan needed to be "reviewed <u>daily</u> along with total census, admissions and discharges emailed to me . . . so that I know you are least looking at the numbers timely."  In response, Bobby Mayo, Cheltenham's assistant administrator, reassured Lehman that the facility's census was its "number one priority and that is our main focus."

112.    In addition to pushing for a higher census, AHF Management also urged Cheltenham to admit residents in worse condition who accordingly required more extensive, and thus expensive, care.  AHF Management did so because residents requiring more care can boost a facility's case mix index, or "CMI."  CMI is the numeric score that reflects the relative resources predicted to be necessary to provide care for residents, and a higher CMI generally leads to higher reimbursements from Medicare and Medicaid.  For example, on November 16, 2017, an AHF Management employee advised Murray that Cheltenham could increase its reimbursement rate for Medicaid if it admitted fewer "Walkie Talkie" patients—meaning

patients who could walk and talk—and thus improved its case mix by increasing the proportion of residents whose care needs were more extensive.

113.    Similarly, on March 13, 2018, Murray sent an email to Lehman and another AHF Management employee in which he reported reduced reimbursement rates.  Lehman responded, "This is going to result in significant decrease in revenues so need an action plan to address," and that Cheltenham needed "to look into case mix."  Lehman further instructed Murray and Mary Klinger, then the director of nursing at Cheltenham, to meet with an outside consultant as soon as possible to address this issue and to let Lehman know when the meeting was scheduled.

114.    On May 4, 2018, an AHF Management employee again emailed Murray, with Sue Lehman copied, about the importance of Cheltenham's case mix index in the context of its Medicaid reimbursement rate, stating "Every .01 [in the case mix index] is $1.41 – that is significant."  Murray responded, "I think CMI will go up eventually . . . we're taking on more complex residents."

115.    And on June 19, 2018, an AHF Management employee emailed Lehman that Cheltenham's latest financial results would have Mark Haemmerle, AHF's president, "bouncing off the ceiling."  Lehman forwarded this message to Murray.  In response, Murray noted that although Cheltenham's census was "not where we want to it be," the facility was "taking on more complex cases" in an effort to boost its CMI.

116.    All this time, and as alleged in more detail below, AHF Management knew that Cheltenham had been providing its residents with grossly substandard care.  Yet AHF Management exhibited far less urgency regarding the quality of care provided to Cheltenham residents than it did for the facility's finances.

117.    Indeed, AHF's financial focus adversely affected resident care at Cheltenham. For example, in November 2016, the facility submitted a proposal to AHF Management to dually certify all the resident beds at Cheltenham for Medicare and Medicaid coverage.  At the time, Cheltenham had only 60 beds certified for Medicare beneficiaries.

118.    In a memo submitted to Lehman and Brad Towns, Murray sought approval for this dual certification because the limited number of Medicare beds meant that Medicare beneficiaries were only located on the facility's fourth floor and had to be moved once they transitioned off Medicare at the end of their benefit period.[1]  This was of particular concern for Cheltenham residents who were readmitted to the facility after a hospital stay, because the limited amount of Medicare beds often caused these residents to move from their original room to a Medicare room, and then move again from a Medicare room when they transitioned to a different type of insurance.

119.    As Murray explained, every room change involved "the packing up and moving of the residents' belongings" which often led to missing items as well as "great confusion" for residents, family, and staff.  Murray further noted that the room changes kept nursing aides away from "actual direct care" and disturbed "continuity of care."  Furthermore, Murray noted, "Residents with memory issues look for familiar faces and surroundings, and these are all disturbed when they must return to a different unit due to certified bed status.  They are already battling hospital disorientation; and when they are stable and ready to return to previous levels of care, they are disrupted with re-orientation to nursing, activities, [and] sounds."

---

[1] Medicare Part A (hospital coverage) covers nursing home care for a limited period in certain circumstances.  If the relevant conditions are met, Medicare fully covers the first 20 days of a nursing home stay.  Medicare also partially covers days 21-100, with the resident being responsible for the remainder of the cost.

120.    Murray concluded that Cheltenham "can do better than this for our residents, and they deserve it."

121.    However, Lehman responded that AHF Management would deny Cheltenham's request for dual certification, because it was easier and more efficient to have just one unit of Medicare beds.

122.    When Murray forwarded this response to other Cheltenham managers, he observed, "If you look at my proposal and Sue's response, you will notice that her response is all about cost and my proposal is all about customer's needs."  Annie Jacob, then the facility's director of nursing, further commented, "I can assure you, we can better serve our residents and they will be happy in their bed without moving to [an]other environment with strange faces."

123.    This issue arose again in April 2018, when Lehman informed Murray, Bobby Mayo, and Mary Klinger that she was now reconsidering AHF Management's position.  Klinger responded that dual certification "would be a great idea for the residents" because "they could return to their room instead of having to be placed on the 4th floor!"  Klinger further noted that being hospitalized was already hard on residents, and then they would "return to the facility to be placed on a different floor for reimbursement reasons and then to be changed again [once] they are cut from insurance.  I am sure you are all aware of how difficult change is for the residents." In a separate email to Klinger and Mayo, Murray just commented, "Lordy, lordy."

124.    Another example of finances outweighing resident care was Cheltenham's continued use of its medical director, Dr. Jerry Cohen.  Cheltenham retained Dr. Cohen because he was affiliated with a large nearby hospital and was believed to be able to assist with increasing the nursing home's census by obtaining more resident referrals.

125.    However, Dr. Cohen's actual performance as a physician was problematic.  He also tried to prevent residents from dropping his services and seeing a different physician.

126.    For example, in September 2018, Mary Klinger, the director of nursing at that time, complained to Murray and Bobby Mayo that Dr. Cohen did "his best to drive other doctors from the building and feels that he should get all the referrals," even though in the past year he had "really done nothing positive for the building . . . or our residents."

127.    For their part, Cheltenham's managers and staff allowed problems to linger, recur, and worsen with little accountability.  This led Colleen Johnson to comment to Sue Lehman in a March 13, 2017, email that Cheltenham was supposed to be a "serious business and not "a 'relief station' for employees."  On July 5, 2017, Johnson also wrote to Lehman that the "management style at Cheltenham" was troubling, as there continued to be "no sense of urgency."  Finally, in an August 14, 2018, email to Sue Lehman and Matt Lehman, Johnson observed, "What is it with [the] lack of resident safety here . . . they don't care about the residents [sic] needs."

128.    Cheltenham also tended to address concerns when pressed by state health inspectors or AHF Management, only to backslide when the facility was no longer under scrutiny.  For example, on July 26, 2017, which was less than a week after Pennsylvania had completed a survey of the facility, one Cheltenham employee sent an internal email with the message:  "Ain't nobody faker than a nursing home when state is in the building . . . #Factz."  Another employee replied, and copied Murray and Mayo on her email, with a picture of person laughing that had the caption, "I'm dead," indicating that she thought this was so funny she had died laughing.

A.     **Basic Resident Care**

129.     Cheltenham provided its residents with grossly substandard care.  In addition to general care deficiencies, the facility had recurring and substantial problems with infection control, pressure ulcers, and falls.

i.     **General Care Deficiencies**

130.     In a survey completed on February 5, 2016, Pennsylvania health inspectors observed that Cheltenham failed to ensure that its residents received ordered or recommended dental services.  Likewise, the facility also failed to follow physician orders for some of its residents.  For example, an ophthalmologist recommended that a resident have a cataract removed on November 9, 2015, but nearly three months later the facility still had not obtained clearance for the surgery from the resident's responsible party.

131.     In April 2016, Cheltenham had to remind its staff that leaving residents unattended in a common area was a safety risk.

132.     On October 4, 2016, Annie Jacob, then Cheltenham's director of nursing, informed Colleen Johnson and Robert Murray that a resident had been neglected.  A nursing aide did not feed the resident breakfast or lunch and "it was found out that [the] resident was not even changed as her brief and bed line[n] was soaked in urine."

133.     Johnson visited Cheltenham in early November 2016.  She found so many serious problems that on November 18, 2016, she informed Sue Lehman, Brad Towns, Murray, and other facility managers that "training and counseling alone will not keep us in compliance."

134.     For example, Johnson found that Cheltenham was not administering residents' insulin correctly.  Residents receiving insulin in the morning were supposed to be fed within 15 minutes, but often did not receive breakfast for at least 60-90 minutes.  When one resident did

not receive breakfast for over two hours, his blood sugar dropped to dangerous levels and he required an emergency injection.

135.    Johnson further observed that residents were receiving wrong nutritional supplements that could cause them harm.  One resident—who was on a physician ordered fluid restriction—had on her bedside table two large glasses of water, one large glass partially full of soda, the rest of the soda in a can, a health milkshake (labeled for a different resident who needed help with weight loss), and a "container of nectar thick liquid" (also labeled for a yet another resident and without a valid, current order for the supplement).  Cheltenham staff did not know why the supplements and extra liquids had been provided to the resident on a liquid restriction, nor why they had been left there for two days.   This same resident on a fluid restriction was also served "several liquids" with her regular meals.

136.    An outside consultant conducted a mock state health department survey in December 2016.   Among other deficiencies, the mock survey found that Cheltenham had many resident assessments that were either not completed at all, only partially completed, or had wrong information.  On December 12, 2016, the consultant shared her findings with Towns, Johnson, Murray, and Jacob.

137.    On January 17, 2017, Jacob informed Murray that nursing aides were not giving showers to residents who lived in one wing of the facility.

138.    Colleen Johnson returned to Cheltenham at the end of January 2017 and again found numerous care deficiencies. For example, there was no evidence that care conferences were set up for high risk or high concern residents relating to "wound development, weight loss and behavior management."

139.   Johnson also observed that some residents were not receiving their necessary diet supplements or the snacks needed to help them meet their nutritional needs.

140.   Another resident complained about sitting in her own urine on February 22, 2017. This resident was a new admission who told the social services director that "she was sitting in her own urine all night until this morning" and that she had tried using her call bell but no one answered.  A staff member later told Murray that the social services director was "being a pain in the . . . ***" regarding this incident.

141.   Pennsylvania health inspectors returned to Cheltenham and found multiple health deficiencies in a survey completed on March 8, 2017.  For example, even though an outside consultant had flagged this issue only a few months earlier, the facility still failed to have accurate assessments and comprehensive care plans for all of its residents.

142.   In addition, Cheltenham failed to follow physician orders for medication administration, the provision of oxygen, wound dressings, cardiac monitoring, and dialysis. Moreover, the facility was found to have failed to adequately monitor two residents with significant and undesired weight loss.

143.   On March 8, 2017, Sue Lehman, Towns, and Johnson received an informal summary of the survey findings from Jacob.  Lehman forwarded this summary to Matt Lehman and commented, "We got slammed at Cheltenham."  Sue Lehman later had final approval of the language the facility used in its resulting plan of correction.

144.   The Pennsylvania Department of Health ultimately imposed a civil monetary penalty of $13,005 on Cheltenham as a result of this survey.  When Robert Murray informed Sue Lehman and Colleen Johnson about this penalty, he commented that "they finally caught up with us."

36

145.    Following the survey, Lehman emailed Towns, Johnson, and Murray that there was "no denying there are some serious operational deficits."  Lehman also emailed Johnson that Cheltenham deserved "a wake up call and they need to step it up!"

146.    Pennsylvania health inspectors returned to Cheltenham in July and again found numerous care deficiencies in a survey completed on July 20, 2017.  For example, the facility had restrained a resident's wrists without any documentation to indicate the this was necessary or to show that the staff had tried alternative interventions before applying the physical restraints.

147.    Cheltenham was also found to have failed to adequately monitor residents at risk for unwanted weight changes, provide needed dental services in a timely manner, provide appropriate rehab services, thoroughly investigate a resident's allegation of neglect, and develop and implement comprehensive care plans.

148.    On or around August 21, 2017, a local dialysis center complained to Cheltenham that it had been sending a resident to dialysis with inadequate or empty oxygen tanks.  The dialysis center further noted that it had supplied the resident with one of their tanks on three different occasions, but Cheltenham never returned the tanks.  These complaints were conveyed to Robert Murray, Eileen Roberts (the new director of nursing), and other Cheltenham managers.

149.    Murray learned that protective services had contacted Cheltenham on September 25, 2017, because a resident had long and dirty fingernails, generally looked unkempt, and there were concerns relating to pain management and the resident's wounds.

150.    On the same day, Murray was also informed that another resident's family member came to pick him up, only to find that the resident was "not dressed appropriately" and smelled.  In addition, there was so much urine in the resident's wheelchair that it had to be dumped out before he could sit in it.

151.    There were also regular allegations of abuse against Cheltenham's staff.  On February 9, 2018, Colleen Johnson reported to Sue Lehman that she had reviewed one abuse allegation and the facility had started investigating another allegation.  In response, Lehman wrote, "OH [sic] geez . . . it never ends there."  Johnson replied that one of the facility's managers was "getting good" at writing abuse allegation reports, because such allegations were common.

152.    On or around March 16, 2018, a Cheltenham staff member left a confused resident on a different floor without any supervision.  As a manager emailed Robert Murray, this could have left the resident "permanently injured or worse."

153.    A resident's family member complained on July 16, 2018, that the resident had a new pressure ulcer, that there was no supervision from nursing on the weekends, and that "NO ONE KNOWS WHAT THEY ARE DOING AND NO ONE CARES TO HELP."

154.    On October 19, 2018, a resident was put in bed using a ripped sling and fell, sustaining an injury.  After this incident, the ripped sling went missing and staff failed to record or report the incident.  Murray emailed internally that this was "[n]ot a good look."

155.    Pennsylvania health inspectors found continued care problems in a survey completed on November 6, 2018.  For example, the facility failed to transfer a resident to the hospital in a timely manner, despite transfer requests from the resident (who was cognitively intact), as well as family and friends.

156.    Cheltenham also failed to develop individualized care plans that addressed one resident's urinary incontinence and another resident's refusal of dental care.  In addition, the facility left a resident, who was totally dependent on staff for all activities of daily living, to lie in bed all day.

157.    Finally, the facility continued to have problems following physician orders.  For instance, a dentist diagnosed a Cheltenham resident with tooth abscesses and severe gum disease and recommended a course of treatment.  But the state health inspectors found that Cheltenham failed to follow up with the dentist after this diagnosis and ultimately failed to provide the recommended treatment.  The facility also had failed to follow a physician's order to administer insulin to a different, diabetic resident.

ii.    **Infection Control**

158.    In a survey completed on February 5, 2016, Pennsylvania health inspectors cited Cheltenham for failing to follow proper infection control protocols during wound treatments. The facility failed to safely dispose of bloody or otherwise soiled dressings by putting them in the proper hazardous waste receptacle.  In addition, the facility had a biohazard bin that was open, as well was open, unlined, or overflowing trash cans.  For example, a "trash bin inside the biohazard room was overfilled with soiled linens and was open to air," while the room itself had an odor that "unacceptable" and "repugnant."

159.    On November 18, 2016, Colleen Johnson informed Sue Lehman, Brad Towns, Robert Murray, and Annie Jacob that Cheltenham staff were not following proper hand hygiene protocols in the kitchen.

160.    An outside consultant similarly informed Johnson, Towns, Murray, and Jacob on December 12, 2016, that there was "no hand hygiene" as a nurse went from one resident to the next during morning medication administration.

161.    On January 18, 2017, Jacob informed Murray and Bobby Mayo that the housekeeping department did not have bleach wipes for wiping commonly touched surfaces.

This was a problem, as the facility had "just got control" of flu and pneumonia outbreaks. Jacob wrote that she was "upset because there is no follow up, including my nursing department."

162.    The same day, a Cheltenham nurse focused on infection control informed Jacob, Murray, and Mayo that she had witnessed several instances where supervisors "watched staff breach infection control knowingly."

163.    Several Cheltenham residents in one hallway developed diarrhea on or around June 16, 2017. In an email sent the same day, Eileen Roberts, Jacob's successors as the director of nursing, commented that the staff had "a lot of misunderstanding . . . regarding transmission based precautions . . . It is becoming quite problematic."

164.    In September 2017, Colleen Johnson informed Murray and Mary Klinger, who had replaced Roberts as the director of nursing, that the facility needed to place an advertisement for an infection control nurse. Johnson noted that this was "a critical position and we have to have someone for that large facility." Yet the position had been vacant for months and would continue to go unfilled.

165.    In an email sent to Johnson and Murray on November 16, 2017, Klinger reported that wound care at the facility was "very disturbing." According to Klinger, the wound care nurse practitioner was removing wound dressings, measuring the wound, and then "putting the same dirty dressing back on!!!" Klinger noted that this conduct was an infection control breach and observed that the nurse practitioner's immediate supervisor did not seem concerned.

      **iii.**      **Pressure Ulcers**

166.    In a survey completed on February 5, 2016, Pennsylvania health inspectors determined that the facility failed to implement proper interventions for pressure ulcers. One resident developed a pressure ulcer on or around October 29, 2015. This wound grew

exponentially over the next three months, in part due to the facility's grossly substandard care. For example, Cheltenham failed to apply a pressure relieving mattress to the resident's bed, as ordered by a physician.  In addition, when the health inspectors visited the facility in February 2016, they found that the resident's low air loss mattress had been turned off—wrongly—for an undetermined length of time.  One Cheltenham employee stated, "Someone giving care never put [the mattress] back on.  I don't know how long it has been off."  A different employee observed that the resident's family wanted her out of bed months ago, and since then moisture in her sacral area had turned into a pressure ulcer.

167.    In December 2016, Cheltenham managers and staff also contributed to a different performance improvement exercise regarding pressure ulcers at the facility.  Among the findings were that high risk residents were not always turned and repositioned as often as they should be, that residents were not consistently provided the correct amount of food and liquid, that staff were not consistently following residents' care plans, and that needed linens and pillows were not always available.  In addition, Cheltenham's risk assessments for pressure ulcers were "not completed on a timely basis and lack[ed] accuracy."  This information was conveyed to Brad Towns, Colleen Johnson, Robert Murray, and Annie Jacob on December 11, 2016.

168.    On February 16, 2017, a resident's representative submitted a complaint to Jacob, who forwarded it to Johnson and Murray on the same day.  The resident's representative wrote that the resident had "been neglected again in your facility."  The resident had been admitted to the hospital staff with pressure ulcers and his representative "was told by [hospital] staff that this is from sitting in his own urine for too long."  The representative further noted that even though he had requested that the resident not be sedated, and the resident's VA hospital also directed Cheltenham to lower his sedatives, the facility had "medically restrained" the resident by putting

41

him on three different sedatives. The representative asserted that this was "unacceptable," as "all your doctors keep doing is drugging him" and the resident's condition had only declined in Cheltenham's care.

169.    Eileen Roberts sent a different performance improvement form related to pressure ulcers to Johnson, Murray, and Mayo on or around June 23, 2017.   The form indicated that Cheltenham had noticed a rash "of new pressure ulcers and lack of progress on community acquired pressure ulcers."  This problem stemmed from communications breakdowns, a lack of documentation, staffing issues, and a lack of skill, knowledge, and competency.  Barriers to fixing these problems included the staff's reluctance to learn, a lack of training, and scant orientation.

170.    In June 2019, an outside consultant found that Cheltenham's performance improvement plans for wounds, including pressure ulcers, were just "paper compliance" and not used to achieve genuine improvement.  Residents were also not put on individualized turning and repositioning schedules.  Cheltenham also was not identifying root causes for pressure ulcers. Finally, there was no evidence that Cheltenham was reviewing the performance improvement plan for wounds and submitting meeting notes to the corporate office.  The consultant shared this report with Bobby Mayo, Mary Klinger, Sue Lehman, Matt Lehman, and Colleen Johnson.

     **iv.**        **Falls**

171.    On November 18, 2016, Colleen Johnson reported to Sue Lehman, Brad Towns, Robert Murray, and Annie Jacob that Cheltenham did not always find the possible cause of a resident's fall.  This information would allow the facility to implement an appropriate intervention.

172.    Later that month, on November 28, 2016, Jacob told Johnson that a resident had fallen and fractured her femur.  The facility was already supposed to be providing one-to-one supervision and care for this resident because she had bruises with an unknown origin.  However, the nurse assigned to this resident claimed that "he did not know this resident was on 1:1."

173.    This caused Jacob to write to Johnson that there was "[a]bsolutely something wrong with nursing.  They [are] all in la la land or day dreaming."

174.    In December 2016, Cheltenham managers and staff contributed to a performance improvement form that recognized the facility had a problem with an increased number of falls each month during staff shift changes.  Among the causes of this problem, and barriers to fixing it, were facility staff not identifying residents at high risks for falls and not implementing individualized interventions.  In addition, Cheltenham was "not prepared for new admissions," who were "not identified and treated as fall risk at admission."  This information was provided to Towns, Johnson, Murray, and Jacob on December 11, 2016.

175.    In June 2019, an outside consultant found that Cheltenham's performance improvement plans for falls and wounds were just "paper compliance" and not used to achieve genuine improvement.  The facility had last reviewed the falls plan in January 2017 and had not been submitting its related meeting notes to AHF Management as required.  Likewise, there was no evidence that Cheltenham was reviewing the performance improvement plan for wounds and submitting meeting notes to the corporate office.  The consultant shared this report with Bobby Mayo, Mary Klinger, Sue Lehman, Matt Lehman, and Colleen Johnson.

176.    Numerous Cheltenham residents suffered from repeated falls.  At a minimum, these repeated falls demonstrated a care deficiency related to the NHRA's requirement that

facilities be "as free of accident hazards as possible" and each resident must receive "adequate supervisions and assistance devices to prevent accidents." 42 C.F.R. § 483.25(d). Cheltenham also failed to ensure that these residents had a drug regimen that was free from unnecessary drugs, as some of the residents received medications that can cause falls. 42 C.F.R. § 483.45(d).

336. For example, MC, a Medicare and Medicaid beneficiary, was admitted to the facility in 2017. MC suffered three falls in four days on December 4-7, 2017. MC also fell three times in six days on February 5-11, 2018. In addition, Omnicare—a national pharmacy that specializes in providing services to numerous homes and served as Cheltenham's consultant pharmacist for much of the relevant period—cautioned Cheltenham in monthly reports for May 2017, August 2017, December 2017, January 2018, and February 2018 that MC was receiving medications that may have contributed to a recent fall.

177. WJ, another Medicare and Medicaid beneficiary, suffered seven falls in fourth months. WJ reported on June 5, 2018, that he had fallen two days ago. He also suffered falls on July 3, 2018, and July 10, 2018. He then fell and was found on the floor on August 2, 2018; August 10, 2018; and August 21, 2018. WJ also suffered a fall on September 27, 2018, when he was found lying next to his wheelchair.

178. CC, a Medicaid beneficiary, fell nine times in a twelve month period. Specifically, she suffered falls on December 18, 2017; February 6, 2018; February 17, 2018; March 30, 2018; March 31, 2018; April 21, 2018; July 18, 2018; November 23, 2018; and December 25, 2018. When she fell on February 17, 2018; CC was found on the floor calling for help. Notably, Omnicare cautioned Cheltenham in monthly reports for November 2017, February 2018, and April 2018 that CC was receiving medications that may have contributed to a recent fall.

44

179.     RF, a Medicaid beneficiary, suffered three falls in three days on November 7-9, 2018.  She also suffered five other falls in 2018 on February 4, 2018; April 4, 2018; June 9, 2018; June 26, 2018; October 29, 2018.  Omnicare informed Cheltenham in monthly reports for September 2016, November 2016, and July 2017 that RF was receiving medications that may have contributed to a recent fall.

180.     Finally, JW, a Medicare and Medicaid beneficiary, fell three times in two days on January 4-5, 2018.  She also fell twice in three days on April 21-23, 2018; and fell twice in three days again on September 6-8, 2018.  She was found crawling on the floor on September 6, 2018.  Finally, JW fell trying to get to the bathroom on August 17, 2018.  Omnicare informed Cheltenham in monthly reports for July 2016, September 2016, August 2017, and April 2018 that RF was receiving medications that may have contributed to a recent fall.

181.     False claims submitted to Medicare and Medicaid for providing nursing home services to these residents are included in Attachment A.

### B.     Psychiatric and Mental Health Services

182.     Cheltenham had a large number of residents with psychiatric or mental health issues.  Yet Cheltenham provided these residents with grossly substandard care, even after a resident committed suicide in June 2018.

183.     Cheltenham had a recurring problem with connecting its residents with specialists who could provide crucially needed mental health care services.  For example, on or around November 22, 2016, a resident was admitted to the hospital after an altercation with another resident.  Annie Jacob informed Colleen Johnson of this incident and further noted that the residents had been fighting since August 2016.  A psychiatric consultation had been recommended then, but they were not contacted until one of the residents was hospitalized.

184.    Cheltenham also had problems monitoring, assessing, and documenting residents' psychiatric issues.  For example, in March 2017, Pennsylvania health inspectors informally told Jacob that the facility was failing to routinely monitor or assess mentally ill residents.  Jacob conveyed this information to Sue Lehman, Brad Towns, Johnson, Murray, and Bobby Mayo.

185.    In March 2018, a resident accused a nursing aide of pushing her into bed.  Mayo shared this allegation with Johnson, Lehman, Murray, and Mary Klinger on March 6, 2018. When reviewing the resident's chart, Johnson noted that her required psychosocial assessment was never started or completed.  The resident's sister had also recently died, but the facility had not updated her care plan for her grief.  In response, Lehman wrote to Murray on March 8, 2018, and told him that Cheltenham's social services department could not "continue to be non-compliant" with respect to its resident assessments.

186.    On May 9, 2018, Mayo informed Johnson that a resident "stabbed another resident in the eye with a plastic fork."  The attacking resident had recently been put on an anti-seizure medication to address aggressive behavior, but per Johnson's subsequent review of his records, there was no monitoring of whether this treatment was effective or alternative interventions were needed.  Johnson also told Mayo, Murray, and Klinger that she could not find any evidence that this resident had been seen by a psychiatric provider after the incident.

187.    Cheltenham's nonexistent or grossly substandard mental health care came to a head when a resident committed suicide in June 2018.

188.    This resident was admitted to the facility in November 2017 after being hospitalized for a change in mental status and potential suicide.  The resident had wrapped a cord around his neck while living at a prior nursing home and the hospital recommended that the

resident remain in the care of psychiatrist while at Cheltenham.  However, Cheltenham did not

include the resident's history of potential suicide in his care plan.

189.    As noted by Pennsylvania health inspectors in a subsequent survey, on February

16, 2018, "the resident was observed to be sad . . . refusing to associate with anyone, just staying

by himself . . . [he] denies pain or discomfort but still looks sad and angry."  A message was left

for a certified registered nurse practitioner to re-evaluate the resident's mental health, but there

was no evidence this evaluation ever occurred.

190.    The resident attempted to slash his wrists on March 7, 2018, and later admitted

that this had been a deliberate attempt to hurt himself.  Mayo shared this information with

Johnson, Lehman, Murray, and Klinger.  Mayo also stated that the resident had "showed no

indications of wanting to harm himself prior to this incident," which was not consistent with the

resident's history of wrapping a cord around his own neck.

191.    After being hospitalized due to his self-harm, the resident was readmitted to

Cheltenham on March 20, 2018.  Shortly thereafter, the resident began refusing his morning

medications.  A physician was notified, but there was no evidence of any resulting orders.

192.    On or around May 2, 2018, Cheltenham sent a psychology referral for the resident

to obtain additional support from behavioral health services.  The resident was never seen by

behavioral health services and never obtained this support.

193.    On May 24, 2018, it was observed that the resident was only getting out of bed to

go the bathroom.  The resident refused dinner and, when asked how he was, just shook his head

from side to side.  There was no evidence of any additional inquiry or intervention.

194.    Less than two weeks later, on June 5, 2018, the resident hung himself with a

bedsheet in one of Cheltenham's shower rooms.  The resident was non-responsive when he was

discovered.  The resident was transported to the hospital, where he was placed on a ventilator. The resident died in the hospital on June 12, 2018.

195.    On June 10, 2018, Pennsylvania health inspectors visited Cheltenham to investigate this incident.  In an internal email sent on June 11, 2018, to Lehman, Murray, Klinger, and Mayo, Colleen Johnson suggested that it was "best to be proactive as we know we will not have a case" to dispute the forthcoming survey findings.  Lehman agreed.

196.    In a survey completed on June 12, 2018, the Pennsylvania health inspectors ultimately determined that "the facility had no system in place to ensure that other residents in the facility with similar needs were receiving the appropriate mental health services, placing residents in the facility in an Immediate Jeopardy situation."

197.    As a result of this survey, the Pennsylvania Department of Health imposed a civil monetary penalty on Cheltenham on June 27, 2018.  The penalty was worth $109,992 per day.

198.    Cheltenham's psychiatrist notified the facility that he was terminating his contract on June 11, 2018.  After learning this, Johnson sent an email to Lehman, Murray, Mayo, and Klinger, in which she wrote that she was not sorry because a nurse practitioner actually "did all the work," while the psychiatrist just "seemed to want our nurses to complete his work and would sign."

199.    The facility had a contract with a psychologist, but as of June 14, 2018, none of his notes were in Cheltenham's medical records.

200.    A nurse practitioner working with the psychologist visited the facility on July 26, 2018, but Cheltenham did not make sure that she examined a different resident with suicidal thoughts.

48

201.     More than two months after the June 2018 suicide, Cheltenham still had not completed the audits it promised as part of its plan of correction for the deficiencies identified by the Pennsylvania health inspectors.  On August 22, 2018, Johnson emailed to Murray, Klinger, and Mayo, "Everyone has to understand by now we have to complete and document as per [the] POC."

202.     On September 7, 2018, Johnson noted to Murray, Klinger, and Mayo that several residents with mental health issues still did not have important information in their care plans. For example, one resident had stated that she was going to commit suicide, but her care plan did not include that Cheltenham staff were supposed to check on her every 15 minutes, change her room, and have an additional visit from a psychiatric provider.

203.     On September 20, 2018, Johnson emailed Murray because Cheltenham was still not properly implementing its plan of correction.  The facility was not sufficiently reviewing and updating care plans for residents with psychiatric issues, which Johnson described as "just not acceptable."  Johnson further observed that "nobody is updating the psych log with next scheduled visits." Johnson also stated, "We cannot afford not to complete the required plan of correction or have another serious situation because we are not following the POC."

204.     Johnson again emailed Murray, Klinger, and Mayo about these problems on September 27, 2018.  Johnson noted that the log of residents needing psychiatric care had all of the residents on an as needed schedule for psychiatric provider visits, which meant that "nobody will be seen unless they have an issue."  As Johnson explained, if all the residents were only seen as needed, then Cheltenham was "back to not knowing when the residents at risk need [to be] seen again."

205.    The facility also continued to have problems updating its care plans for residents with psychiatric needs.  On October 8, 2018, Johnson sent an email to the Murray, Klinger, and Mayo that provided specific examples of this failure.  For instance, a psychiatric provider recommended a follow-up visit for a resident in one to three months, but Cheltenham did not include this in the resident's care plan or update the scheduled list of visits to make sure the visit did not get missed.  As Johnson noted, this was exactly what the Pennsylvania Department of Health had cited as a deficiency in the June 2018 survey following a resident's suicide.  Johnson also observed that two other residents did not have an activity care plan to help decrease their social isolation, even though this was recommended by their psychiatric provider.  Finally, all residents were still being seen only as needed rather than proactively.

206.    Despite Johnson's instructions, Cheltenham had not yet fixed these problems on October 12, 2018.  As Johnson emailed to Sue Lehman, Pennsylvania's "immediate jeopardy" finding "was mainly due to [no] follow up from psych and we didn't know it, or have interventions to assist him."  As a result, Cheltenham set up a log "to track so nobody is missed," but this was meaningless if all the residents were only seen as needed.  Johnson further noted that, in an audit of only ten residents, she had found a resident who required a follow-up psychiatric visit but had not actually been seen.  This suggested to Johnson that additional residents were not receiving necessary psychiatric care.

207.    According to Johnson, Cheltenham just did not "understand that this is serious . . . This is why they stay in trouble."

208.    On October 19, 2018, Johnson emailed Murray, Klinger, and Mayo to exhort them to keep the log current because they could not "take any chances that even one resident is missed."  In response, Murray wrote that the facility had audited all residents diagnosed with

depression, bipolar disorder, schizophrenia, anxiety, dementia, impulsive disorder, and ethanol alcohol abuse.  The facility had found that seven such residents had not been seen by a psychiatric provider since the resident suicide in June and that four "were last seen before June."

209.    This meant that even after a resident did not receive adequate psychiatric care and committed suicide, Cheltenham had not—three months later—ensured that all its residents with serious psychiatric needs were seen and treated by a mental health professional.

C.    **The Building and Physical Environment**

210.    Cheltenham's building was plagued with problems during the relevant period.  As a result, it was often not a healthy and safe environment for its residents.

211.    Pennsylvania health inspectors completed a survey on February 5, 2016, that found that the facility failed to provide adequate maintenance and housekeeping services.  There were, for instance, "areas of pooling water and accumulation of debris in the dietary kitchen." The central communal shower room on the third floor also did not have sufficient curtains to provide privacy for the residents when they bathed.  In addition, the ceiling tiles and vents "throughout the resident dining room on the first floor were heavily soiled with a covering of dirt and dust."

212.    In resident council meetings from May 2016 to at February 2017, residents made numerous and repeated complaints about the environment at Cheltenham, including the following:

- Soiled bathrooms, including bad odors and blood on the floor and toilets

- Soiled shower rooms that were not cleaned, including feces left on the floor

- Pest infestations, including cockroaches and ants

- Insufficient washcloths, towels, toilet paper, and paper towels

- Staff throwing soiled diapers on the floor and walls

- Electrical sockets that did not work

- Leaky ceilings

213.    For example, Cheltenham ran out of clean linens in August 2016, including towels and pillows.  This was a problem for at least two weeks and greatly inhibited the ability of the staff to clean and care for the facility's residents, as they were forced to dry residents with washcloths and blankets after showers.  There also continued linen shortages in the following months.  On December 29, 2016, Annie Jacob sent an internal email in which she asked whether the "linen problem [could] ever be corrected?"

214.    Beyond the resident council complaints, there was internal recognition that the physical environment at Cheltenham had serious problems.  For example, Colleen Johnson visited Cheltenham in November 2016 and provided a report of her experience to Sue Lehman, Brad Towns, Robert Murray, Jacob, and Bobby Mayo on November 18, 2016.  Although Johnson stated that she had not intended to look for environmental issues, she identified numerous problems while making her clinical care assessments.  Johnson observed that resident clothes had been "left for days in bags on the floor in their rooms" and a hallway.  She also witnessed cockroaches in a housekeeping room next to the kitchen and noted that a contemporaneous city health inspection had likewise found cockroaches in the kitchen.  Johnson further stated that there were "[n]umerous heating/ac units with trash/debris on top," which posed a respiratory health concern.  In addition, Johnson saw linen rooms with trash and other items on the floors, as well as dining room tables were not be cleaned after meals.  Finally, Johnson noted that there were resident bathrooms "with urine odor" and soiled walls.

215.    Pennsylvania health inspectors returned to investigate resident complaints in a survey completed on November 16, 2016.  A resident had complained that "she refused to take her showers because they were so dirty," and the inspectors found bathrooms "with dirty floors, dried feces, [and] urine odor," in addition to "all shower rooms" being soiled and having clogged drains with "hair and stuff."

216.    On November 21, 2016, Jacob emailed Johnson that even after the survey one of the shower drains was still clogged and there was no urgency to fix the problem.

217.    On December 4, 2016, Murray emailed facility staff that there was a "mouse sighting" in a pantry.  Murray reminded staff that "one mouse sighting is an IJ [immediate jeopardy]!"  Immediate jeopardy is the most serious deficiency level for government nursing inspections.

218.    On January 25, 2017, Murray contacted the facility's rehabilitation provider to inform her that the microwave used by the rehabilitation group was "infested with roaches."

219.    Johnson returned to the facility at the end of January 2017.  In her subsequent report, she noted that one shower room had a "urine odor," and there were soiled items in various shower rooms including shower chairs, linens, and dried washcloths left in a shower stall.  One shower chair was also missing one of its safety straps.  In addition, Johnson observed dining tables that had not been cleaned after meals and overflowing linen hampers with soiled laundry.  Finally, there were "[n]o cleaning supplies available for use in any of the shower/bathrooms used by residents.  Interview with staff revealed none [were] available."

220.    Johnson observed hazards as well.  She found one medication cart "left unlocked and unattended."  She also saw a "[l]arge flooded area" in a bathroom that had been there for at least a day.

221.    Per an internal email sent to Sue Lehman, Brad Towns, and Murray on February 17, 2017, the shower room floors were still dirty and there was no soap.

222.    Another internal email sent to Towns and Murray on February 24, 2017, described new reports of ants and "an increase in roaches."

223.    Cheltenham continued to have issues with pests, including cockroaches, ants, and flies from at least March 2017 to June 2017.

224.    Cheltenham continued to have other environmental problems as well.  In a visit completed on July 20, 2017, Pennsylvania health inspectors found that Cheltenham "failed to dispose of garbage and refuse properly."  The facility's outdoor dumpster was located next to the sewage drainage system and "was leaking a malodorous liquid substance" that had "accumulated around the sewage drainage system."  In addition, "[a]n infestation of household flies was present at the foul smelling pooling liquid drainage from the dumpster unit," as well as near the sewage drainage system.

225.    The health inspectors also found that Cheltenham failed to store, prepare, distribute, and serve foods under sanitary conditions.  The floor in the food preparation, storage, and distribution area "was heavily soiled with dirt, food spillage, water, and debris."   The heavily soiled floor "provided food/feeding for common household pests (roaches, ants, flies, and mice)."  In addition, six food carts used by dietary staff to deliver food for residents were also "heavily soiled with dried food spillage, coffee stains, and white dried substances."

226.    Moreover, a "pungent, sour, malodorous smell was noted near the floor inserted grease trap," which was located where food carts were stored.  There was also "[v]isible physical evidence" that small flies were living in the janitor closet in Cheltenham's dietary department. Health inspectors further noted there were large bins of uncovered food in the dry food storage

area and observed "small flying insects" nearby.  Finally, a "green/black colored mold like substance" was visible in multiple locations in the kitchen.

227.    Outside the kitchen area, the health inspectors found that Cheltenham "failed to ensure a safe, functional, and sanitary environment on three of the four nursing units, general public areas, and facility maintenance areas."  For example, the inspectors observed that the "receptacle used to empty bedpans in the biohazard room was stopped up and water was dripping out of the faucet."  Among an array of other problems, the inspectors also noted bathrooms with "a strong urine odor," a floor that was "visibly soiled" and "coated with a sticky substances," and a toilet seat "soiled with dried feces."

228.    On August 25, 2017, Lehman, Johnson, and Murray received a report that one resident's room had an extremely strong urine odor.  Lehman commented that, with an odor so strong, "urine has most likely gotten under the flooring and into the concrete or sub flooring."  Lehman also noted that one of Cheltenham's courtyards seemed to be "a dumping ground" for trash.

229.    In an email dated September 20, 2017, Murray informed Lehman that fourteen of the facility's eighteen exhaust fans were not working.  Thus, according to Murray, "It's no wonder we have an odor problem."

230.    On November 13, 2017, a resident complained to Cheltenham staff that his assigned room smelled like urine, had "piles of linen under the sink, and was generally not clean."  This complaint was conveyed to Murray, Mary Klinger, and Bobby Mayo.

231.    On March 30, 2018, a resident's daughter complained to Murray that the "smell on the 3rd floor [was] so foul, I could not stomach it."

232.    On August 10, 2018, Cheltenham's former maintenance director sent an email to Murray with a "brief report" of some of the issues at the facility.  In addition to "a lot of other items not being done that are monthly life safety requirements," the former maintenance director found that Cheltenham had not been testing its generator, carbon monoxide detectors, emergency lighting, and exit signs.  He also found other problems, including blocked fire exits, smoke/fire doors that did not close completely, resident doors that did not latch, and cleaning chemicals left accessible to residents.

233.    Pennsylvania health inspectors substantiated a complaint about Cheltenham's pest control on August 11, 2018.  The inspectors interviewed residents who said they had seen cockroaches, as well as one resident who had personally killed a cockroach in his room and saved it for the inspectors to see.

234.    In an email to Sue Lehman dated August 13, 2018, Johnson further reported that when she visited Cheltenham it "was so nasty when I got there, the sour/sewer smell was awful toward the offices by the kitchen" and when she opened the office door "it just got worse." Johnson also found leaking or standing water in the halls, standing water in the kitchen, and standing water in the cooler.  Johnson then described the facility's housekeeping as "nasty."

235.    Pennsylvania health inspectors returned to the facility for a survey completed on November 6, 2018.  While they were there, residents discussed the continued problem of pests at Cheltenham, including flies, ants, gnats, and mice.  One resident stated that "she killed a mouse in the dining room with her wheelchair," while another reported "seeing wasps in her room." The inspectors also verbally told facility managers that there were noticeable smells "throughout the building."

236.    In Pennsylvania's formal survey findings, the inspectors "determined that the facility failed to provide adequate housekeeping and maintenance services to maintain a safe, functional, sanitary, and comfortable environment for residents, staff, and the public." Cheltenham also "had a significant amount of paper cups, paper plates, plastic water bottles, and scraps of paper scattered across the entire property."  Moreover, "the floor in the lobby area was dirty, the overhead vent was covered with dust, several tiny black flying insects were seen on the wall, and the room had a foul odor."  There were also "urine odors" on the third floor, as well as damage and debris in various resident rooms.

237.    The inspectors further noted that Cheltenham "failed to maintain an effective pest control program related to flying insects on four of four nursing units."  Flying insects "resembling fruit flies" and gnats were observed throughout the building.

238.    In a different "life safety" survey, Pennsylvania inspectors found numerous problems, including smoke doors that failed to latch, an emergency lighting system that failed its test, and missing electrical circuit breakers in a boiler room.

239.    Cheltenham continued to have environmental problems in 2019.  A city inspection from April 2019 uncovered dirty shower rooms and rodent droppings in the kitchen storeroom, among other issues.

### D.    <u>Resident Quality of Life and Dignity</u>

240.    Cheltenham's misconduct often deprived its residents of their dignity and significantly reduced their quality of life.

241.    In a survey completed on February 5, 2016, Pennsylvania health inspectors found that Cheltenham failed to investigate and try to resolve a resident's complaint regarding missing clothing and a motorized wheelchair that had been missing since November 2015.  When the

survey was completed, Cheltenham still had not decided whether it would replace the missing wheelchair, even though it had been missing for months.

242.     In April 2016, Cheltenham had to remind its staff that residents had "the right to get out of bed any time they want."  This instruction was necessary because staff were refusing resident requests for assistance getting up from their beds.

243.     Cheltenham's resident council repeatedly complained to the facility that their clothes or personal items were going missing.  The residents expressed these concerns in resident council meetings in February 2016, March 2016, April 2016, May 2016, August 2016, September 2016, October 2016, and November 2016.

244.     Pennsylvania health inspectors found similar problems in a survey completed on March 8, 2017.  The health inspectors determined that Cheltenham had "failed to thoroughly investigate and promptly resolve resident grievances" expressed during resident council meetings.  In an interview with eight alert and oriented residents, all of the residents stated that the facility did not follow up on their concerns.  In particular, the facility had not addressed four different resident's concerns about missing clothes.  When the health inspectors visited Cheltenham's laundry room, they observed "numerous racks of residents' lost clothing and a dozen or more boxes filled with residents' belongings."  There was, however, no process in place that allowed residents to look for their items.

245.     On May 17, 2017, a Cheltenham staff member reported to Robert Murray and Bobby Mayo that four residents were reporting missing money.  The staff member further stated, "At this point I'm unsure what to do to assist the resident's [sic] with keeping their money safe."

246.     On June 9, 2017, Murray was told that another resident's wallet had been stolen from a locked drawer in his room and that someone had seemingly taken a different resident's phone.  The additional four complaints about missing money were also still unresolved.

247.     When a resident's daughter visited her mother at Cheltenham on August 8, 2017, she found her mother dressed inappropriately.  The resident's family had complained about this before and even put an explanatory sign on her wardrobe, but Cheltenham staff still did not dress her properly.  The resident was found in a public lounge, underdressed, and wearing a different resident's pants.  She also complained of having no clothes. When her family checked her closet, they did not find any clothes except garments belonging to her roommate.  As stated in an email to Murray and Eileen Roberts, facility staff went to the laundry room and identified "a few items and will be getting them upstairs so the resident will have clothes for [the] next couple of days." The rest of the resident's clothes were considered lost.

248.     According to an internal email sent to the Murray, Roberts, and Mayo on August 14, 2017, a different resident also had missing clothes and was being dressed inappropriately. Cheltenham staff looked for the missing clothing but could not find them.  Eventually, one staff member found a labeled bag of the resident's clothes and put them in her closet—only for those items to go missing as well.  According to a different internal email, this problem had "been going on for a while."

249.     Another internal email dated August 16, 2017, reported that a resident had lost baseball tickets that had been in a white envelope.  Murray and Bobby Mayo were told that a staff member thought that "maybe staff took them thinking it was money."  Murray replied that this suspicion was "a sad commentary."

250.    In addition to missing personal items, residents also were not always treated respectfully by Cheltenham staff.  Colleen Johnson visited the facility in November 2016 and observed unkempt residents, staff entering residents' rooms without knocking, and staff pulling residents backwards in their reclining chairs.  A mock survey conducted in December 2016 also witnessed staff entering residents' rooms without either knocking or waiting for a response after knocking.

251.    There were also multiple reports of Cheltenham staff verbally abusing residents. On April 26, 2018, Murray reported that a resident was worried because two nurses were giving her a "hard time" and were "always annoyed with her when she asks for colostomy bags or medicine on time."  The resident stated that when she could not get her antianxiety medication in time "she began to cry and they made fun of her."

252.    That same day, a Cheltenham manager spoke with different residents about their interactions with a different staff member and had "so much to write as far as what was said, how it was said, [and] how often this occurs."  The manager wrote in an internal email to Murray and Bobby Mayo that the information she received "had me near tears."

253.    A subsequent internal investigation of the staff member revealed that she had been abusive with several residents.  For example, one resident stated that this staff member had recently told her and other residents to "[g]et the fuck out of here, I'm sick of all of you."  This outburst had been witnessed by at least one other member of the Cheltenham staff.

254.    Finally, Cheltenham failed to ensure that its residents had activities or other types of stimulation.  For example, in a survey completed on February 5, 2016, Pennsylvania health inspectors found that the facility had failed to provide a blind resident with a radio.  Cheltenham had documented that listening to the music and keeping up with the news were very important to

this resident, yet the resident told the health inspectors that he had been without a radio for some time.  The facility eventually confirmed that the resident had not had a radio for more than two months.

255.    This survey also documented that Cheltenham failed to assess a resident's adjustment to a room change and whether the resident had become distressed.  This resident had been moved to a different room in January 2016 when there was a fire in her old room.  The resident informed the health inspectors that "she could not move her right side at all" and that her furniture and wheelchair were on her right side.  The resident further stated that she missed her old roommates and was visibly upset about not being with them.  The resident also said that on a typical day, she "just lay here and watch the folks go up and down the hall."  Cheltenham later acknowledged that the resident should have been returned to her old room after it was repaired.

256.    On April 19, 2016, Annie Jacob sent Colleen Johnson an email regarding allegations that a nursing aide was not getting a resident out of bed.  At times, this meant the resident stayed in bed all day.  On one instance, this caused the resident to miss attending church.

257.    Jacob sent Johnson another email on June 16, 2016, in which she noted that the activity department was "not good at all."  Jacob stated that Cheltenham needed "real activity people," as opposed to "someone from dietary or housekeeping" who "just dance on Fridays." Jacob further observed that when residents with mental health issues got agitated or loud they were removed from any recreational therapy.

258.    In a subsequent November 2016 visit, Johnson observed residents in common areas without "any type of stimulation or programming or any items for them to read/color/touch etc. available."

259.    A survey completely by Pennsylvania health inspectors on March 8, 2017, similarly found that Cheltenham "failed to provide an ongoing activities program on weekends for residents that was meaningful" and designed to meet the residents' needs.  Residents informed the health inspectors that the facility did not have enough staff to run planned activities and that Cheltenham just offered the same activities all the time.  Further investigation confirmed these problems.

260.    Pennsylvania health inspectors found related problems in a subsequent visit in November 2018.  They informed the facility in an informal debriefing that they had observed no stimulation when residents were in common area lounges, two residents "with their heads on the table and nothing going on," and dementia residents that did not have enough activities.  Finally, the inspectors mentioned that they saw "activities posted" but that there was "not much going on."

### E.    Prescription Medications

261.    Cheltenham regularly provided grossly substandard care related to its residents' prescription medications.

262.    In a survey completed on February 5, 2016, Pennsylvania health inspectors found that Cheltenham failed to ensure that a resident did not receive "unnecessary drugs." Cheltenham had given one of its residents various antipsychotic medications even though the medical record indicated the sole justifying behavior was yelling on two particular evening shifts.  The facility confirmed that there was no documentation indicating that the resident was danger to himself or others.  The resident was observed "sleeping and slumped over in his wheelchair," during an activity in a common room.  The facility also confirmed that it failed to attempt a gradual dose reduction of the resident's medication.

263.    In April 2016, Cheltenham instructed its staff that agitation was not a behavior sufficient to justify the administration of psychotropic medications, like antipsychotics.

264.    Cheltenham also continued to provide unnecessary drugs and have problems implementing gradual dose reductions.  In December 2016, a mock survey found that some residents were receiving unnecessary drugs.  Several residents were given multiple psychotropic drugs without documentation indicating that these residents had any "significant behaviors" warranting such medication.  In addition, Cheltenham's infection control log identified "a number of residents this quarter who were administered antibiotics without proof of an actual infection."

265.    The December 2016 mock survey also found that that the care plans for multiple residents lacked a plan for gradual dose reductions of psychotropic medication and "a behavior management plan for the purpose of replacing psychotropic medication."

266.    Similarly, Cheltenham's contracted psychiatrist was scheduled to visit the facility to review residents' medications for a gradual dose reduction on September 12, 2017.  However, as a Cheltenham employee told Robert Murray in an email, when the psychiatrist came to Cheltenham the facility was not prepared, so he "came her[e] for nothing."  According to the employee, this meant that the facility was "[a]gain out of compliance."

267.    According to a report provided to Cheltenham by Omnicare, the facility's consultant pharmacist, in the last quarter of 2016 Cheltenham was a significant outlier in its administration of antipsychotic, anxiolytic, and hypnotic medications.  The percentage of Cheltenham residents receiving antipsychotic and anxiolytic medications was more than twice as the state average, and the percentage of Cheltenham residents receiving hypnotics roughly three times higher than the state average.  The exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
|---|---|---|
| Antipsychotics | 43.8 percent | 19.6 percent |
| Anxiolytics | 48.2 percent | 23.5 percent |
| Hypnotics | 11.9 percent | 3.7 percent |

268.    These trends continued in the first quarter of 2017, as Cheltenham continued to administer antipsychotic, anxiolytic, and hypnotic medication to a significantly higher portion of its residents than the typical Pennsylvania facility.  Per Omnicare's report provided to Robert Murray, the exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
|---|---|---|
| Antipsychotics | 40.9 percent | 19.6 percent |
| Anxiolytics | 44.9 percent | 23.5 percent |
| Hypnotics | 11.1 percent | 3.7 percent |

269.    On or around March 30, 2017, Cheltenham received a gradual dose reduction tracking report from Omnicare.  The report noted that 72 percent of Cheltenham residents were receiving a psychotropic medication, including antipsychotics, anxiolytics, and hypnotics.

270.    Following a June 2017 bulletin from the Pennsylvania Department of Human Services regarding pre-authorization rules for certain narcotics, one staff member commented to Murray that, "We like narcotics…."  Murray responded, "I know…."

271.    On July 24, 2017, Murray, Bobby Mayo, and Eileen Roberts received Omnicare's consultant pharmacy report that indicated Cheltenham was still a psychotropic drug outlier for the second quarter of 2017.  The exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
|---|---|---|
| Antipsychotics | 41.9 percent | 19.6 percent |
| Anxiolytics | 44.5 percent | 23.5 percent |
| Hypnotics | 11.5 percent | 3.7 percent |

272.     Cheltenham continued to be psychotropic drug outlier in the third quarter of 2017, according to the report Omnicare provided to Murray and Mary Klinger.  The exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
|---|---|---|
| Antipsychotics | 43.2 percent | 19.8 percent |
| Anxiolytics | 40.5 percent | 23.7 percent |
| Hypnotics | 10.4 percent | 3.7 percent |

273.     Cheltenham was again a psychotropic drug outlier in the fourth quarter of 2017, as confirmed by Omnicare's consultant pharmacist report that was shared with the facility.  The exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
|---|---|---|
| Antipsychotics | 39.7 percent | 19.8 percent |
| Anxiolytics | 41.1 percent | 23.7 percent |
| Hypnotics | 13.7 percent | 3.7 percent |

274.     These trends continued in the first quarter of 2018, as Cheltenham continued to administer antipsychotic, anxiolytic, and hypnotic medications to a significantly higher portion

of its residents than the typical Pennsylvania facility.  Per the consultant pharmacist report that Omnicare provided to the facility, the exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
| --- | --- | --- |
| Antipsychotics | 38.8 percent | 19.8 percent |
| Anxiolytics | 37.9 percent | 23.7 percent |
| Hypnotics | 11.5 percent | 3.7 percent |

275.    These metrics improved slightly in the second quarter of 2018, but Cheltenham was still an outlier with respect to antipsychotic, anxiolytic, and hypnotic medications.  Per that consultant pharmacist report that Omnicare provided to Murray and Klinger, the exact percentages were as follows:

| Medication Type | Cheltenham | Pennsylvania Average |
| --- | --- | --- |
| Antipsychotics | 37.6 percent | 19.8 percent |
| Anxiolytics | 35.7 percent | 23.7 percent |
| Hypnotics | 5.9 percent | 3.7 percent |

276.    On August 29, 2018, Klinger, Murray, and Mayo received reports from a different consultant pharmacist.  This consultant pharmacist expressed concerns about the medication regimen for 116 residents and again noted that Cheltenham was an outlier with respect to its use of antipsychotic medications.

277.    In a survey completed on November 6, 2018, Pennsylvania health inspectors determined that Cheltenham had failed to adequately monitor residents receiving psychotropic medications to see whether their doses could be gradually reduced or attempt non-pharmacological, behavioral interventions.  For example, after one psychiatric mental health

nurse practitioner documented that she was unsure as to why a resident was on certain medications, the health inspectors found that "the facility had no tool or method developed for the monitoring of the resident's target symptoms or behaviors."  Similarly, another resident was taking two antianxiety medications even though "[n]o indication was noted for either medication."  The also facility had no existing means of monitoring the resident's target symptoms or behaviors.

278.    Medication monitoring continued to be an issue in 2019.  Cheltenham's pharmacy consultant performed a mock survey in June 2019 and found that the facility was not documenting adverse reactions when residents were taking psychotropic medications.

279.    Cheltenham also had a persistent problem with needed medications not always being available for residents.  For example, on April 4, 2017, a Cheltenham staff member emailed Murray, Mayo, and Annie Jacob to inform them that a resident claimed that she had not received her daily pain patch for two days.  Jacob later described this as a "serious problem" and noted that this had been a care deficiency in the past.

280.    Yet two weeks later, a Cheltenham staff member conducted medication audits and found some residents were not receiving their medications, even though there was signed documentation that the medications had been administered.

281.    In March 2018, Cheltenham managers also recognized that the facility was having difficulty obtaining needed medications from their pharmacy in a timely fashion.  For example, Mary Klinger noted in an email sent to Colleen Johnson and Murray on March 30, 2018, that most of Cheltenham's new residents "recently have not received their meds until 5 PM the next day!"  In addition, the pharmacy also was not always sending the right medications.

282.     On April 10, 2018, Johnson described the pharmacy issues in an email to Sue Lehman and Matt Lehman.  Johnson noted that Cheltenham was still not receiving medications in a timely fashion.  According to Johnson, it was "truly too long for the residents" to go without their medications.

F.     **Staffing and Staff Competencies**

283.     Cheltenham was regularly understaffed during the relevant period.  In addition, the staff working at Cheltenham often lacked the competencies needed to provide sufficient care to the facility's residents.

284.     For example, in a survey completed on February 5, 2016, Pennsylvania health inspectors found that Cheltenham failed to provide adequate supervision for cognitively impaired residents.  The health inspectors observed twenty-five such residents in a common room with only one nursing aide providing supervision.  There was also no call bell or other mechanism to communicate outside the room for help.  Accordingly, a resident wanting to leave the room was prevented from doing so, as the aide would have to accompany the departing resident and could not leave the other twenty-four residents unattended.  Two days later, the same common room had twenty-six cognitively impaired residents with only one nursing assistant.

285.     In an email to Colleen Johnson dated August 17, 2016, Annie Jacob noted that the facility had "lost 18 licensed nurses since February 2016" because the workload was too demanding.

286.     As a result of these "continuing nursing staffing issues," Robert Murray informed Brad Towns on August 20, 2016, that Cheltenham needed to consider supplementing its regular employees with temporary, "agency" staff.

287.   Johnson received an anonymous complaint from a Cheltenham employee on October 1, 2016.  Among other concerns, the employee stated that nurses were "not getting enough orientation," because the facility was understaffed and needed new employees to start working before they were ready.  As a result, the anonymous employee asserted that "new nurses did not know what they [were] supposed to do and what [was] not supposed to be done," which in turn meant that "problems happen."

288.   Johnson forwarded this complaint to Towns, who responded it that it was "hard to say how" the complaint should be taken because it was unsigned.  Instead of trying to determine whether the allegations were true, Towns asked Johnson if she could uncover the anonymous employee's identity.

289.   After Johnson visited the facility in early November 2016, she sent a report to Towns, Jacob, Murray, Mayo, and Sue Lehman in which she observed that there was a "lack of supervision for nursing staff to validate care/safety."  She also wrote that there was "no evidence of follow-up or monitoring to note that training was effective."

290.   On November 22, 2016, a Cheltenham staff member told Murray and Jacob that there were "not enough staff to cover the floors."

291.   A Cheltenham staff member further informed Murray and Jacob on December 16, 2016, that "without [additional] nursing staff," she was unable to make schedules for the facility. Staffing was so short that nursing aides were "working on their days off and doing doubles throughout the week."  She further stated, "You guys need to hire staff" in order to fully staff the facility and that she would "not be held accountable for Cheltenham not having the amount of staff needed."

292.    On January 9, 2017, Jacob informed Murray and Mayo that there were no employment applications at the front desk and candidates had been turned away as a result.  This was "not good," according to Jacob, because the facility was "really short" of nurses, nursing assistants, and other staff.

293.    Later in the month, a staff member informed Jacob that "due to staffing shortages," Cheltenham had new nurses start working before their orientation was complete. Another nurse had been at the facility for month but had never completed her wound care competencies.

294.    On February 22, 2017, Murray informed Sue Lehman and Brad Towns that the facility needed to hire 1 registered nurse, 7 licensed practical nurses, and 40 nursing aides. Murray also noted that Cheltenham was conducting a survey to see if its salaries for nursing aides were competitive.

295.    Jacob eventually informed Colleen Johnson on February 24, 2017, that she was only "working with just enough staff" and did not know how she would function if there were additional cuts.  For example, a nurse working in the facility's west wing had just told Jacob that current staffing levels were so low as to be unsafe.

296.    By May 2017, Jacob had resigned and Eileen Roberts was Cheltenham's new director of nursing.  Roberts proposed an improvement plan on May 10, 2017, to Johnson, Towns, Murray, and Mayo, in which she called for Cheltenham to "[s]tablize staffing and fill our open positions," because "critical staffing levels are counterproductive to maintaining clinical processes."

297.    The next day, Mayo wrote in an email to a Cheltenham staff member that the facility could not "pass up on good referrals," because the facility had been "census challenged

70

for far too long not to accept good payers." The staff responded, "No idea what beds are available or if we can manage staffing wise."

298.   Later that day, Cheltenham staff member reported to the Roberts, Murray, and Mayo that because the facility's census had increased, there was not enough staff to cover the facility during the weekend. Referring to the 3 PM to 11 PM shift, she wrote, "THERE ARE 5-6 HOLES FOR SATURDAY AND SUNDAY 3-11 ALONE AND I CANNOT FIND ANYONE TO WORK."

299.   Just a few days later, on May 15, 2017, Brad Towns complemented Murray and Roberts because the facility's last payroll "showed that overall the direct care was under budget." Towns further commented that Cheltenham's higher census, and thus revenue, should allow for direct staff to "continue to remain on budget."

300.   On July 7, 2017, Roberts emailed Murray that Cheltenham had been short-staffed the last few days because she suspected the staff member in charge of the schedule was sabotaging the facility after putting in her two weeks' notice. Roberts reported that this was "causing great chaos" and that staff were "getting sent home and we are short." She further begged Murray to fire the scheduler because she was "causing major damage," including staff "getting pissed that they come in and find out they are not on schedule." However, Murray indicated he would keep the employee on staff until her previously scheduled departure date.

301.   Murray later acknowledged in an email dated July 26, 2017, to Sue Lehman that there had been "a scheduling problem due to the departing scheduler giving too many people off" around the July 4 holiday. However, Murray further stated, "The real problem of course is a shortage of staff."

302.     On September 29, 2017, Murray sent an email to Lehman and Cheltenham managers in which he noted that efforts to hire more nursing aides had been "hampered by our pay rate which is at least a dollar [per hour] lower than our local competitors."

303.     On March 19, 2018, Cheltenham received a list of concerns from its employees' union representative.  Among them were complaints about the facility "being understaffed" and regular employees being reassigned or denied overtime in order to accommodate temporary, agency workers.

304.     Cheltenham managers had to complete a questionnaire for the facility's lender in March 2018.  In a draft he shared with Mayo and Mary Klinger, Murray acknowledged the facility's staffing difficulties, noting that recruiting nursing aides had "been a challenge for about a year."  Murray also wrote that the most important factor to the facility's success was adequate funding.  In another draft that he shared with Mark Haemmerle, AHF's president, Murray noted, "Rate of pay is an issue," for recruiting nursing aides.  Haemmerle forward the questionnaire to Sue Lehman.

305.     On July 13, 2018, Murray emailed Sue Lehman about the facility's payroll.  In this email, Murray noted that staffing difficulties meant that the facility had been using temporary, agency staff on the weekends.  He further stated that some newly hired nursing aides had already quit and speculated that the recent "pay boost will help with recruiting better candidates."

306.     On July 16, 2018, a resident's sister complained about the resident's new pressure ulcer and stated that there was no supervision from nursing on the weekends.

307.     Notwithstanding these understaffing concerns, there were continued efforts to pare down Cheltenham's staffing.  On December 27, 2018, Bobby Mayo sent an email to Sue

Lehman and Matt Lehman in which he stated that Klinger would "develop a plan to cut down on Nursing hours."

308.    In 2017 and 2018, CMS gave Cheltenham a rating of two out of five stars for its staffing, indicating that the facility's staffing levels were "below average."  Cheltenham's registered nursing staffing received 2.5 stars, and 1.75 stars, respectively, in 2017 and 2018.  In 2019 and 2020, Cheltenham's staffing rating was one star for both overall and registered nurse staffing.  A one star rating meant that the facility's staffing levels were "much below average."  Cheltenham currently has a one star rating for both overall and registered nurse staffing.  These ratings were based on quarterly payroll data submitted to CMS, the number of residents at the facility, and the facility's case mix.

309.    In addition to its understaffing issues, Cheltenham's staff continued to lack basic competencies.

310.    For example, in February 2017, a Cheltenham nurse responsible for training and educating staff identified a "knowledge deficit" that was "clearly observable" regarding care for residents who had a tracheostomy, which is a surgically created opening in the neck that allows a breathing tube to be placed in the patient's windpipe.  The nurse identified this knowledge deficit in an email she sent to Jacob and Murray on February 13, 2017.

311.    On February 20, 2017, a resident who had tracheostomy tube died while in Cheltenham's care.  A nurse left her at 6:30 p.m. and returned at 7:45 p.m. to find that the resident's tracheostomy tube was out and the resident had no pulse.  The resident was pronounced dead at 8:33 p.m.

312.    In a subsequent survey stemming from this incident, Pennsylvania concluded that Cheltenham "failed to implement interventions and supervision to prevent" the resident from harming herself.

313.    Moreover, in March 2017, the facility was failing to scan and process hospital records for admitted residents.  As Colleen Johnson wrote in an email to Murray dated March 13, 2017, it was "critical" that records were maintained properly and this was "not an option, but a requirement."  Yet as Johnson noted to Sue Lehman in an email from the same day, the person responsible for Cheltenham's medical records had been so incompetent in previous roles that she was nearly terminated.   Lehman responded that it was "so frustrating that they just 'fill a hole' without regard for the person's ability to do the job.  Historically this has happened over and over."

314.    Murray later emailed Johnson that he thought the medical records employee "might be a little dyslexic."  Johnson forwarded this to Lehman, writing that she believed this employee was illiterate "and have mentioned that on several occasions, but she is still full time and filing."  Lehman replied that she was "actually speechless on this . . . no common sense!"

315.    On June 14, 2017, a Cheltenham nurse informed Murray, Roberts, and Mayo that there seemed "to be a knowledge deficit pertaining to basic first aid implementation."

316.    Similarly, on June 20, 2017, Johnson informed Lehman that Roberts was having to educate nursing unit managers "like they were still in nursing school."

G.    **Examples of Federal Health Care Program Beneficiaries**

317.    The following are examples of Medicare and Medicaid beneficiaries who received grossly substandard care at Cheltenham during the relevant period.  The care deficiencies for

these residents included, but were not limited to, the following violations of the Nursing Home Reform Act and its implementing regulations:

- Failing to provide appropriate mental health treatments and services, in violation of 42 § 1395i-3(b)(4)(A)(vii) and 42 C.F.R. § 483.40(b);

- Failing to create a comprehensive and current written care plan for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met," in violation of 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C);

- Failing to be keep residents free from abuse and neglect, in violation of 42 C.F.R. § 483.12;

- Failing to provide routine and emergency dental services sufficient to meet the needs of resident, including helping residents make dental appointments and arrange for their transportation, in violation of 42 U.S.C. § 1395i-3(b)(4)(A)(vi) and 42 C.F.R. § 483.55(a)(4);

- Failing to keep the resident (or the resident's representative) properly informed and failing to appropriately consult with the resident's physician, in violation of 42 U.S.C. § 1395i-3(c)(1)(A)(i); 42 C.F.R. § 483.10(c); and  42 C.F.R. § 483.10(g)(14);

- Failing to provide "adequate supervision and assistance devices to prevent accidents," including resident falls, in violation of 42 C.F.R. § 483.25(i);

- Failing to ensure the residents do not receive unnecessary drugs, in violation of 42 C.F.R. § 483.45(d);

- Failing to provide nursing services "sufficient to meet the nursing needs of its residents," in violation of 42 U.S.C. § 1395i-3(b)(4)(C)(i) and 42 C.F.R. §§ 483.35(a)(1); and

- Failing to provide respiratory care, including tracheostomy care, consistent with professional standards of practice, in violation of 42 C.F.R. § 483.25(i).

318.    False claims submitted to Medicare and Medicaid for these beneficiaries are included in Attachment A.

### ii.  JM

319.    JM was a Medicaid beneficiary who was admitted to the facility in November 2017.  At a minimum, Cheltenham failed to provide JM with appropriate mental services and treatments and failed to create a comprehensive and accurate care plan for him, in violation of 42 § 1395i-3(b)(4)(A)(vii); 42 C.F.R. § 483.40(b); 42 U.S.C. § 1395i-3(b)(2)(A); and 42 C.F.R. § 483.21(b).

320.    Prior to his admission, JM had been hospitalized for a change in mental status and potential suicide, as he had wrapped a cord around his own neck while at another nursing home. The hospital recommended that JM remain in the care of a psychiatrist while at Cheltenham.

321.    On February 16, 2018, JM was observed refusing to associate with anyone and appearing visibly sad and angry.  There is no evidence that this behavior caused JM to receive a psychiatric evaluation.  On March 7, 2018, JM was hospitalized after he slashed his wrists in a deliberate attempt to hurt himself.   It was only after this episode that Cheltenham included JM's history of potential suicide in his care plan.

322.    JM was readmitted to Cheltenham on March 20, 2018.  Shortly thereafter, he began refusing his morning medications.  A physician was notified, but there was no evidence of any resulting orders.

323.    On or around May 2, 2018, Cheltenham sent a psychology referral for JM to obtain additional support from behavioral health services, but he was never seen by these specialists and never received the support.  On May 24, 2018, JM was observed only getting out of bed to go the bathroom.  JM refused a dinner and, when asked how he was, just shook his head from side to side.  There was no evidence of any additional inquiry or intervention by Cheltenham staff.

324.    Less than two weeks later, on June 5, 2018, JM was found "hanging from a piece of bedsheet from the shower pole in the shower room."  JM was non-responsive and transported to the hospital, where he was placed on a ventilator.  JM died on June 12, 2018.

### ii.  CH

325.    CH was a Medicaid beneficiary.  At a minimum, Cheltenham failed to provide CH with appropriate mental services and treatments and failed to create a comprehensive and current care plan for her, in violation of 42 § 1395i-3(b)(4)(A)(vii); 42 C.F.R. § 483.40(b); 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C).

326.    On June 9, 2018, CH informed Cheltenham staff that she was suicidal and had a plan to kill herself.  Cheltenham sent her to the hospital, where CH was admitted for psychiatric evaluation and treatment.  She subsequently returned to Cheltenham, but when a psychiatric nurse practitioner visited the facility on July 27, 2018, CH was not evaluated.

327.    As of September 7, 2018, CH's care plan had not been updated to reflect that staff was supposed to check on her every 15 minutes, change her room, and arrange an additional visit from a psychiatric provider.

328.    On September 27, 2018, CH was only being seen by a mental health professional "as needed," even though Cheltenham still considered her to need regularly scheduled evaluations.  She was still only being seen "as needed" on October 8, 2018, and Cheltenham was not tracking whether she needed more psychiatric care.  According to Colleen Johnson, this represented a failure to address the problems that lead to JM's suicide in June 2018, which were insufficient interventions and psychiatric evaluations.

### iii.  RG

329.    RG was a Medicaid beneficiary.  At a minimum, Cheltenham failed to keep RG free from neglect; failed to provide her with adequate dental services; failed to create a comprehensive and current care plan for her; and failed to keep her, her representative, and her physician properly informed and able to participate in the planning of her treatment, in violation of 42 C.F.R. § 483.12; 42 U.S.C. § 1395i-3(b)(4)(A)(vi); 42 C.F.R. § 483.55(a)(4); 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); 42 U.S.C. § 1395i-3(c)(1)(A)(i); 42 C.F.R. § 483.10(c); and 42 C.F.R. § 483.10(g)(14).

330.    In October 2016, RG was placed in isolation due to fears of a staph infection in her craniotomy site.  RG was neglected during her isolation, as one day she was not fed breakfast or lunch, her brief was not changed, and she was found soaked in urine.

331.    RG also had a history of refusing to see the dentist in August 2017, September 2017, and October 2018.  Her care plan, however, did not contain any specific interventions

developed to address this problem, any attempts to find care alternatives, or any efforts to educate RG or her representative about the risks posed by her refusal of dental care.

332.     By July 2018, RG was severely cognitively impaired.  On July 11, 2018, RG's gums were observed to be swollen, bleeding, and containing pus.  The next day, a dentist identified abscesses on three of her teeth, determined that these teeth were not restorable, and diagnosed her with severe periodontal disease and "gross" amounts of plaque.

333.     RG was to be referred to an oral surgeon for tooth extractions and prescribed additional dental treatments, including medication and additional dental treatments.  However, as of November 5, 2018—nearly four months later—Cheltenham had not provided the recommended medication or followed up with the dentist for additional treatments.  Cheltenham also did not notify the resident's physician about the dentist's recommendation.

### iv.  JD

334.     JD was a Medicare and Medicaid beneficiary first admitted to Cheltenham on November 30, 2015.  At a minimum, Cheltenham failed to keep JD free from abuse and neglect, failed to provide adequate supervision to prevent accidents, failed to ensure she did not receive unnecessary drugs, and failed to provide nursing services sufficient to meet JD's needs, in violation of 42 C.F.R. § 483.12; 42 C.F.R. § 483.25(i); 42 C.F.R. § 483.45(d); 42 U.S.C. § 1395i-3(b)(4)(C)(i); and 42 C.F.R. §§ 483.35(a)(1).

335.     On February 15, 2016, JD was hit in the chest by another resident.  On February 17, 2016, she was kicked in the shin by a nursing aide and suffered a bruise.  She was also found with different bruises on her body on April 11, 2016; April 16, 2016; April 25, 2016; May 30, 2016; June 10, 2016; and June 22, 2016.

336.     In a monthly report for April 2016, Omnicare recommended that Cheltenham reevaluate and potentially discontinue JD's receipt of lorazepam, an antianxiety drug, because the 2015 American Geriatric Society Beers Criteria strongly recommended avoiding such medications for individuals with agitation, insomnia, or delirium due to an increased risk of serious, negative side effects, including falls and fractures.[2]

337.     Omnicare repeated this recommendation in September 2016.

338.     Eventually JD was put on one-on-one supervision due to her accumulating bruises.  But even after supposedly receiving this one-on-one supervision, she fell and was hospitalized with a fractured hip.  On information and belief this injury occurred on or around November 1, 2016.

339.     After returning to Cheltenham from the hospital on November 4, 2016, JD fell again and fractured her femur on or around November 28, 2016.  The nurse who was supposed to be supervising her claimed that he did not know she was supposed to receive one-on-one supervision.

340.     JD also suffered additional falls on October 26, 2018, and on December 15, 2018.

341.     Finally, Omnicare informed Cheltenham in monthly reports for January 2016, July 2016, January 2018, and June 2018 that JD was receiving appetitive suppressing medications even though she had experienced unintentional weight loss or been diagnosed with anorexia or malnutrition.   In monthly reports for May 2016 and February 2018, Omnicare also recommended reducing and hopefully discontinuing JD's antipsychotic medication, because the

_____

[2] The Beers Criteria was established in 1991 to help identify potentially inappropriate medications for the elderly.

medication's label contained a warning from the FDA that antipsychotics posed an increased risk of mortality for individuals who had dementia.

### v. LC

302.    LC was a Medicaid beneficiary who was admitted to Cheltenham on February 16, 2017, after three months in acute care for a massive stroke.  At a minimum, Cheltenham failed to provide nursing services sufficient to meet LC's needs and failed to provide her respiratory care consistent with professional standards of practice, in violation of 42 U.S.C. § 1395i-3(b)(4)(C)(i); 42 C.F.R. §§ 483.35(a)(1); and 42 C.F.R. § 483.25(i).

303.    LC was non-verbal, but could communicate by nodding or shaking her head.  LC had a tracheostomy, or a surgically created hole through the front of the neck and into the windpipe which provides an air passage for a breathing tube.

304.    On February 17, 2017, LC was observed attempting to pull her breathing tube out of her windpipe.  Cheltenham ordered hand mittens in response.

305.    On February 19, 2017, LC was found in bed with her breathing tube completely out.  Cheltenham staff were able to put the tube back in by hyperextending the resident's neck, but LC was in respiratory distress.  In response, the facility's only interventions were to increase supervision and continue with the hand mittens.  However, LC continued to have periodic episodes of agitation in which she attempted to remove her breathing tube.

306.    On February 20, 2017, at 2:48 pm, LC attempted to pull her breathing tube out.  At 6:30 pm on the same day, the resident was found with one mitten off.  The mitten was replaced and the resident left alone in her room.  At 7:45 the resident was found to be unresponsive and without her breathing tube.  LC died at 8:33 pm.

## V. <u>THE SANCTUARY AT WILMINGTON PLACE</u>

307.    From at least January 1, 2017, through December 31, 2018, the Sanctuary at Wilmington Place provided grossly substandard care to its residents.  Throughout this period, the facility had pervasive and significant deficiencies relating to general resident care, prescription medications, staffing, and medical records.

308.    However, during this time, Matt Lehman and others at AHF Management were largely focused on Wilmington Place's financial health, instead of the well-being of its residents. This was a substantial factor in causing the worthless and grossly substandard care that Wilmington Place provided.

309.    For instance, on April 18, 2017, Colleen Johnson informed Matt Lehman that there were still significant problems with Wilmington Place's clinical care, including medication errors, a failure to document and address resident falls, missing skin assessments, and incorrect care plans and orders.  Johnson further stated that she was concerned "that we are not correcting or following up from same items from previous visits . . . I wanted to give you a heads up so we can come up with some kind of plan to get this on track here."

310.    On April 24, 2017—less than a week after Johnson informed him of repeated care deficiencies at the facility—Matt Lehman wrote an email to Rick Cordonnier, Wilmington Place's administrator, in which he did not mention the facility's various care problems.  Instead, Lehman told Cordonnier that the "March financials" indicated "it was an awful month and year to date is not any better."  Lehman continued his admonishment, writing that Wilmington Place "should be making money every month.  Let me know what your plan is to get it back on track."

311.    As alleged in further detail below, following these emails, none of the care problems that Johnson had identified were fixed.  However, Wilmington Place's net income in 2018 was nearly nine times higher than it was in 2017.

**A.    Basic Resident Care**

312.    Wilmington Place repeatedly identified or learned that there were serious problems with the care it provided to its residents.  Notwithstanding this knowledge, the facility continued to provide grossly substandard care, including various infection control failures.

**i.    General Care Deficiencies**

309.    On March 8, 2017, Colleen Johnson reported to Matt Lehman that she had found numerous residents with pressure ulcers during a recent facility.  However, Johnson observed that there was "[n]o evidence wound protocols were followed/in place."

310.    Later that month, a risk management consultant visited Wilmington Place and provided feedback on "pressure ulcers that worsened after admission," to Sue Lehman, Matt Lehman, Colleen Johnson, and Rick Cordonnier.  In general, the consultant stated that post-admission pressure ulcers were something facility needed "to work on due to their elevated number."  In fact, she noted that residents at Wilmington Place were developing pressure ulcers at more than twice the average rate of other facilities in Ohio and the rest of the country.  The facility identified several root causes for this problem, including that residents were regularly "just left in bed by staff."  In addition, Wilmington Place recognized that facility staff were not properly repositioning residents in their bed or chair and that staff was "slow to notice and communicate the early stages of functional decline."

311.    In an internal email sent on March 21, 2017, to an AHF Management employee, Matt Lehman described falls and pressure ulcers at Wilmington Place as "a major concern that they will need assistance on."

312.    Ohio health inspectors also found that Wilmington Place "failed to prevent neglect of residents" in a complaint survey completed on May 17, 2017.

313.    One resident "was found sitting in her wheel chair with dried feces and urine on her wheel chair and lower back."  Nursing aides at the facility "documented [that] they believed [the resident's] incontinence pad had not been changed for a while" and "it took three [nursing assistants] to clean up the mess."  A nursing aide had been observed cleaning "up the feces on the floor but did not clean the resident."

314.    A different resident had to urinate at 5:00 A.M. "and was unable to call for help" because a nursing aide "had moved her call light out of [her] reach and told her I am tired of you putting on your light."  This nursing aide was found "sleeping in the common room during the middle of the shift."

315.    Even after the nursing aide was found sleeping, Wilmington Place allowed the nursing aide to continue to work and no one checked on the residents assigned to the assistant "to ensure care was provided to the residents."  Moreover, the facility did not have "policies or procedures for staff to follow if an employee is found sleeping on the job."

316.    An AHF Management employee sent an internal email to Matt Lehman, Johnson, and Cordonnier on May 26, 2017, in which she described attempts to educate Wilmington Place's staff of their responsibilities "when abuse or neglect is suspected."   The AHF Management employee reported that "not one nurse mentioned that checking the residents" was something that should be done when abuse or neglect was suspected.

317.    In another survey completed on October 17, 2017, Ohio health inspectors found that the facility had failed to follow hospital discharge instructions by failing to schedule an ordered physician consultation for a discharged resident.  The inspectors noted that this deficiency was "an example of continued non-compliance" from an earlier survey completed on August 24, 2017.

318.    Johnson visited Wilmington Place from December 4 to December 7, 2017, and subsequently reported continued resident neglect to Matt Lehman and Jeff Weiner, the facility's new administrator.  For instance, Johnson observed that residents were just left "in bed in the daytime in a gown, on their back and [a] call light not in reach."  Johnson also noticed other "unkempt" residents who needed to be shaved or receive nail care, as well as residents' catheter bags just left out in plain view.

319.    Moreover, despite the facility documenting that many residents were eating less than 50 percent of your food, Johnson noted that there was "no evidence" that staff offered these residents any food substitutions or supplements.  In addition, Johnson witnessed two "small residents in low wheelchairs at the dining tables and their heads are barely above the table," leaving them "[u]nable to reach their food items."

320.    Meanwhile, Wilmington Place continued to provide deficient skin care to its residents.  An internal January 2018 wound audit found that 20 residents had some sort of wound or sore on their skin.  This was roughly 1/3rd of Wilmington Place's resident population.

321.    In another survey that was completed on April 30, 2018, Ohio health inspectors found that Wilmington Place had failed to properly report and investigate alleged resident abuse and neglect.  These deficiencies stemmed from two alleged incidents of verbal abuse and neglect. In the first, a resident needing assistance to go the bathroom and then return to bed claimed that

an aide told her to "shut up," left feces on her floor, and improperly positioned her on her bed. The resident shared this alleged verbal abuse with a different aide who did not report it to her supervisor or Wilmington Place's management.  Instead, the director of nursing only learned of the incident from the son of the affected resident.  The facility had no evidence that the aide in question, or other residents who interacted with the aide, were interviewed.

322.    The second incident involved a resident alleging that an aide was rude, improperly placed her on her bed, and then left the room.  The resident "urinated in her briefs and got some urine on her dress," before a different aide entered and helped her.  There was no evidence that anyone "reported the alleged abuse immediately to a manager as required and there was no witness statement obtained" from the second aide.

323.    Both incidents were contrary to Wilmington Place's own abuse policy, which required allegations of abuse or neglect to be reported within two hours and for the facility to obtain written statements from any witnesses.

324.    On January 26, 2019, a friend or relative of a Wilmington Place resident posted a review of the facility on Caring.com, in which the reviewer stated that "[i]f you care about the person don't put them there."  The reviewer explained that he or she "had my loved ones removed [within] the first twelve hours," because Wilmington Place just "put them in bed," left them there, "and won't come when the call button is pushed."

### ii.    Infection Control

325.    Colleen Johnson visited Wilmington Place in March 2017 and found the documentation relating to infection control to be lacking.  As she reported to Matt Lehman on March 8, 2017, Johnson did not see any logs of infections, a map of the facility with infections

marked to assess if an infection was spreading, or education provided on deficient infection practices.

326.    In a survey completed on August 24, 2017, Ohio health inspectors found that Wilmington Place "failed to maintain an infection control monitoring program." In fact, "there was no evidence of anyone at the facility monitoring infection trends" from June 2016 until July 2017. The health inspectors further noted that the director of nursing confirmed that "there was no evidence of an infection control or monitoring program."

327.    In her visit to the facility in early December 2017, Johnson viewed a student nurse violate infection control standards by drawing blood from a resident's finger without wearing any gloves. As Johnson indicated in the report she provided to Matt Lehman and Jeff Weiner, a facility instructor was present but did nothing. Johnson also asked Wilmington Place to educate the instructor "on requirements for dignity and infection control."

328.    Johnson further noted the staff were placing soiled linens on the floor of resident's rooms, which was also a deficient infection control practice.

329.    In an Ohio survey completed on November 26, 2019—mere months before the onset of the COVID-19 pandemic—the facility was found to have "failed to ensure standard infection control practices were followed for the residents." The health inspectors concluded that a resident being treated for an infection should have been isolated, but an interview with a nurse confirmed that this resident "was not on any isolation precautions." An order was eventually issued for "airborne and contact precautions" until the resident's infection was no longer contagious. However, the inspectors eventually learned that Wilmington Place was "not equipped" for airborne infection control precautions.

330.    The facility also "failed to provide monitoring of their water management plan" to help prevent legionella, a bacteria that can cause a pneumonia-like illness commonly known as Legionnaires disease.  Wilmington Place was supposed test its water every month to help prevent legionella, but "there was no evidence the facility completed the routine monitoring specified in their water management program."

### iii.    Quality Measures

331.    Wilmington Place was an outlier on several quality measures, which are metrics that CMS has designated as potentially useful in evaluating nursing home performance.  This information was available to the facility through CMS' CASPER reports, which allow nursing homes to check their quality measure data, compare their metrics compare to state and national averages, and determine if they are an outlier in any categories.

332.    For example, on December 15, 2017, Christina Lukezic, a registered nurse working for AHF Management, obtained a CASPER report that showed that Wilmington Place was a significant national outlier in several nursing home quality measures from June 2017 to November 2017.  During this period, Wilmington Place was in the 97th percentile for residents suffering falls with a major injury, the 97th percentile for residents who were prescribed antianxiety or hypnotic medications, the 95th percentile for residents with excess weight loss, the 93rd percentile for residents with behavioral symptoms affecting others, the 90th percentile for residents suffering falls, and the 90th percentile for low-risk residents who lost their bowel or bladder control.  As a practical matter, this often meant that, for these quality measures, Wilmington Place was two or three times worse than an average facility.

333.    Wilmington Place was still a significant quality measure outlier in 2018.  For example, in the fourth quarter of 2018, the facility was in the 96th national percentile for falls

with a major injury and in the 96th percentile for residents whose ability to move independently worsened.  Again, Wilmington Place was exponentially worse than the national average for these quality measures.

      **B.**     **Prescription Medications**

335.    Wilmington Place had repeated problems with unnecessary medications, medication errors, and unavailable medications.   The facility was also repeatedly alerted by Omnicare, its consultant pharmacist, to numerous other deficiencies related to prescription medications.

       **i.**     **Unnecessary Medications and Medication Errors**

337.    Omnicare is national pharmacy that specializes in providing services to numerous homes.  Between January 2016 and October 2018, Wilmington Place received over 1,000 specific recommendations from Omnicare relating to medications that were unnecessary, contraindicated, or otherwise problematic.

338.    For example, on July 12, 2017, Omnicare recommended that Wilmington Place consider reducing the dose of (and ultimately eliminating) an antipsychotic drug for a resident with dementia.  The basis for this recommendation was an FDA warning that there is an increased risk of death when elderly people with dementia are treated with antipsychotics.  In addition, the 2012 Beers Criteria for potentially inappropriate medications for the elderly recommended avoiding antipsychotics for persons with dementia due to an increased risk of stroke and death.  Wilmington Place did not respond to this recommendation.

339.    In fact, the facility had a habit of not responding to pharmacy recommendations. When Colleen Johnson visited Wilmington Place at the beginning of March 2017, she found numerous pharmacy recommendations dating back to the last quarter of 2016 that "were not

addressed" by Wilmington Place or a physician.  Johnson emailed this information to Matt
Lehman on March 8, 2017.

340.    In a survey completed on August 24, 2017, Ohio health inspectors found that the
facility was still failing to ensure the pharmacy recommendations were addressed in a timely
manner.

341.    In addition, the health inspectors determined that Wilmington Place had failed to
ensure non-drug interventions before administering pain medication.  The inspectors noted that
one resident's care plan called for pain management through repositioning and back rubs.  Yet
the resident was given pain medication for six weeks and the facility never attempted these non-
drug interventions.  Ohio's health inspectors also found a similar deficiency with another
resident.

342.    Wilmington Place also struggled with medication errors.  For example, following
her visit to Wilmington Place in April 2017, Johnson sent an email to Matt Lehman in which she
noted a "BIG concern" related to a resident medication error.  This resident had been admitted on
March 20, 2017, at which point he was receiving Coumadin (a blood thinner) and Plavix
(another blood thinner).  The Plavix medication was supposed to be discontinued in three days,
yet the resident was still receiving it nearly a month later.  This placed the resident at
unnecessary risk of hemorrhage or other serious side effects related to blood thinners.

343.    While investigating an unrelated complaint on October 1, 2018, Ohio health
inspectors further determined that Wilmington Place had a medication error rate above the five
percent threshold for acceptability.

344.    The Ohio inspectors returned ten days later and found that Wilmington Place had
"failed to ensure a resident was free from unnecessary medications" and "failed to ensure an

antibiotic was assessed and reviewed as required" when it administered an antibiotic without a sufficient justification.  A resident had received an antibiotic to prevent a urinary tract infection, but there was no "documentation of a urine culture being completed or signs and symptoms of a UTI."  In an interview, the director of nursing verified that there was "no reason why" this resident should have received the antibiotic and that the medication "should have been discontinued unless there was documentation for a need."  The resident's urologist also "denied having information as to why or how long the resident had received the medication."

        **ii.**      **Unavailable Medications**

345.    Wilmington Place also persistently failed to ensure that prescribed medications were actually provided to residents.

346.    In a complaint survey completed on October 17, 2017, Ohio health inspectors concluded that Wilmington Place had "failed to have physician ordered medications available from the pharmacy for resident administration."  In other words, the facility had failed to obtain the medications prescribed for physicians for its residents.  One resident had not always received a prescribed anti-seizure medication, another resident did not always receive prescribed anti-nausea medication, and an inhaler prescribed to help still another resident breathe was not always available.

347.    Colleen Johnson visited Wilmington Place shortly after this survey in October 2017 and learned that obtaining medications for residents was a persistent problem.  As she relayed in in an email sent to Sue Lehman on November 10, 2017, facility managers had "confirmed they have been having issues with receiving ordered medications for some time."  When Johnson asked them if they had contacted the back-up pharmacy, she was told "they had

no idea there was a back-up in place."  Johnson further interviewed several nurses who confirmed that they had trouble getting prescribed medications for residents.

348.    As a result, Johnson had Wilmington Place conduct an audit "of all medication carts to validate medications were available for residents."  This audit uncovered "pages of missing medications."

349.    During Johnson's October 2017 visit, one resident did not receive their prescribed psychotropic medication for three days, "had an episode," and tried to leave the facility.  Another newly admitted resident also did not receive their prescribed pain medication.

350.    When Johnson returned to Wilmington Place in December 2017, she found medical records indicating that prescribed medications were still not available from the pharmacy on Fridays and Saturdays.  These medications were often not obtained until Sunday when a weekend supervisor intervened.  Johnson conveyed this information in an email to Matt Lehman and Jeff Weiner on December 14, 2017.

351.    Similarly, in a complaint survey completed on October 1, 2018, Ohio health inspectors found that Wilmington Place "failed to ensure medication was available and given in accordance with physician orders," with a resident going without her needed anxiety medication for two days.

352.    Ohio completed an annual survey of Wilmington Place on November 26, 2019.  During this survey, Ohio found that "the facility failed to provide adequate pain control for a resident after her admission to the facility."  This failure lead to "actual harm" when Wilmington Place failed to ensure that a resident had her pain medication "when she rated her pain a 10 out of 10) and "described it as excruciating pain resulting in crying."  A review of the medical

records indicated that the resident was left to suffer in this excruciating pain for over seven hours without receiving any medication.

353.    Moreover, on February 26, 2020, a current or former resident of Wilmington Place posted on Caring.com that it could take up to 24 hours to get prescribed medications.  The resident also stated that medications were "administered per facility schedule" and "not as ordered," and that consequently residents had to independently "know and seek medication from staff."

### iii.    Omnicare Recommendations

354.    For most of the period at issue, Omnicare served as Wilmington Place's consultant pharmacist.

355.    In this role, Omnicare repeatedly observed numerous, systemic medication problems that it identified as either a "pattern" or "widespread" in quality improvement summaries.  These deficiencies included several that had already been identified by AHF Management or Ohio health inspectors.

356.    Omnicare defined "pattern" and "widespread" consistent with CMS' definitions for survey protocols for long term care facilities.  Therefore, "pattern" meant that more than a limited number of residents or staff were involved, or the same residents had repeatedly been affected by the deficient practice.  In comparison, a "widespread" deficiency was when the problem was pervasive or represented systemic failure that affected or could effect a large portion of the residents.

357.    From August 2017 to October 2018, Omnicare found—and shared with Wilmington Place, including administrators Vicki Hickman and Jeff Weiner—numerous "pattern" or "widespread" deficiencies.  Some examples are as follows:

358.    Wilmington Place did not attempt and document non-pharmaceutical interventions before administering powerful medications in August 2017, September 2017, March 2018, April 2018, May 2018, June 2018, July 2018, August 2018, September 2018, and October 2018.  For example, in September 2017, Omnicare noticed that two residents had repeatedly been treated with lorazepam, a controlled substance used to treat seizure disorders and relieve anxiety, without any evidence that Wilmington Place had attempted alternative interventions.  Lorazepam can cause paranoia or suicidal intentions, among other side effects.

359.    Wilmington Place made discontinued or expired medications available to residents in August 2017, November 2017, March 2018, April 2018, May 2018, June 2018, July 2018, August 2018, and September 2018.  For example, in March 2018, Omnicare found that "several discontinued/expired medications were available for administration," including insulin that was past its expiration data and had since been opened.  Because expired insulin can be less effective, taking it can be dangerous, and even fatal, by increasing blood sugar levels or causing death through diabetic ketoacidosis (when a lack of insulin causes the body to break down fat to use as fuel).

360.    Wilmington Place did not identify appropriate target behaviors for antipsychotic therapy in August 2017, October 2017, January 2018, April 2018, May 2018, August 2018, September 2018, and October 2018.  As a result, Omnicare repeatedly provided "a few examples of APPROPRIATE target behavior for antipsychotic therapy," (like hitting, biting, fighting, hallucinations, and continuous screaming), and "few examples of INAPPOPRIATE target behaviors for antipsychotic therapy" (like agitation, anxiety, fidgeting, inattention, memory issues, nervousness, poor self-care, uncooperativeness, and unsociability).[3]

---

[3]     Omnicare's complete antipsychotic medication reminder was follows:

361.     Wilmington Place administered medications outside the parameters of the
prescribing physician's order in September 2017, October 2017, December 2017, February 2018,
March 2018, April 2018, July 2018, and August 2018.  For example, in April 2018, Omnicare
found that multiple residents were given medications to lower blood pressure, when the
residents' blood pressure readings were low enough that the medication was potentially
unnecessary or even harmful.

362.     Wilmington Place did not properly monitor medications in August 2017,
September 2017, December 2017, January 2018, June 2018, July 2018, and August 2018.  For
example, in June 2018, Omnicare observed that there were thirteen recommendations made
"regarding suggested lab monitoring or labs that were ordered but have been not been drawn,"
including blood work for one resident taking antiplatelet medications that "ranked highest in a
meta-analysis of preventable drug-related hospital admissions and also ranked highest for
adverse drug reactions and over-treatment."

363.     Wilmington Place administered medications in excessive doses or durations in
October 2017, December 2017, January 2018, February 2018, March 2018, May 2018, and June
2018.  For example, in May 2018, Omnicare made fourteen related recommendations, including

---

Here are a few examples of APPROPRIATE target behaviors for antipsychotic therapy:
hitting, biting, scratching, fighting, hallucinations, kicking, delusions, continuous crying
out, continuous yelling, or continuous screaming).  The target behaviors should be
quantitatively monitored according to facility.

Here are a few examples of INAPPROPRIATE target behaviors for antipsychotic
therapy:  agitated, anxiety, depressed/withdrawn, fidgeting, impaired memory, inattention
or indifference to surroundings, insomnia, mild anxiety, mood changes, nervousness,
noisy, pinching, poor self-care, restless, uncooperative, unsociability, wandering,
indications that do not represent a danger to the resident or others.

one for a resident taking Apixaban, an anticoagulant medication used to treat atrial fibrillation, at a dosage level that actually increased the risk of deep vein thrombosis or a pulmonary embolism.

364.    Wilmington Place did not record when medication vials were opened in March 2018, April 2018, May 2018, June 2018, July 2018, August 2018, and September 2018.  For example, in June 2018, Omnicare found that insulin pens and vials were "not being dated when removed from fridge or stored in fridge until needed" as well as inhalers that were "not being dated when removed from foil packaging."   Expired insulin and inhalers can lose their effectiveness during a diabetic or asthmatic episode—and, as noted above, expired insulin can even cause harm or death.[4]

365.    Wilmington Place did not appropriately act upon previous medication review recommendations in December 2017, March 2018, June 2018, and July 2018.  For example, in July 2018, Omnicare found that numerous recommendations relating to a gradual dose reduction of psychotropic drugs—including antipsychotic, antianxiety, and antidepressant medications— "were deferred to psych but never acted upon."

366.    Wilmington Place did not appropriately document as needed psychotropic drugs used for greater than 14 days in December 2017, January 2018, February 2018, and June 2018. For example, in December 2017, Omnicare found that one resident had an as needed order for Ambien to address insomnia that had "been in place for 14 days without a stop date," without justifying the prescription, explaining the intended duration, or providing a "rationale for the extended time period."  This violated CMS' requirements for such drugs.

---

[4]     In a survey completed on November 26, 2019, Ohio health inspectors also determined that Wilmington Place had "failed to store medications, inhalation medications, and nutritional supplements according to their expiration dates."  Health inspectors identified six residents who might have received expired inhalers and another seven residents who might have received expired supplements.

367.    Wilmington Place did not properly label medications in March 2018, April 2018, May 2018, and July 2018.  For example, in April 2018, Omnicare found that numerous items "were missing labels," as well as inhalers and insulin removed from their boxes "without indicating patient name, etc."  Omnicare also observed that medication cart drawers had loose anticoagulants, antibiotics, and muscle relaxant pills without a container.

**C.    Staffing and Staff Competencies**

368.    Wilmington Place had recurrent problems with staffing during the period at issue. These problems included chronic failures to adequately staff the facility, staff members who were not properly trained, and excessive staff turnover.  These deficiencies significantly hurt Wilmington Place's ability to treat its residents.

369.    On March 8, 2017, Colleen Johnson informed Matt Lehman that Wilmington Place had a significant staffing shortage.  This lead to Wilmington Place managers working on the floor as nurses.  One manager even "had to come back and work the night shift."  In response, Lehman recognized that the facility was understaffed "and will need to continue to actively hire."

370.    Johnson also noted that facility lacked "orientation skills checklist[s]" for registered nurses, licensed practical nurses, and nursing assistants.  Lehman acknowledged that he knew Wilmington Place had "some issues staffing bringing back employees who should never have been brought back and having them train new employees."

371.    On March 19, 2017, an outside consultant sent Sue Lehman, Matt Lehman, Johnson, and Rick Cordonnier a performance improvement plan because half of Wilmington Place's "new hires in nursing and housekeeping self-terminate within 30 days of hire or less." This problem stemmed in part from the facility being habitually understaffed, as "the staff on

[the] 7 pm to 7 am [shift] are presumed to be 'working short' more than 2 ½ days per week."  In addition, Wilmington Place staff admitted that the facility's orientation and training was inconsistent, with "no skill competency completion."

372.    Moreover, the consultant found that staff turnover, and "especially direct staff on [the] night shift," contributed to an increase in falls among its residents.  Staff on the night shift were increasingly "vacating their position within 14 days of hire," which made solving this problem more difficult.  Another barrier was direct training that was "insufficient for competency of new employee[s]."

373.    The outside consultant also concluded that the facility's staffing problems contributed to an exceedingly high propensity for pressure ulcers among Wilmington Place residents.  Specifically, staff turnover in nursing and housekeeping was "at high rates," which meant "training and skill competency evaluations [were] insufficient."  Similarly, Wilmington Place's higher than average rate of falls were in part caused by staff turnover, the high "frequency of staff vacating their position within 14 days of hire on [the] night shift," and training that was "insufficient for competency of new employee[s]."

374.    On April 18, 2017, Matt Lehman explained to Colleen Johnson that Wilmington Place's staffing deficiencies came from their inability to retain people, which "starts with training."

375.    On April 20, 2017, Lehman further commented to Johnson, "I'm surprised they have any staff left."

376.    Wilmington Place's training problems even included managers.  For example, the facility's assistant director of nursing revealed to Johnson during a meeting on May 8, 2017, that

"he was never really trained even when promoted to [assistant director of nursing]." Johnson relayed this information to Matt Lehman on the same day.

377. In addition to training, Wilmington Place had problems with staff not filling their normally scheduled shifts due to illness or other reasons. This occurrence is commonly referred to as "call outs" or "call ins." On May 16, 2017, Johnson reported to Matt Lehman that "call ins really need [to be] addressed," because of the "inability to provide cares [sic] when this happens. We have 5 [direct care staff] scheduled for days and then only 3 show up."

378. The facility attempted to fill these gaps by hiring temporary, agency staff, but this was expensive and discouraged by AHF Management. On October 10, 2017, Matt Lehman sent an email to Jeff Weiner regarding "agency staffing bills for September," which Lehman wrote indicated that the facility was "over staffing with agency by quite a bit." Lehman sent a similar email to Weiner on November 22, 2017, in which he said the October financials also indicated that "someone is calling in agency staff when not necessary."

379. Wilmington Place, however, was still having problems with staff retention and training. In an email to Cristina Lukezic on January 7, 2018, a facility manager requested access to training modules because the facility was still "having a consistent problem with retention" and she thought improved training could help.

380. Meanwhile, AHF Management continued to press Wilmington Place to reduce its staffing costs. On March 9, 2018, Matt Lehman directed Weiner to create a plan to improve the facility's financial performance. Lehman further wrote that the facility needed to ensure "that census remains a priority and each department is being held accountable for their expenses including staffing." Lehman noted that it was "not ideal to have to micromanage each

department," but explained that "we will need to until we can get this facilities profitable again which I am confident you will make happen."

381.    Weiner submitted a financial improvement plan on March 16, 2018.  The top item to address was overspending related to nurse staffing.  Weiner also pledged that "the entire team will continue to be census focused."

382.    On March 28, 2018, an agency nurse was accused of taking a break that was inappropriately long.  In response, the agency nurse requested that she not be assigned to work at Wilmington Place in the future.  The agency nurse said she "fears working there would put her license in jeopardy."  She further commented on the resident to staff ratio, "They are constantly understaffed, the ratio is in no way safe for residents and staff."   Weiner received this information on the same day

383.    The next day, a nursing aide from the same agency was accused of neglecting and verbally abusing a resident.  In her defense, the aide denied the accusation and noted that she "walked into a huge mess from the prior shift" because the facility was "short staffed once again."  The aide further explained, "Trays were still out everywhere, I had to clean up the utility closet and take the trash out as well."  Moreover, a different resident "seemed as if she hadn't been changed all day, she literally had poop up to the back of her neck, and I ended bathing her ASAP."  This aide also stated that she had been left with "20 residents to myself."  Finally, the aide observed that it "seemed like everyone was upset that night.  Being staffed so short is not a good situation to be in, and it's just too much."  Weiner received this information March 30, 2018.

384.    On July 16, 2018, the human resources manager for Wilmington Place emailed Matt Lehman and reported that the facility had been able to significantly reduce its use of agency

staff.  The manager attributed this to a recent increase in wages, which she asserted "has been the biggest help in keeping and employing good staff."

385.    Nonetheless, Wilmington Place continued to face staffing difficulties.  On June 20, 2019, a former nursing aide employed by Wilmington Place published a post on Indeed.com (a website for persons seeking employment) in which the aide described working at the facility as "stressful."  The aide explained that there were "too many residents to take care of" with there being "over 20 clients in the 12 hours a day shift."

386.    Similarly, a resident posted their impressions of Wilmington Place at Caring.com on February 26, 2020.  The resident stated that facility staff was "highly overworked." Moreover, the facility's staffing was "only to State minimums" and the "[h]igh use of agency nurses/aides creates lack of patient care continuity."

387.    In 2017, CMS rated Wilmington Place 3.25 stars out of a possible 5 for overall staffing and 2.25 stars out of 5 for registered nurse staffing.  In 2018, Wilmington Place received 2.25 stars out of 5 for both overall and registered nurse staffing.  In 2019, Wilmington Place's star rating for both overall and registered nurse staffing was 1.5 out of 5.  In 2020, Wilmington Place's received 2 stars for overall staffing and 1.5 for registered nurse staffing.  Wilmington Place currently has 1 star for overall and registered nurse staffing.  A one star rating means that the facility's staffing levels were "much below average," while two stars indicates that the facility's staffing levels were "below average."   These ratings were based on quarterly payroll data submitted to CMS, the number of residents at the facility, and the facility's case mix.

**D.    Care Plans, Assessments, and Other Medical Records**

388.    Wilmington Place had repeated, important clinical record deficiencies in 2017 and 2018 related.  Specifically, Wilmington Place did not have complete, accurate, and current care

plans, assessments, orders, and other important medical records for its residents.  These deficiencies often resulted in Wilmington Place residents receiving grossly substandard care. These problems were also often identified by AHF Management and Wilmington Place, but left uncorrected.

389.    For example, on December 22, 2016, the facility administrator, Rick Cordonnier, emailed Matt Lehman that "one area we need to improve on is discharge planning."  On March 8, 2017, Colleen Johnson found 41 records where no discharge summary had been completed. Just months later, on May 19, 2017, Johnson reported to Sue Lehman and Matt Lehman that she discovered an additional "50 closed records without discharge summaries" during her recent visit to the facility.

390.    Yet Wilmington Place did not fix its discharge problems.  Responding to a complaint, Ohio health inspectors completed a survey on September 29, 2017, that established that Wilmington Place had "failed to provide a safe discharge" for one of its residents.  The resident was cognitively impaired, but the facility discharged her home without a discharge order, an order for discharge services for physical or occupational therapy, or a referral for "home health services to meet the resident's needs." Ultimately, due to "poor discharge planning," the resident was left "home alone without needed services for two days."  Moreover, when the Ohio inspectors asked Wilmington Place "for a policy addressing safe discharges," the facility failed to provide one.

391.    This dynamic repeated throughout the relevant period.  Wilmington Place or AHF Management would identify a clinical record problem, the problem would not be fixed, and it would ultimately lead to resident harm.

392.    When a risk management consultant visited Wilmington Place in March 2017, the consultant and facility staff recognized that Wilmington Place had problems preventing resident falls.  Among other factors, the prevalence of falls at the facility was considered to have stemmed from a failure to consistently use fall risk assessments "to add prevention strategies to the resident care plan" and employees that were "not always aware of the names of residents at risk for a fall."  This information was conveyed to Sue Lehman, Matt Lehman, Colleen Johnson, and Rick Cordonnier.

393.    Later in March 2017, Johnson informed Matt Lehman that she had further discovered that "several residents" had "incorrect or missing diet" orders.  For example, this meant that at least eight insulin dependent residents were missing additional food orders to help with their fluctuating blood sugar.

394.    In addition, Johnson noted that Wilmington Place was not documenting weekly skin assessments and that the facility was not consistent on whether a resident's skin was intact or not.  Johnson also found that "[n]one of the pressure ulcer documentation for weekly measurements" was in the facility's electronic health records.  Finally, Johnson observed "many residents" had old orders and care plans related to wounds and skin assessments.

395.    Johnson returned to the facility in April 2017 and again reported to Matt Lehman that Wilmington Place was still having problems with its records.  For example, the facility had not updated its charts or care plans after residents suffered a fall.  One resident fell on April 14, 2017, and went to the emergency room for a head laceration, but the facility did not update his chart or care plan.  Other Wilmington Place residents also did not have skin assessments, orders, or chart updates for their skin conditions.  Johnson further found that some residents did not have

the correct care plans or any care plan at all.  Finally, Johnson noted that some of the residents' diets were "wrong again and one I just reviewed doesn't have a diet order."

396.    Johnson visited Wilmington Place yet again in May 2017 and found that the facility was still not completing required assessments on its residents or updating the residents' care plans.  As Johnson relayed to Matt Lehman in an email dated May 16, 2017, these issues were "a big concern."

397.    Johnson further informed Lehman that when another AHF Management employee "told me there were so many things not done here she is concerned . . . I stated that it was obvious nobody is here than can complete care plans."  Per Johnson, Wilmington Place had assigned this "major task" to only two staff members who had since left the facility.  It was also "obvious" that one of these departed employees had stopped completing certain assessments "a while back before she left."  This was, according to Johnson, "the downside of not training all the nurses to complete assessments."

398.    In early December 2017, Johnson and Christina Lukezic audited the facility's skin assessments and found that many were missing and "the few they have done" were either blank or had inaccurate information.

399.    For example, in an email to Matt Lehman and Lukezic dated December 6, 2017, Johnson described a resident who was identified as having two open sores one day and none the next.  As Johnson stated in a different report, it was "obvious the nurse did not assess the resident nor did she even take the time to read the previous note."

400.    In a subsequent report emailed to Matt Lehman, Lukezic, and Jeff Weiner on December 14, 2017, Johnson described being unable to tell what type of wounds the facility's residents had because the required assessments were missing.  In fact, when Johnson examined

Wilmington Place's wound records, she found "no evidence any assessments were completed or weekly [wound] measurements being performed."   Moreover, Johnson noted that Wilmington Place was not documenting weekly skin assessments and that the facility was not consistent on whether a resident's skin was intact or not.  Johnson also found that "[n]one of the pressure ulcer documentation for weekly measurements" and other relevant information was in the facility's electronic health records.

401.    Johnson similarly discovered that "several residents" had "incorrect or missing diet" orders.  Johnson found nine residents without diet orders and "many ordered supplements with no evidence of documentation" for the amount to be taken and whether the supplements were effective.

402.    Johnson additionally reported was that there were residents "without core care plans," while others had incomplete care plans.  For example, there was a new admission who suffered from depression, but there was no evidence that the facility initiated a care plan, documented support being provided, or assessed whether outside consults were needed.

403.    Another problem Johnson noted was that the facility's restraint assessments were not complete, so there was "no evidence" why restraints were used with residents.

404.    Finally, Johnson determined that the facility was not following its required systems for new admissions.  These resulted in residents receiving antibiotics with "no evidence of [an] assessment of where [the] infection is and if [it is] improving."  Wilmington Place also failed to document whether vaccines were provided to "any of the new admissions" Johnson reviewed.  And Johnson further observed that "skilled charting notes" were not complete for new admissions, which meant that a new resident was on oxygen without any amount listed or even an order for the oxygen.

405.    Later in December, Christina Lukezic emailed Matt Lehman her own findings regarding Wilmington Place's resident assessments.  Lukezic described calling the facility on November 29, 2017, to discuss untimely assessments and underline the importance of correcting this issue.  She also sent a task list to the facility "to be filled out as a team so that all would know who was accountable for what pieces and a back-up person would be identified if the primary person was unavailable."

406.    On December 7, 2017, Lukezic had an in-person meeting with facility staff.  In a report that Lukezic sent to Matt Lehman on December 14, 2017, she wrote that Wilmington Place still was not completing the required assessments.  In fact, there were "several residents" for whom "the bulk of assessments have never been completed" in Wilmington Place's electronic medical records system and "many residents [where] the bulk of the assessments were not completed with the [minimum data set]" that is used as the basis for billing Medicare and most state Medicaid programs.  Lukezic "explained that this was not acceptable" and the facility pledged it would fix the outstanding assessments.

407.    Yet when Lukezic conducted ongoing audits, she found "there were still compliance issues."  For instance, assessments still "were not scheduled to be completed on the residents that were out of compliance."

408.    On January 29, 2018, Lukezic emailed Matt Lehman and Johnson to report that there were still "many times" when vital signs were not taken and "falls/pain" assessments were not completed following a resident fall.  As Lukezic explained, "these areas should be completed with each fall."

409.    On March 30, 2018, Lukezic again informed Matt Lehman that Wilmington Place was not properly completing its assessments.  Specifically, the facility was still only getting input

106

from a few staff members for the assessments.  Lukezic explained that this was a problem because multiple perspectives were needed "to properly determine the status of the resident and to open up discussions on the residents [sic] care."

410.    In a survey completed on November 26, 2019, Ohio health inspectors found that Wilmington Place still "failed to accurately assess residents."  This affected, for example, a resident who "was not to receive any food by mouth," but whose assessment contained different information.

**E.    Examples of Federal Health Care Program Beneficiaries**

406.    The following are examples of Medicare and Medicaid beneficiaries who received grossly substandard care at Wilmington Place.  The care deficiencies for these residents included, but were not limited to, the following violations of the Nursing Home Reform Act and its implementing regulations:

- Failing to ensure the residents do not receive unnecessary drugs, in violation of 42 C.F.R. § 483.45(d);

- Failing to ensure that residents only receive antipsychotic drugs when the medication is necessary to treat a specific, diagnosed, and documented condition, and that residents receiving such drugs also receive gradual dose reductions and behavioral interventions so that they may be weaned off or stop receiving the medication. 42 C.F.R. § 483.45(e);

- Failing to follow the course of treatment set forth in a resident's care plan, in violation of 42 U.S.C. § 1395i-3(b)(2)(A);

- Failing to create a comprehensive and current written care plan for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such

needs will be met," in violation of 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. §

483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C); and

- Failing to ensure that residents receive a safe and orderly discharge from the facility,

   in violation of 42 U.S.C. § 1395i-3(c)(2)(C) and 42 C.F.R. § 483.15(c).

407.    False claims submitted to Medicare and Medicaid for these beneficiaries are

included in Attachment A.

### i.    BF

408.    BF was a Medicare beneficiary who was admitted to Wilmington Place on

January 23, 2017, with heart failure, vascular disease, and Alzheimer's disease.  At a minimum,

Wilmington Place failed to ensure that BF did not receive unnecessary drugs, failed to properly

justify and discontinue her antipsychotic medication, failed to follow the course of treatment set

forth in her care plan, and failed to create a complete and current care plan to meet her needs, in

violation of 42 C.F.R. § 483.45(d); 42 C.F.R. § 483.45(e); 42 U.S.C. § 1395i-3(b)(2)(A); 42

U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C).

409.    In the facility's comprehensive assessment, BF was characterized as severely

cognitively impaired, exhibiting delusions, and needing extensive help for all activities of daily

living except eating.

410.    On February 13, 2017, Wilmington Place's consultant pharmacist recommended

that the facility evaluate and possibly discontinue BF's antipsychotic medication because the

documentation did not support its use.  On March 13, 2017, and May 24, 2017, the consultant

pharmacist also noted that Wilmington Place did not seem to be monitoring for involuntary

movements, which could be an early sign of irreversible nervous system damage caused by the

antipsychotic.

411.     But rather than discontinuing the antipsychotic medication, Wilmington Place doubled the dose.  The consultant pharmacist subsequently recommended a gradual dose reduction in May 2017, August 2017, and November 2017.

412.     In addition, BF's care plan called for her pain to be managed through alternative measures before resorting to medication.  However, BF was administered an opiate, Oxycodone, 16 times in July 2017 and twice more in August 2018 without Wilmington Place attempting any alternative interventions.

413.     BF had also been proscribed a daily medication to help fluid retention and swelling caused by her congestive heart failure, but her care plan did not address this medication.

    ii.     CC

414.     CC was a Medicaid beneficiary who was admitted on August 18, 2017, following a stroke.  At a minimum, Wilmington Place failed to ensure that CC received a safe and orderly discharge from the facility, in violation of 42 U.S.C. § 1395i-3(c)(2)(C) and 42 C.F.R. § 483.15(c).

415.     CC was cognitively impaired and also had atrial fibrillation and aphasia.  CC was discharged to her home on September 4, 2017.

416.     However, the facility discharged her without a discharge order, an order for discharge services for physical or occupational therapy, or a referral to a "home health services to meet the resident's needs."  This ultimately led to CC being home alone, without needed services, for two days.

**VI. SAMARITAN NURSING HOME AND VILLA**

417.     From at least October 2016 through 2018, Samaritan had a culture which tolerated incompetence and neglect, with repeated management problems and squabbles among staff.  As

a result, Samaritan's residents received grossly substandard care from an understaffed facility that was often in disarray and disrepair.

418.    For example, on September 27, 2017, E.J. Boggs, Samaritan's then administrator, wrote an email to Matt Lehman in which he stated that "[w]hen I first came here this facility was a mess and employees were not being held responsible for their conduct."  At this point, Boggs had only been at the facility for "a very short period of time."

419.    A few days later, on October 2, 2017, a departing Samaritan employee also emailed Matt Lehman to inform him that, in fact, Boggs "thinks he knows what he is doing, but I've seen a great deal that says otherwise."  For example, instead of focusing on needed improvements for resident care, Boggs was concerned about painting the offices a new color. The departing employee further stated, "Residents Rights [sic] have been violated.  Resident dignity has been disregarded."

420.    On December 13, 2018, Janice Collins, a subsequent administrator for the facility, informed Matt Lehman, "There are many areas and systems at Samaritan where money has been wasted."

421.    Two months later, Collins had a meeting with a manager at the Cleveland Clinic. As Collins later relayed to Lehman, the Cleveland Clinic manager stated that the Samaritan's "reputation in the community and with the [hospital] discharge planners is extremely poor."  In fact, according to Collins, the Cleveland Clinic manager stated that Samaritan's "reputation was so poor in the past, she was surprised we were still open."

A.   **Basic Resident Care**

422.    Samaritan consistently provided grossly substandard care to its residents. Samaritan had repeated failures related to general care, as well as glaring deficiencies regarding infection control and quality measures.

i.    **General Care Deficiencies**

423.    On October 26, 2016, Colleen Johnson submitted a report to Sue Lehman and Matt Lehman that described the grossly substandard care provided by Samaritan.  For example, Johnson found that facility had failed to address documented resident complaints.

424.    Samaritan residents were also often not provided consultations with external medical providers in a timely manner, if at all.  According to Johnson, Samaritan outright cancelled some of the consults due to "transportation," while others lacked any explanatory justification.  Johnson heard that one resident had "been waiting 2 months for some authorization needed for therapy."  Johnson was unable to tell whether these appointments were rescheduled or if the resident's physician and family were notified.  Samaritan management told Johnson that they did not even have a system in place for tracking their residents' outside appointments.

425.    Johnson also reported that Samaritan did not always perform the interventions for falls that were documented in resident care plans.

426.    In an email sent to Matt Lehman on February 2, 2017, Johnson further described several other instances of care deficiencies.  This included one resident who had not been receiving showers or oral care.  Another resident had suffered a fall and there was no evidence that the resident's doctor or representative were ever notified.

427.    Johnson also noted that Samaritan was not following physician orders. Specifically, the facility had failed to follow orders to track the condition of residents who had

111

fallen or received antibiotics.  In addition, Samaritan staff had neglected to follow orders intended to avoid pressure ulcers on residents' feet.

428.    Moreover, although Johnson informed Matt Lehman that nearly 1/6th of the residents at Samaritan had facility acquired pressure ulcers, the facility was not regularly performing skin checks for these wounds or documenting their progression.  For example, one resident developed a pressure ulcer on December 19, 2016, but there was no evidence of any further documentation or measurements.  Instead, the resident's records indicated that her skin was wrongly charted as "intact" on December 22, 2016.  Another resident's weekly skin assessment similarly indicated the resident's skin was intact even though the resident had various wounds.

429.    On February 17, 2017, Johnson further notified Sue Lehman and Matt Lehman that Samaritan did not consistently follow recommendations made by its registered dietician, and that there were still "several care plans with interventions we are not doing," as well as "several [residents] with orders we are signing off, but not providing the care/service."

430.    Johnson also reported that three residents had been assessed as an elopement risk, yet the facility had failed to implement the proper protocols, including photos of these residents at the front desk and in the nursing units so that staff could ensure the residents did not wander away from the facility.

431.    Finally, Johnson stated that there needed to be "a definitive plan" to address existing deficiencies, because some of the issues she raised in an earlier visit had not been fixed.

432.    On April 13, 2017, Johnson sent another email to Matt Lehman in which she observed that the majority of the residents had good mental capabilities "and are pretty verbal when you talk with them."  Johnson noted that the facility was supposed to "ask required

questions to residents" so that concerns could be addressed and resident council meetings would "hopefully go better."

433.    A few months later, Ohio health inspectors responded to a complaint and, in a survey completed on April 22, 2017, found that the facility was providing deficient wound care because a resident's wound dressings "were not performed twice a day as ordered by the physician."  In addition, "there were several times when the dressings ordered by the physician were not available."  Samaritan had used an alternative dressing, but did not document this in the resident's record, inform the resident's physician, or take action to increase their supply of the ordered dressings.

434.    Johnson informed Sue Lehman and Matt Lehman on May 26, 2017, that she had found that there was "no evidence of the ordered dressings" for a resident with pressure ulcers, yet "the nurses were signing off as completed."  The same resident had an order to "float heels in bed" to reduce the pressure, but three separate observations revealed this order was not being followed.

435.    On May 12, 2017, Sue Lehman, Matt Lehman, and Johnson were notified by an outside consultant that the facility had a problem responding to resident call lights in a timely way.  A call light audit validated resident complaints that it took longer than 10 minutes for a call light to be answered.  According to the consultant, this problem stemmed from non-nursing staff just "walking by activated call light[s] without answering," because they did not know "how to address resident needs."  In addition, staff admitted that they did not prioritize answering call lights.

436.    On July 17, 2018, Johnson reported to Matt Lehman and Christina Lukezic that there were "[n]o activities going on" for Samaritan's residents.

437.     In a survey completed on September 7, 2018, Ohio health inspectors found lots of care deficiencies.

438.     For example, Ohio found that Samaritan failed to respond to resident concerns. All residents interviewed by the inspectors "agreed the facility never followed up with them about the concerns they had expressed during their [resident council] meetings."  The residents "were never told if their requests were possible or not."  The inspectors also found that resident council meeting minutes revealed numerous concerns voiced by the residents, but no evidence of any further concern, inquiry, or resolution from the facility.

439.     For example, one resident stated that "what upset them most were the stained washcloths" the facility used for bathing and incontinence care.  The resident said that "they have complained about it over and over but no one ever did anything about it.  He said they felt as if they were being cleaned with dirty washcloths."  Another resident noted that "being washed with stained washcloths made her feel like she was no more than an animal."  The surveyors then examined a linen closet and found stained yellow washcloths.

440.     The Ohio inspectors also found that Samaritan had failed to ensure that a resident was free from neglect. The resident had a bowel movement, asked for help cleaning himself, and had to wait for 90 minutes before a nursing aide provided the requested help.  The facility also failed to thoroughly investigate this incident, as they failed to obtain any resident statements or interviews regarding the aide in question.

441.     The Ohio survey additionally concluded that Samaritan had further failed to properly report allegations of abuse.  One resident reported that she felt like she was being mentally abused by facility staff, but the staff seemingly ignored this allegation, even though all allegations of neglect or abuse were to be reported within 24 hours.

442.    Finally, according to the Ohio survey, the facility had failed to have its residents examined and evaluation by a doctor, as required.  One resident who had "severe cognitive impairment and required extensive assistance from staff for most activities of daily living" was supposed to be examined and evaluated by a physician at least once every 60 days.  Yet Ohio health inspectors found that the facility allowed the resident to go 81 days, 104 days, and 120 days without a physician exam.

443.    Many of these deficiencies, including the failure to respond to resident concerns, failure to promptly attend to residents needing help, and failure to provide appropriate outside medical care were problems that AHF Management or Samaritan had previously identified but neglected to fix.

444.    Samaritan's care problems continued in 2019.  A risk management consultant visited the facility in July 2019 and found several concerning practices indicating grossly substandard care of residents.  For example, for residents with wounds, Samaritan staff were not reviewing "the current interventions used for individual residents" and were not discussing "whether interventions need to be added or changed."  In addition, facility documents were silent as to the probable root causes of resident falls and Samaritan was not immediately implementing new or revised safety interventions to prevent falls.  Finally, the facility was also not completing "[r]outine skill competency validation for nursing staff."

### ii.    Infection Control

445.    In a report sent to Sue Lehman and Matt Lehman on October 26, 2016, Colleen Johnson documented various infection control problems that she observed at Samaritan.  For example, Samaritan staff failed to clean isolation rooms daily.  Johnson also witnessed a resident with a foot wound and suffering from MRSA, an antibiotic-resistant staph infection, who was

placed in a dirty isolation room.  Johnson eventually saw that resident remove his sock and

wound dressing and place his feet were on a floor that was "visibly soiled."

446.    Johnson returned to the facility a few months later and reported continued

infection control problems to Matt Lehman on January 31, 2017.  Just in her "initial rounds,"

Johnson again reported seeing "infection control issues in the rooms."

447.    In an email to Matt Lehman dated February 2, 2017, Johnson elaborated that the

infection control problems she observed included open (and thus non-sterile) wound dressing

supplies, a soiled feeding apparatus, soiled wound dressings that were not disposed of properly,

and a refrigerator in a resident's room with food items that were six months past their expiration

date.  Johnson also found that staff members were not sanitizing their hands properly when

having contact with residents and assisting with meals in the dining room.

448.    Johnson observed continued infection control problems at Samaritan in May

2017.  For example, Johnson told Matt Lehman on May 26, 2017, that she found that one staff

member was not following the proper protocols when handling personal protective equipment

and was "[n]ot consistent at sanitizing her hands."

449.    When Johnson visited the facility in July 2018 she found that facility still had not

fixed its infection control issues.  In fact, Johnson wrote to Matt Lehman and Christina Lukezic

on July 17, 2018, that "[n]othing I trained them on/went over on my orientation visit is done,"

including corrections to infection control protocols.

450.    When Ohio health inspectors visited the facility for a complaint survey completed

on August 15, 2018, they also observed that the "facility failed to ensure adequate infection

control practices were maintained, including appropriate hand washing techniques during a

dressing change."  One resident had a facility acquired pressure ulcer wound on the resident's

coccyx, at the base of his or her spine.  During the dressing change for this wound, the resident was "observed wearing an incontinence brief that was saturated with urine."  After a nursing aide unfastened the brief and repositioned the resident, the urine-saturated brief "remained near the area of the wound and was not removed from the resident, nor was the resident's skin cleansed of urine prior to beginning the pressure wound treatment."  In addition, one wound nurse cleaned the wound without changing her dirty gloves or washing her hands.  The nurses involved in this wound care later verified that the saturated incontinence brief "had the potential to contaminate the coccyx wound during the dressing change."

### iii.    Quality Measures

451.    Samaritan was an outlier on several quality measures, which are metrics that CMS has designated as potentially useful in evaluating nursing home performance.  This information was available to the facility through CMS' CASPER reports, which allow nursing homes to check their quality measure data, compare their metrics compare to state and national averages, and determine if they are an outlier in any categories.

452.    On December 15, 2017, Christina Lukezic sent Samaritan's quality measure data to Matt Lehman.  Lukezic also obtained quality measure data on or around January 11, 2018.  Together, this data spanned all of 2017 and showed that the facility was a significant outlier in several important quality of care metrics.  The facility's quality measures had also worsened throughout the year.

453.    For example, from January 2017 to November 2017, Samaritan was in the 98th percentile for percentage of residents exhibiting symptoms of depression, percentage of residents with excess weight loss, and percentage of residents reporting moderate to severe pain.  The 99th

percentile was the worst possible measure, so Samaritan was a significant negative outlier for each of these quality measures.

454.    Christina Lukezic obtained and circulated updated quality measure data to facility administrator Rhonda Holmes and other Samaritan managers on April 30, 2018.  This data spanned the period from November 2017 through April 2018.  During this period, the facility was in the 99th percentile for residents exhibiting symptoms of depression, the 99th percentile for residents reporting moderate to severe pain, the 97th percentile for residents with excess weight loss, the 93rd percentile for residents on antianxiety or hypnotic medications, the 93rd percentile for residents whose ability to move independently had worsened, and the 90th percentile for residents who had suffered falls with major injury.

455.    In addition, the facility had dire quality measure metrics for at least the second half of 2019, per a report obtained by AHF Management and Samaritan.  Among other troubling metrics, the facility was in the 99th national percentile for residents who needed increased health with activities of daily living, 98th national percentile for residents who ability to move independently had worsened, 97th national percentile for residents with excess weight loss, 97th national percentile for residents with symptoms of depression, and 93rd national percentile for use of antianxiety or hypnotic medications.  For example, 16.7 percent of Samaritan residents had excess weight loss, while the state average was only 5.8 percent of residents.

**B.    Staffing**

456.    Samaritan's staffing was a consistent issue during the relevant period, with the facility often understaffed and the staff often demoralized.

457.    In May 2017, the facility worked with an outside consultant to identify staffing as a problem that needed to be improved.  Specifically, Samaritan's licensed nurses were quitting

within 30 days of their start date and nursing aides were quitting within 14 days.  Samaritan identified lower wages than the competition as one of the root causes of this problem, with Samaritan's nurses earning, on average, $5 per hour less than their counterparts at surrounding facilities.  As a result, improved wages were the number reason departing staff cited in their exit conferences.  This information was conveyed to Sue Lehman, Matt Lehman, and Colleen Johnson on May 12, 2017.

458.   In an email sent to Matt Lehman on May 26, 2017, Colleen Johnson confirmed that staffing was "really a challenge" at Samaritan.

459.   In an accompanying report, Johnson further observed that the limitations on direct care staff was likely "a cause for increased falls."

460.   In a series of emails dated December 21, 2017, one Samaritan staff member reported difficult working conditions to Christina Lukezic.  The staff member had previously been an administrator and in other management roles with different organizations, but still found it "almost impossible" to do her job at Samaritan because she was given broad responsibilities that were "not presented to me during the interview and I still have yet to see a job description to even sign."  She further stated that there was "hostile work environment" and ultimately noted that she could "count on 1 hand the amount times I've eve[r] cried at work and 2 of them from this place."

461.   In an email dated January 11, 2018, Samaritan's director of nursing observed to Rhonda Holmes that nursing aides "have not been mandated to stay when someone doesn't show or is going to be late etc. [sic] since I have been here."  The director of nursing complained that she was "lucky if someone will agree to stay an hour over" their allotted shift.

462. Holmes relayed these concerns to Matt Lehman and Christina Lukezic for their input and commented that she "believe[d] in mandating staff [to work if needed] because we work in healthcare and we must be staffed to provide care."

463. On or around August 14, 2018, Ohio health inspectors informally notified Samaritan that the facility's staffing was deficient because there was "no RN [registered nurse] coverage for the required 8 hours every other weekend." The surveyors also found that there was, in general "not enough staff in the facility on weekends."

464. In a "quick and dirty" meeting with Janice Collins, Samaritan's new administrator, on September 7, 2018, one inspector noted that "agency is killing you." This was a reference to the facility needing to bring in temporary, "agency" staff when it did not have enough regular clinical care personnel to staff the facility. These agency staff were the source of many resident complaints, including that the staff did not answer resident call lights or provide care for the residents. Collins sent this information to Matt Lehman and Colleen Johnson on the same day.

465. In the official results for the state health survey completed on September 7, 2018, Ohio health inspectors found that "the facility failed to maintain sufficient levels of nursing staff to meet the total care needs of all residents." For example, one resident revealed that "he has had to sit in soiled briefs for up to two and half hours before he was changed" even though "he notified staff as soon as he soiled himself." Another resident interview "revealed [that] the facility was chronically understaffed on all shifts." Still another resident reported that when she complained about it taking a long time to receive help, "staff always told her they were short staffed so she gets what she can get." This resident further stated that "sometimes it feels as if

her bladder is going to burst before staff take her to the bathroom" and that it took "a long time to get her pain medication"

466.    The Ohio health inspectors confirmed Samaritan's staffing problems in an interview with one of Samaritan's licensed practical nurses, "who revealed that the facility was short staffed and indicated showers were not always being provided due to a lack of staff."

467.    The Ohio inspectors also found that the facility "failed to use the services of a registered nurse (RN) for at least eight consecutive hours a day, seven days a week as required." The director of nursing confirmed that the facility had not had any registered nurses for two days in the last week.

468.    The inspectors further discovered that two newly hired employees, including the administrator, were working at the facility without a completed background check.

469.    Finally, the Ohio health inspectors discovered that the facility's mandated self-assessment did not contain required information about facility staffing level needs.  The missing information included an "evaluation of the overall number of facility staff needed to ensure sufficient number of qualified staff are available to meet each resident's needs" as well as information relating to "the knowledge and skills required among staff to ensure residents are able to maintain or attain their highest practicable . . . well-being and [the facility] meet[s] current professional standards of practice.'

470.    On October 17, 2018, a former nursing aide commented on Indeed.com that Samaritan had a "high turnover rate," was "short staffed," and had an "unfriendly" working environment.  The former nursing aide further stated, "I don't think [management] know what they are doing honestly.  They don't mind [assigning] one nurse and one [nursing assistant] to the whole building without any other help."

471.   These comments echoed earlier reviews from former employees posted on Indeed.com in August 2018.  On August 22, 2018, another former nursing aide wrote that the facility had "gone down hill [sic].  There's not enough nurses or [nursing assistants].  Someone is always quitting . . . You have to do the job of 2-3 people."  And on August 27, 2018, one former employee wrote that the employee "[w]ould not recommend anyone to work there.  Turn over [sic] is crazy high.  Not professional.  Below average care."

472.   Samaritan's staffing problems continued into 2019.  In an internal email sent to Matt Lehman, Colleen Johnson, and Christine Lukezic on January 9, 2019, Janice Collins reported that there was "constant back and forth bickering" among staff, including the director of nursing, which was "extremely counterproductive and disturbing."  Collins further noted that the director of nursing "has made zero effort at Leadership [sic].  She is not a leader, and as a result, she does not care about motivating her subordinates to get the job done."

473.   Collins wrote again to Johnson on January 23, 2019, stating that she had "never seen such arguing between nurses in my life.  Nurses aren't communicating & the dissension is spreading to the floor . . .  I am going to, once again, have to sit them all down like children and talk to them."

474.   Samaritan had a new director of nursing in early 2019.  However, on March 22, 2019, this new director of nursing announced that she was resigning because "[t]he demands of this building are beyond what I can accomplish.  The stress of staff, poor systems, and [lack] of cooperation [from] staff makes things impossible."

475.   On April 17, 2019, Johnson wrote an email to Matt Lehman in which she noted that Samaritan needed that to "get nursing staff under control," because just "a couple nurses

122

work weekends."  Johnson further commented that it was "no wonder they had staffing issues with hardly any nurses working their share of weekends."

476.    Lehman responded that "[s]taffing at [Samaritan] has been a nightmare . . . Hopefully we can get a plan together today and end allowing people to work when they choose."

477.    Johnson replied that she assumed that part of the problem was that "with census so slow, they don't schedule extra staff and then . . . there is nobody to fill in" when staff are unexpectedly absent.  Johnson further noted that it was harder to have someone work extra time when they were already working 12 hour shifts.

478.    It appears, however, that Samaritan still had not fixed its staffing issues in 2020. For example, on April 5, 2020, a former nurse wrote on Indeed.com that "[t]his place is a disaster."  She explained that management was always changing and the facility was "always way under staffed."  She further commented that Samaritan did not terminate its employees "when they call off every other day" and "[n]urses are constantly having to work over[time]. The aides refuse to work over[time] and they will leave one aide in the building for all the residents.  And there is no way management is going to help.  It's horrible."

479.    In 2017, CMS gave Samaritan 2.5 stars out of a possible 5 for overall staffing and 4 stars out of 5 for registered nurse staffing.  In 2018, Samaritan received 2 stars out of 5 for overall staffing and 1.25 stars for registered nurse staffing.  In 2019, Samaritan received 3 stars out of 5 for overall staffing and registered nurse staffing.   For staffing levels, a one star means "much below average," two stars means "below average," three stars means "average," and four stars means "above average."   These ratings were based on quarterly payroll data submitted to CMS, the number of residents at the facility, and the facility's case mix.

C.    **Care Plans, Assessments, and Other Medical Records**

480.    AHF and Samaritan knew that the facility had widespread problems with medical records, as key documents or information were routinely missing or incorrect.  These deficiencies resulted in Samaritan residents receiving grossly substandard care.

481.    On October 26, 2016, Colleen Johnson reported to Sue Lehman and Matt Lehman that the facility had "piles of incident reports" related to falls that were not completed or logged.

482.    In addition, Johnson noted that the Samaritan had two sets of nutrition care plans for its residents and that, as a result, many residents had conflicting care plans.  Johnson further stated that some residents did not have diet orders or had conflicting orders.

483.    Moreover, residents' diet cards, which indicated what types of food they should or should not eat, were "a big concern" to Johnson.  Many residents did not have even have a diet card and the cards that existed were not able to be updated.  According to Johnson, this posed "a real safety concern on diet orders, texture, correct fluid consistency" and other factors, as there was "no way to verify the tray with the diet order before serving."  All of these diet record problems meant that residents were at risk for receiving food they could not eat, were allergic to, or that might cause them to choke.

484.    In an email to Matt Lehman from January 31, 2017, Johnson further stated that the facility was not documenting its weekly skin assessments or maintaining adequate records for falls or infections.

485.    Johnson also determined that some residents had problems with their care plans. For example, in a subsequent email she sent to Matt Lehman on February 2, 2017, Johnson mentioned that Samaritan had not placed any interventions in the care plan for a resident who suffered from pressure wounds.

486.    Conversely, another resident's care plan had various interventions that were not followed.  This resident's care plan for cognitive loss called for staff "to have resident attend out of room activities to promote socialization with residents."  Nonetheless, Samaritan had not been getting her out of bed for months.

487.    Upon reviewing a recently discharged resident's record, Johnson further noted that there was "no evidence a discharge care plan was developed on admission or prior to discharge."  There was thus "no evidence" that discharge requirements were followed.

488.    Finally, Johnson found that Samaritan had not completed a change assessment for a resident who had suffered a significant cognitive decline and weight loss.  The resident "had a steady decline in her behaviors, refusing medications, treatments, delusional behavior" and had developed a pressure ulcer.  But there was no evidence that the facility ever conducted the significant change assessment required by federal regulations.  The resident's care plan also did not reflect her delusional behavior or her refusal of medications, treatments and cares.  In addition, the facility had not added any post-fall interventions to her care plan.

489.    A few weeks later, Johnson returned to the facility and found that Samaritan still had not even started a significant change assessment for this resident.  On February 17, 2017, Johnson informed Matt Lehman and Sue Lehman that the facility also had not updated the resident's care plan to reflect her delusional behavior, refusal of treatment, and weight loss.  Meanwhile, the resident's condition had continued to decline.

490.    Johnson also noted that she had reviewed 27 residents' records and found they were all missing social work or activity assessments, as well as complete immunization information.

491.    In a different email from the same day, Johnson told Matt Lehman and Sue Lehman that pharmacist recommendation forms were often missing "and some of the few I found were not addressed."

492.    On April 13, 2017, Johnson also wrote another email to Matt Lehman in which she stated that new admissions were not getting the correct orders for their care.  Johnson also reported that she had reviewed all the printed orders for the residents and found numerous concerns that Samaritan had not addressed.  Finally, Johnson observed that some residents were receiving supposedly quarterly assessments that were only three weeks apart.  Johnson was told this was done to increase the "case mix" at the facility, which typically results in higher reimbursements from Medicare and Medicaid.  Per Johnson, this practice "[c]ould really be an audit issue if caught."

493.    Nonetheless, Samaritan did not fix the planning and assessment deficiencies.  In a survey completed on July 17, 2017, Ohio health inspectors documented that Samaritan had failed to develop a care plan for a resident taking an antipsychotic medication.  Interviews with a Samaritan nurse "verified that there was no care plan for the use of antipsychotic medication" for this resident.

494.    Ohio health inspectors returned to Samaritan for a survey completed on September 9, 2017, and found still more assessment and care plan failures.  For example, the inspectors concluded that the facility failed to conduct complete and accurate skin assessments on its residents.  One resident "had a dark purple and yellow bruise on the right arm, from wrist to elbow," as well as a "large dark purple bruise" on his left arm from wrist to elbow.  The coloring and appearance of the bruises indicated that they were not recent or fresh.  There was, however, "no documentation of the bruising on both arms or when they started."  Another

resident also had multiple bruises that appeared to be old, but there was no evidence that the facility was aware of these injuries.

495.    Finally, the Ohio health inspectors found that the facility failed to have an adequate care plan for a resident's pain.  The resident had chronic pain, but the resident's care plan "did not specify what aggravated the resident's pain, what relieved the pain, and . . . if the resident was able to call for pain pills, reposition self, and/or ask for assistance for the pain." The care plan "further did not state how the resident preferred to have her pain controlled."

**D.    Building and Environment**

489.    The Samaritan building often did not provide residents with a safe and sanitary physical environment.

490.    For example, in October 2016, Colleen Johnson visited the facility and relayed to Sue Lehman and Matt Lehman that the front or main door "never locks."  In addition, although the door had a keypad and buzzer, "neither work," so Johnson was "able to come and go without anyone knowing."  This was not safe for residents and staff.

491.    Johnson also saw many resident rooms "with much clutter in [the] room and bathroom," which "facility staff already identified in one recent fall as the cause."

492.    Johnson returned to Samaritan a few months later and, in an email dated January 31, 2017, reported to Matt Lehman that there were still "cluttered rooms" with items on the floor, thus "increasing fall risk."

493.    Johnson also found "caustic chemical" toilet bowl cleaner left open and unattended in a hallway.  The label's hazard warnings revealed that this was corrosive substance that "causes irreversible eye damage and skin burns."

494.    Johnson visited Samaritan again in February 2017.  As she noted in a subsequent email to Sue Lehman and Matt Lehman, Johnson found there were still cluttered rooms, including rooms where "incontinent brief bags and wet wipes" were in plain sight.  This made Johnson question whether Samaritan had "toileting programs in place."

495.    On the same visit, Johnson observed that the facility did not appear to be replacing used trash bags when they were emptied, even though there were rolls of new trash bags in the bottom of the cans.  Johnson further saw staff throw trash in the unlined trash cans without looking or replacing the bags.  As Johnson explained to Sue Lehman and Matt Lehman, this was "an infection control issue," because infectious items may have been thrown in the unlined trash cans.

496.    On July 16, 2018, Samaritan's "maintenance man" turned in his keys without notice.  This person "had no clue," according to an email Johnson sent to Matt Lehman on July 17, 2018, and Samaritan was not sure whether it was in compliance with building requirements, including those concerning alarms, fire drills, and water temperatures.

497.    In the same email, Johnson noted that "general repairs aren't done."  For example, there was "no lock on the door inside the breakroom that goes to the courtyard," which meant that "any resident [had] the opportunity to be out in the weather."  In addition, a readily accessible electrical panel was not secured, which meant "any resident/visitor [could] turn off or play with the breakers."  As Johnson informed Lehman, these were "just some [problems] that jump out at you without even looking."

498.    When Ohio health inspectors came to visit Samaritan for a survey completed on August 15, 2018, they told staff that the facility needed cleaning, repairs, and the grounds were not maintained "except what [resident] families do outside."

499.    In a different survey completed on September 7, 2018, Ohio health inspectors found that one resident's room had a "strong odor of urine," including "a smell of urine in the resident's closet and by her bed."  The next day, "a very strong overwhelming smell of urine continued."  The facility eventually determined that "the source of the pervasive urine odor . . . was from the resident hoarding urine soaked briefs in her closet."  Samaritan's staff had apparently not discovered and addressed this hoarding, notwithstanding the overwhelming smell of urine in the room.

### E.    Examples of Federal Health Care Program Beneficiaries

496.    The following are examples of Medicare and Medicaid beneficiaries who received grossly substandard care at Samaritan.  The care deficiencies for these residents included, but were not limited to, the following violations of the Nursing Home Reform Act and its implementing regulations:

- Failing to promptly conduct a comprehensive and accurate assessment of the resident following "a significant change in the resident's physical or mental condition," in violation of 42 U.S.C. § 1395i-3(b)(3)(C)(i);

- Failing to create a comprehensive and current written care plan for each resident that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met," in violation of 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C);

- Failing to provide "adequate supervision and assistance devices to prevent accidents," including resident falls, in violation of 42 C.F.R. § 483.25(i);

- Failing to keep the resident (or the resident's representative) properly informed and failing to appropriately consult with the resident's physician, in violation of 42 U.S.C. § 1395i-3(c)(1)(A)(i); 42 C.F.R. § 483.10(c); and  42 C.F.R. § 483.10(g)(14);

- Failing to "make prompt efforts" to address or resolve resident concerns, in violation of 42 C.F.R. § 483.10(j)(2);

- Failing to keep residents free from neglect and abuse, as well promptly report, thoroughly investigate, and address allegations of such misconduct, in violation of 42 U.S.C. § 1395i-3(c)(1)(A)(ii); 42 C.F.R. § 483.12(a)(1); and 42 C.F.R. § 483.12(c);

- Failing to provide nursing services "sufficient to meet the nursing needs of its residents," in violation of 42 U.S.C. § 1395i-3(b)(4)(C)(i) and 42 C.F.R. §§ 483.35(a)(1); and

- Failing to provide pain management to residents that is consistent with professional standards of practice," in violation of 42 C.F.R. § 483.25(k).

500.    False claims submitted to Medicare and Medicaid for these beneficiaries are included in Attachment A.

### i.    MF

501.    MF was a Medicare and Medicaid beneficiary.  At a minimum, Samaritan failed to promptly perform an assessment on MF following a significant change in her condition, failed to maintain a current care plan to meet her needs, failed to make interventions to prevent future falls, and failed to inform her representative and her physician about major changes in her condition, in violation of 42 U.S.C. § 1395i-3(b)(3)(C)(i);  42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); 42 U.S.C. § 1395i-3(b)(2)(C); 42 C.F.R. § 483.25(i); 42 U.S.C. § 1395i-3(c)(1)(A)(i); 42 C.F.R. § 483.10(c); and  42 C.F.R. § 483.10(g)(14).

502.     In November 2016, Samaritan recognized that MF's cognition had significantly declined and she had suffered a significant weight loss.  In addition, MF had started refusing medication and treatments, engaging in delusional behavior, and developed a stage 2 pressure ulcer.

503.     But as of February 2, 2017, there was no evidence Samaritan ever completed a significant change assessment, even though it was required to do so under the NHRA.  Samaritan likewise did not include MF's delusional behavior or refusal of medications and treatments in her care plan.

504.     MF also fell on January 4, 2017, but the facility did complete any post-fall charting or document any responsive interventions to prevent further falls.

505.     As of February 2, 2017, there was no evidence that the facility informed her doctor or resident representative about MF's falls or her general refusal of medications and treatments.

> ii.     **BB**

506.     BB was a Medicaid beneficiary admitted in December 2017 with sciatica, congestive heart failure, and hypertension.  At a minimum, Samaritan failed to make prompt efforts to address BB's concerns; failed to properly report, investigate, or address her allegations of abuse; failed to provide sufficient nursing services sufficient to meet her needs; failed to provide her with appropriate pain management, and failed to ensure that her care plan was comprehensive and current, in violation of 42 C.F.R. § 483.10(j)(2); 42 U.S.C. § 1395i-3(c)(1)(A)(ii); 42 C.F.R. § 483.12(a)(1); 42 C.F.R. § 483.12(c); 42 U.S.C. § 1395i-3(b)(4)(C)(i); 42 C.F.R. §§ 483.35(a)(1); 42 C.F.R. § 483.25(k); 42 U.S.C. § 1395i-3(b)(2)(A); 42 C.F.R. § 483.21(b); and 42 U.S.C. § 1395i-3(b)(2)(C).

507.     By September 2018, BB had stated numerous concerns in resident council meetings that Samaritan never tried to address or resolve.  First, she stated that it took so long for her call light to be answered that she sometimes felt like her bladder would burst.  BB also said that facility staff bathed her with the same stained washcloths that were also used to provide incontinence care, which made her feel like she was no more than an animal.  Finally, BB asserted that she was in constant pain because the facility did not work with her doctor to get her a prescription for regular pain medication.

508.     In addition, when BB directly told Samaritan staff that she had been mentally abused, this allegation was not even recorded by the facility.

509.     BB was repeatedly told by Samaritan personnel that it took a long time for them to answer her call light or assist her because the facility was understaffed.

510.     Finally, although BB had chronic pain, her care plan did not address these needs. For example, as of September 2018, Samaritan did not list any specific interventions, specify what aggravated her pain, record what relieved the pain, or note whether the resident was able to take any action on her own to alleviate the pain.

## VII. THE DEFENDANTS' FALSE CLAIMS WERE MATERIAL

511.     The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

512.     Under this definition, the Defendants' false claims were material, as the truth about their grossly substandard or non-existent care would have had a natural tendency to influence the payment of their Medicare and Medicaid claims.

513.    Indeed, a reasonable person would not pay for a good or service that was non-existent.  A reasonable person would similarly not agree to pay the claims that Cheltenham, Wilmington Place, and Samaritan submitted for grossly substandard resident care.

514.    The NHRA also directly links grossly substandard care with federal payment for nursing home services.  As outlined above, if CMS or a state finds that a facility has not met an applicable NHRA requirement relating to the provision of services, resident rights, facility administration, or other matters, CMS can deny payments to the facility or issue civil penalties. 42 U.S.C. §§ 1395i-3(h)(2)(a) and (b).  And if a state survey determined that a nursing home violated the NHRA and the facility is still not in substantial compliance three months later, then CMS *must* deny payments for new admissions to the facility.  42 U.S.C. § 1395i-3(h)(2)(d); 42 C.F.R. § 488.412(c); 42 C.F.R. § 488.417(b)(1).  Moreover, if a facility has not obtained substantial compliance by six months after the last date of the survey, then CMS must either terminate the facility's provider agreement with Medicare or discontinue federal payments to the facility for Medicare and Medicaid.  42 C.F.R. § 450(d).  Finally, if a nursing home is "found to have provided substandard quality of care" in three consecutive standard inspection surveys, CMS is likewise obligated to deny all payments until the facility satisfactorily demonstrates its compliance.  42 U.S.C. § 1395i-3(h)(2)(e); 42 C.F.R. § 488.414(a); 42 C.F.R. § 488.417(b)(1).

515.    Here, the Defendant facilities are alleged to have been consistently noncompliant with the NHRA during the relevant periods at issue for each nursing home.  In addition, the above allegations are replete with NHRA violations that were not remedied three or even six months later.  The above allegations against Cheltenham also reflect grossly substandard care for three years, in 2016, 2017, and 2018, which is roughly the same span of time as three standard inspection surveys.

516.    Yet CMS did not know, beyond the deficiencies found in state surveys, that Cheltenham, Wilmington Place, and Samaritan repeatedly:

- Subjected their residents to grossly substandard care in general (Cheltenham, Wilmington Place, and Samaritan);

- Failed to follow proper infection control protocols (Cheltenham, Wilmington Place, and Samaritan);

- Provided inadequate and untrained staff (Cheltenham, Wilmington Place, and Samaritan);

- Failed to implement interventions to prevent and address pressure ulcers and falls (Cheltenham, Wilmington Place);

- Failed to provide a safe, sanitary, and comfortable building and environment (Cheltenham and Samaritan);

- Failed to create and maintain resident care plans and assessments (Wilmington Place and Samaritan);

- Failed to provide residents with needed medications (Cheltenham and Wilmington Place);

- Gave residents unnecessary medications (Cheltenham and Wilmington Place);

- Failed to properly administer and monitor prescription drugs (Cheltenham and Wilmington Place);

- Failed to provide residents with needed psychiatric care (Cheltenham); and

- Failed to protect and respect residents' dignity (Cheltenham).

517.    If CMS had known that these facilities had such long standing, serious care deficiencies, it would have had no choice but to deny payments under the NHRA's mandatory sanction provisions.  And even if the mandatory sanction provisions did not exist, the Defendant

facilities' NHRA violations were, at a minimum, either widespread deficiencies that posed the

potential for more than minimal harm or isolated deficiencies that constituted actual harm.

Accordingly, these NHRA violations were of sufficient severity to require CMS to deny

payments or issue civil monetary penalties under 42 C.F.R. § 488.408(d).

518.    In fact, CMS, Ohio, and Pennsylvania imposed administrative sanctions on the

Defendant facilities—based only on the limited knowledge they obtained from state surveys.

519.    For example, on March 17, 2017, Pennsylvania imposed a civil monetary penalty

on Cheltenham after a complaint survey found the facility failed to ensure that a resident

"received adequate supervision" when the resident, who had been left alone, removed her

tracheostomy and caused her death.

520.    On June 21, 2018, Pennsylvania imposed another civil monetary penalty on

Cheltenham for a series of care deficiencies that placed a resident in immediate jeopardy and

ultimately contributed to his fatal suicide.  The penalty was $109,992 for each day of

noncompliance.

521.    On September 24, 2018, CMS and Ohio notified Samaritan that it would impose

the mandatory denial of payment for new admissions required by 42 C.F.R. § 488.417(b).  The

denial of payment was scheduled for November 15, 2018, unless Samaritan could show its

substantial compliance in the interim.  Ohio had completed a complaint survey at Samaritan on

August 15, 2018, and concluded that the facility was not in compliance with three Medicare and

Medicaid program requirements.  Samaritan was advised of these deficiencies and claimed to be

in substantial compliance on August 24, 2018.  Ohio returned to the facility for a standard survey

on September 7, 2018, and found numerous additional deficiencies, which led to the September

24, 2018, notification.

522.     Finally, Ohio and CMS indicated that they would impose the mandatory denial of payment for new admissions on Wilmington Place on three separate occasions in 2017 and 2018. Each time, Ohio conducted a survey, found deficiencies, found more deficiencies when the state returned shortly thereafter, and notified the facility that the mandatory payment denial would be imposed 90 days after the initial survey unless Wilmington Place could show its substantial compliance in the interim.

523.     In short, if CMS (or a reasonable person) had known, beyond what was uncovered during the state surveys, the grossly substandard care that was regularly provided at these facilities during all relevant times, it would have affected future payment decisions, let alone whether the Defendant facilities could continue to participate in the Medicare and Medicaid programs.

## SUMMARY OF THE UNITED STATES' CLAIMS

524.     As described in the allegations above, AHF, AHF Management, Cheltenham, Wilmington Place, and Samaritan, through their related conduct in the operation of the Defendant facilities, submitted or caused to be submitted false or fraudulent claims to the Medicare and Medicaid programs for services that were (a) non-existent or grossly substandard and (b) provided in violation of the requirements and obligations set forth in the NHRA. Specifically, AHF and AHF Management caused false claims to be submitted, while Cheltenham, Wilmington Place, and Samaritan submitted the false claims.  Due to the ownership and control they exerted over the Defendant facilities, AHF and AHF Management are also liable for the false claims submitted by those facilities.

525.     As a result of state surveys, outside consultant reports, and their own internal communications, the Defendants knew that resident care at these facilities was non-existent or

grossly substandard, and that residents suffered or risked suffering physical and mental harm as a result.  Yet rather than correct the care deficiencies that placed residents at risk and caused actual harm, instead the Defendants allowed the problems to fester and persist and submitted more than ten thousand claims to Medicare and Medicaid for the services at issue.  The United States is entitled to recover its damages from these charges under the False Claims Act.

526.     For services rendered during the periods at issue, the Defendant facilities received millions of dollars in reimbursement from Medicare and Medicaid.  Had CMS known the true nature of the care provided at the facilities, it would have denied a substantial portion, if not all, of the federal payments, either through the mandatory remedy for persistent care deficiencies or the discretionary remedy for substantial NHRA violations.  Instead, the Medicare and Medicaid programs mistakenly paid for the grossly substandard or non-existent services the Defendants provided to their residents.

527.     The Defendants were also unjustly enriched by their receipt of money that they knowingly received when circumstances make it inequitable for them to retain these funds. In equity, fairness, and good conscience, the Defendants should be required to account for and disgorge these unjustly obtained amounts.

## CLAIMS FOR RELIEF

528.     For AHF, AHF Management, AHF Home Office, and AHF Montgomery d/b/a Cheltenham Nursing & Rehabilitation Center, the following counts are for services rendered from January 1, 2016, to December 31, 2018.   For AHF Ohio, d/b/a The Sanctuary at Wilmington Place and d/b/a Samaritan Care Center and Villa, the following counts are for services rendered between January 1, 2017, and December 31, 2018, for Wilmington Place and October 1, 2016, to December 31, 2018, for Samaritan.

## Count I:  False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

529.    The United States restates and incorporates by reference paragraphs 1 through 528 as if fully set forth herein.

530.    The Defendants knowingly presented or caused to be submitted false or fraudulent claims for payment by the Medicare and Medicaid programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).  These claims were for nursing home care and services that were non-existent, grossly substandard, or in violation of the NHRA.

531.    Under the False Claims Act, the Defendants are jointly and severally liable to the United States for its damages resulting from such false claims, in an amount to be determined at trial and trebled, as well as for civil penalties of between $12,537 and $25,076 for each violation.

## Count II:  Payment by Mistake

532.    The United States restates and incorporates by reference paragraphs 1 through 528 as if fully set forth herein.

533.    This is a claim for the recovery of funds paid by the United States to Cheltenham Nursing & Rehabilitation Center, the Sanctuary at Wilmington Place, and Samaritan Care Center and Villa.

534.    The Medicare and Medicaid programs paid these funds for the benefit of these nursing homes because of a mistaken belief that the care and services the facilities provided to its residents were adequate, when in fact the care and services were non-existent, grossly substandard, or in violation of the NHRA.  The Medicare and Medicaid programs paid these Defendant facilities certain sums of federal money to which the facilities were not entitled.

535.   Under federal common law, the Defendants are liable to account for and repay such amounts to the United States, in an amount to be determined at trial.

Count III:  Unjust Enrichment

536.   The United States restates and incorporates by reference paragraphs 1 through 528 as if fully set forth herein.

537.   The Defendants wrongfully received and retained the benefit of federal funds paid from the Medicare and Medicaid programs for non-existent, grossly substandard, or non-NHRA compliant nursing home care and services provided to the residents of Cheltenham Nursing & Rehabilitation Center, The Sanctuary at Wilmington Place, Samaritan Care Center and Villa. This grossly substandard care resulted in serious physical and emotional harm to the vulnerable, elderly, disabled, and low-income residents of these facilities.

538.   As a result of these payments, the Defendants were unjustly enriched with federal funds which the Defendants should not in equity and good conscience be permitted to retain. Under federal common law, the Defendants are liable to account for these funds and disgorge them to the United States in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, the United States of America, prays that judgment be entered in its favor as follows:

A.   On Count I under the False Claims Act against the Defendants, jointly and severally, for the amount of the United States' damages to be established at trial, plus civil penalties of between $12,537 and $25,076 for each violation, as well as all such further relief the Court deems just and proper;

B.      On Count II for payment by mistake against the Defendants, jointly and severally, for the amount to be established at trial by which Cheltenham, Wilmington Place, and Samaritan were mistakenly paid, plus all such further relief the Court deems just and proper; and

C.      On Count III for unjust enrichment against the Defendants, jointly and severally, for the amount to be established at trial by which the Defendants were unjustly enriched, plus all such further relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

Dated:  June 14, 2022

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BY:     /s/ Benjamin Young
JAMIE A. YAVELBERG
ANDY J. MAO
SUSAN LYNCH
BENJAMIN YOUNG
U.S. Department of Justice
Civil Division
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Tel:  (202) 616-0291
benjamin.s.young@usdoj.gov

*Attorneys for the United States*