IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 22-02344 |
| | : | |
| AMERICAN HEALTH FOUNDATION INC.; | : | |
| AHF MANAGEMENT CORPORATION; | : | |
| AHF MONTGOMERY, INC. d/b/a | : | |
| CHELTENHAM NURSING AND | : | |
| REHABILITATION CENTER; AND AHF | : | |
| OHIO, INC. d/b/a THE SANCTUARY AT | : | |
| WILMINGTON PLACE and d/b/a | : | |
| SAMARITAN CARE CENTER AND VILLA | : | |

**<u>MEMORANDUM</u>**

**SURRICK, J.**                                                          **MARCH 31, 2023**

Presently before the Court is Defendants' Motion to Dismiss First Amended Complaint

(ECF No. 19), the Government's response in opposition thereto (ECF No. 23), and Defendants'

reply to the Government's response (ECF No. 26.)  For the following reasons, Defendants'

Motion will be denied.

The Government alleges that Defendants submitted claims for Medicare and Medicaid

reimbursements in which they falsely claimed compliance with the Nursing Home Reform Act

(NHRA) and its implementing regulations, thereby violating the False Claims Act (FCA).  The

Government also brings common law claims of unjust enrichment and payment by mistake based

on these allegedly false representations.  Defendants move to dismiss the Government's FCA

claim on the grounds that the Medicare and Medicaid reimbursement requests that they

submitted were not "false" under the worthless services doctrine and not material absent proof

that the Government routinely denies reimbursements based on similar misrepresentations. Defendants also move to dismiss the Government's common law claims on the basis that they too require proof of materiality.

This Motion will be denied as to the FCA claim because the allegations against Defendants rise to the level of gross-negligence necessary to deem their services worthless and, regardless, Defendants' requested reimbursements for these services contained impliedly false certifications. In addition, these alleged misrepresentations materially affected the Government's decision to reimburse Defendants' claims. The Motion will also be denied as to the common law claims given precedent that payment by mistake and unjust enrichment are adequately pled where the allegations state a claim for fraud under the FCA.

## I.     BACKGROUND

This matter stems from allegations of abuse and neglect at three nursing homes: Cheltenham Nursing and Rehabilitation Center in Pennsylvania, The Sanctuary at Wilmington Place in Ohio, and Samaritan Care Center and Villa in Ohio. Defendant American Health Foundation, Inc. (AHF) owns and directs these nursing homes through its subsidiaries and fellow defendants AHF Management Corporation, AHF Montgomery, and AHF Ohio. The Government alleges that Defendants had knowledge of the following substandard care at each of these three nursing homes.

### A.     Cheltenham Nursing and Rehabilitation Center

The Government contends that from 2016 through 2018, residents at Cheltenham Nursing and Rehabilitation Center (Cheltenham) were subjected to pervasive general care deficiencies, inadequate infection control, negligent psychiatric and mental health services, an unsafe and unsanitary physical environment, and an undersized and untrained staff.

According to the Amended Complaint, Cheltenham failed to provide its residents with sufficient medical care.  Specifically, the facility allegedly failed to follow physician orders for follow-up medical treatment, including dental care, medication administration, oxygen provision, wound dressing, cardiac monitoring, and dialysis.  (Am. Compl. ¶¶ 130, 142, 147, 157; ECF No. 5.)  Moreover, Cheltenham failed to generate accurate assessments or comprehensive care plans for any of its residents.  (*Id.* at ¶¶ 136, 141, 156.)  This led to lapses in care such as failing to: abide by a resident's liquid diet restriction (*id.* at ¶ 135); set up care conferences for wound development, weight loss, and behavior management (*id.* at ¶ 138); or provide residents with necessary diet supplements (*id.* at ¶ 139).  Residents also frequently did not receive their prescribed medications until a day after they were supposed to be taken.  (*Id.* at ¶¶ 280-83.)

In addition to these lapses in medical care, the Amended Complaint asserts that Cheltenham staff frequently left residents unattended (*id.* at ¶ 131), forgot to feed them (*id.* at ¶ 132), did not provide them with showers (*id.* at ¶ 136), and did not change their clothing or bed sheets, leaving residents sitting in their own urine (*id.* at ¶¶ 132, 140).  On one occasion, protective services contacted the facility because a resident had long and dirty fingernails and was generally unkept.  (*Id.* at ¶ 149.)  On another occasion, a resident's family member found him dressed inappropriately and sitting in a wheelchair filled with urine.  (*Id.* at ¶ 150.)

As for the relationship between residents and staff, the Government alleges that resident clothing and personal items were often lost and not returned to them.  (*Id.* at ¶¶ 242-50.)  Moreover, Cheltenham staff mocked or were openly hostile to residents and entered their rooms without knocking.  (*Id.* at ¶¶ 251-54.)  Staff members had to be reminded that residents had the right to get out of their beds whenever they wanted because the staff had been refusing resident requests to do so.  (*Id.* at ¶¶ 243.)  In addition, the home lacked activities to keep residents

occupied; Pennsylvania health inspectors observed residents sitting in the common area with their heads on the table and nothing to do.  (*Id.* at ¶¶ 255, 261.)

The Government further contends that residents at Cheltenham were frequently injured or in danger of becoming injured either due to neglect or allegedly intentional abuse.  On February 9, 2018, nurse Colleen Johnson[1] reported to AHF management that Cheltenham managers were "getting good" at writing abuse allegation reports due to their frequency.  (*Id.* at ¶ 151.)  In a survey completed on July 20, 2017, Pennsylvania health officials found that Cheltenham had restrained a resident's wrists without any documentation to indicate that it was necessary to do so.  (*Id.* at ¶ 146.)  Moreover, facility staff had to be reminded that it was unsafe to leave residents unattended (*id.* at ¶ 131), and on March 16, 2018, a confused resident was left alone on a different floor without supervision (*id.* at ¶ 152).

The Government alleges that this lack of supervision resulted in several resident falls.  On November 28, 2016, a resident fell and broke her femur.  (*Id.* at ¶ 172.)  This resident was supposed to be under one-to-one supervision because she had bruises from an unknown origin, but that level of supervision was not provided.  (*Id.*)  The Government also identifies five specific Medicare and Medicaid beneficiaries who suffered from numerous falls during the relevant time period.  (*Id.* at ¶¶ 177-181.)  For many of these beneficiaries, Cheltenham had been warned repeatedly by a pharmacy that they were taking medications that could contribute to falls.  (*Id.* at ¶¶ 177, 179-81.)  In addition to failing to heed those warnings, Cheltenham allegedly failed to consistently investigate the cause of resident falls in order to intervene.  (*Id.* at ¶¶ 171.)  However, when they did investigate in December of 2016, Cheltenham managers and

---

[1] Colleen Johnson is a registered nurse who worked as a consultant for AHF Management and whose reports on the state of the three nursing homes form the basis for many of the Government's allegations.

staff reported that falls increased during staff shift changes, that high-risk residents were not identified, and that the facility was not prepared for new high-risk admissions.  (*Id.* at ¶ 174.)

In addition to falls, many Cheltenham residents suffered from pressure ulcers.  On February 5, 2016, a survey by Pennsylvania health inspectors determined that the facility failed to implement proper interventions to combat this problem.  (*Id.* at ¶ 166.)  In one specific example, a resident's pressure ulcer was left untreated and grew over three months.  (*Id.*)  A performance improvement exercise found that residents at high risk for pressure ulcers were not always turned and repositioned as needed or provided with adequate food and liquid, staff were not following resident care plans, fresh linens and pillows were not available, and risk assessments for pressure ulcers were not being completed timely and accurately.  (*Id.* at ¶ 167.) Subsequent internal and external reviews in June of 2017 and June of 2019 found that Cheltenham had not corrected its pressure ulcer problem.  (*Id.* at ¶¶ 169-70.)

The Government also points to Cheltenham's lack of infection control.  The Amended Complaint cites a state health department citation indicating that Cheltenham failed to follow infection control protocols during wound treatments, failed to safely dispose of bloody wound dressings, and that the facility contained open and overflowing biohazard bins and trash cans. (*Id.* at ¶ 158.)  In addition, both internal and external sources reported that staff were not following proper hand hygiene in the kitchen or when treating residents.  (*Id.* at ¶¶ 159-60.)  The facility did not have any bleach wipes to disinfect surfaces or an infection control nurse, despite this being deemed a "critical position."  (*Id.* at ¶¶ 161, 164.)

As for Cheltenham's psychiatric services, the Government alleges that the facility consistently failed to document and monitor its residents' mental health conditions and, even when it did so, failed to ensure that the residents were seen by mental health specialists.  (*Id.* at ¶

184.)  The Government's most poignant example involves a resident who was admitted to Cheltenham after being hospitalized for wrapping a cord around his neck while living in a prior nursing home.  That resident's care plan at Cheltenham made no mention of his prior suicide attempt.  Cheltenham staff observed that the resident appeared depressed and angry, but there is no evidence that a mental health evaluation occurred.  (*Id.* at 190-91.)  Eventually, the resident attempted to slash his wrists.  (*Id.* at ¶¶ 190-91.)  Following a hospital stay, the resident returned to Cheltenham and began refusing his morning medications, only got out of bed to use the bathroom, refused to eat, and was noncommunicative.  (*Id.* at ¶ 192.)  Shortly thereafter, the resident hung himself with a bedsheet in one of Cheltenham's shower rooms and died.  (*Id.* at ¶ 195.)  The Government alleges that, even after this incident, Cheltenham failed to retain appropriate mental health specialists (*id.* at ¶¶ 199-201), update resident care plans with mental health issues (*id.* at ¶¶ 203-06), or ensure that residents with known mental health issues were properly attended to (*id.* at ¶¶ 209.)  The Government also contends that Cheltenham was a significant outlier in the overuse of antipsychotic, anxiolytic, and hypnotic medications, and allegedly used them unnecessarily without monitoring their effectiveness and without a plan for gradual dose reductions.  (*Id.* at ¶¶ 265-79.)

Cheltenham's physical facilities, according to the Amended Complaint, were unsafe, unsanitary, and in a state of disrepair.  The home's shower rooms lacked privacy curtains, had feces on the floor and drains clogged with hair, smelled strongly of urine, lacked any soap, and contained dirty shower chairs, linens, and dried washcloths.  (*Id.* at ¶¶ 212, 213, 216, 220, 222.)  Bathrooms emitted foul odors, had blood and feces on the floors and toilets, and lacked sufficient toilet paper and paper towels.  (*Id.* at ¶¶ 213, 216, 228.)  Cheltenham residents ate in a dining room where the ceiling was "heavily soiled with a covering of dirt and dust" and the dining

tables were not cleaned after meals.  (*Id.* at ¶¶ 212, 215.)  The floor in the food preparation area

was heavily soiled with dirt and trash, and the food carts used to serve residents were covered in

dried food, coffee stains, and "white dried substances."  (*Id.* at ¶ 226.)

Furthermore, the Government contends that Cheltenham was infested with pests, such as:

cockroaches in the kitchen (specifically infesting the microwave) (*id.* at ¶¶ 215, 219); ants, flies,

mice, and roaches in the food distribution area (*id.* at ¶ 226); flies in the dietary department's

janitor's closet (*id.* at ¶ 227); wasps in a resident's room (*id.* at ¶ 236); and "flying insects" in all

four nursing units (*id.* at ¶ 238).  Multiple parties complained of a pungent odor throughout

Cheltenham's facility, and it was subsequently discovered that fourteen out of eighteen exhaust

fans were not working.  (*Id.* at ¶ 229.)  Cheltenham did not properly test its generator, carbon

monoxide detectors, emergency lighting, or exit signs, and the facility contained blocked fire

exits.  (*Id.* at ¶ 233.)  A formal state survey summarized that Cheltenham had "failed to provide

adequate housekeeping and maintenance services to maintain a safe, functional, sanitary, and

comfortable environment for residents, staff, and the public."  (*Id.* at ¶ 237.)

The Government further alleges that Cheltenham was understaffed, with nurses leaving at

an alarming rate due to a demanding workload.  (*Id.* at ¶ 287.)  It was reported that there was

"not enough staff to cover the floors" (*id.* at ¶ 291), that staffing levels were so low as to be

unsafe (*id.* at ¶ 296), that the facility needed to hire one registered nurse, seven licensed practical

nurses, and 40 nursing aides (*id.* at ¶ 295), and that there was not enough staff to cover the

facility on weekends (*id.* at ¶¶ 299, 307).  In one example, 26 cognitively impaired residents

were left with only one nursing aide to provide supervision, meaning that no one could leave the

room because the aide would have to accompany them and leave the remaining residents

unattended.  (*Id.* at ¶ 285.)  It was recognized that the staffing shortage was a result of paying

wages below the competitive rate, yet Cheltenham's management did not increase their pay rate and in fact continued to cut down on nursing hours and take on additional patients.  (*Id.* at ¶¶ 298, 300, 303, 305, 308.)

Due to Cheltenham's high turnover, the facility had to be staffed by temporary agency employees who were not properly oriented or trained.  (*Id.* at ¶ 288.)  Multiple staff members reported that new nurses began working before orientation was completed because they were so badly needed.  (*Id.* at ¶¶ 288, 294.)  Moreover, there was no supervision of the staff or follow-up to ensure that training had been effective.  (*Id.* at ¶ 290.)  In one case, a "clearly observable knowledge deficit" regarding care for residents with a tracheostomy caused one such resident to pull out her own breathing tube and die.  (*Id.* at ¶¶ 311-12.)  The Amended Complaint also alleges that the staff member in charge of resident medical records had been nearly fired for incompetence in previous roles and failed to properly scan and process hospital records for Cheltenham's residents.  (*Id.* at ¶ 314.)

Finally, the Government offers five examples of residents who it alleges "received grossly substandard care at Cheltenham during the relevant period," and attaches the allegedly false claims submitted to Medicare and Medicaid on behalf of these residents.  (*Id.* at ¶¶ 318-19.) Included in these example residents are JM, the resident with a history of suicidal actions who hung himself in one of Cheltenham's shower rooms; LC, the resident who pulled out her breathing tube and died; and JD, the resident who suffered numerous bruises and falls due to a lack of one-to-one supervision and the administration of medication by Cheltenham against its pharmacy's recommendation.  There is also CH, who allegedly "informed Cheltenham staff that she was suicidal and planned to kill herself" (*id.* at ¶ 327), but whose care plan was not updated to reflect her need for psychiatric care after she returned from a hospital visit (*id.* at ¶¶ 328-29).

The fifth resident, RG, was placed in isolation, where she was not fed and was left to soak in urine.  RG was cognitively impaired and refused dental treatment, but no interventions were taken, and her gums became swollen, bloody, and filled with pus.  (*Id.* at ¶ 333.)  Cheltenham referred RG to an oral surgeon, but it did not administer the recommended medication, follow up with the surgeon for additional treatment, or inform RG's physician about the surgeon's recommendations.  (*Id.* at ¶ 334.)

### B.  The Sanctuary at Wilmington Place

The Government contends that, from January 1, 2017, through December 31, 2018, the Sanctuary at Wilmington Place (Wilmington Place), rendered grossly negligent care through numerous general care deficiencies, inadequate infection control, overmedication, staffing shortages and incompetency, and incomplete and inaccurate care plans.

The Amended Complaint alleges that Wilmington Place neglected its residents in ways that caused them physical and emotional harm.  In one example, staff failed to change a resident's incontinence pad and she was found in her wheelchair with urine and dried feces up to her lower back.  (Am. Compl. ¶ 358.)  Another resident was unable to call for help to urinate during the night because her nursing aide was sleeping during his shift.  (*Id.* at ¶ 259.)  Ohio health inspectors discovered two additional instances of alleged abuse and neglect, one in which a nursing aide told a resident to "shut up" when she asked to use the bathroom and then left feces on the resident's floor, and another where a nursing aide rudely and improperly put a resident in bed and left her to urinate on herself before a different aide eventually assisted her.  (*Id.* at ¶¶ 366-67.)  When Colleen Johnson visited the facility, she observed that residents were left in their beds during the day in gowns with no call light within reach.  (*Id.* at ¶ 363.)  Residents ate less than half of their food, but Wilmington Place offered no food substitutions.  (*Id.* at ¶ 364.)

In addition to these alleged detriments to resident quality of life and dignity, the Government asserts that neglect in Wilmington Place also caused residents to suffer physical harm.  On March 8, 2017, Nurse Johnson discovered that numerous Wilmington Place residents had pressure ulcers but that there was no evidence of wound protocols in place or being followed.  (*Id.* at ¶ 354.)  An outside consultant reported that existing pressure ulcers worsened upon admission to Wilmington Place and that residents at the facility developed pressure ulcers at more than twice the statewide and national rate.  (*Id.* at ¶ 355.)  An audit in January of 2018 discovered that one third of residents had some sort of wound or sore on his or her skin.  (*Id.* at ¶ 365.)

The Government contends that Wilmington Place's infection control was similarly lacking.  The facility had no infection log, did not map infections to track their spread, and failed to educate staff on infection practices.  (*Id.* at ¶¶ 370-71.)  Nurse Johnson observed a student nurse draw a resident's blood without gloves on and saw that staff were simply placing soiled linens on the floor of resident rooms.  (*Id.* at ¶¶ 372-73.)  A survey conducted on November 26, 2019, found that Wilmington Place failed to isolate a resident with an infection and was generally not equipped for airborne infection control.  (*Id.* at ¶ 374.)  Finally, the facility failed to perform a required monthly test of its water for bacteria.  (*Id.* at ¶ 375.)

Wilmington Place allegedly provided its residents with unnecessary medications at a high error rate, failed to ensure that residents received their necessary prescribed medications, and did not abide by pharmacy recommendations concerning these issues.  According to the Amended Complaint, Wilmington Place failed to attempt non-pharmaceutical interventions prior to administering pain medications and antipsychotics to its residents.  (*Id.* at ¶¶ 384, 401, 403.)  The facility also had a medication error rate over five percent, leading to instances such as

administering two separate blood thinners to a resident and putting her at a high risk of hemorrhage.  (*Id.* at ¶¶ 385-86.)  Wilmington Place administered medications outside of the parameters of the prescribing physicians' orders (*id.* at ¶ 404), did not monitor residents' responses to medications (*id.* at ¶ 405), and administered medications in excessive doses or durations (*id.* at ¶ 406).

Moreover, when medication was necessary, the Government alleges that Wilmington Place failed to ensure that residents received it on time or at all.  (*Id.* at ¶ 389.)  Facility managers confirmed problems receiving ordered medications and were not aware that there was a back-up pharmacy to help address this issue.  (*Id.* at ¶ 390.)  Wilmington Place also provided residents with several discontinued and expired medications.  (*Id.* at ¶ 402.)

Many of these issues were flagged by Omnicare, the consultant pharmacy for Wilmington Place.  The Government contends that between January 2016 and October 2018, "Wilmington Place received over 1,000 specific recommendations from Omnicare relating to medications that were unnecessary, contraindicated, or otherwise problematic."  (*Id.* at ¶ 380.)  The facility did not respond to or address many of the pharmacy's recommendations.  (*Id.* at ¶ 381-82.)

The Government further alleges that Wilmington Place was understaffed to the point that facility managers had to work as floor nurses.  (*Id.* at ¶ 412.)  This problem was primarily attributed to high staff turnover, with new hires in nursing and housekeeping quitting withing 30 days, and staff working night shifts quitting within 14 days.  (*Id.* at ¶¶ 414-15.)  Attempts to supplement the staff with temporary agency employees was discouraged by Defendants due to the expense.  (*Id.* at ¶¶ 421, 423-24.)  According to the Amended Complaint, the staff members

that Wilmington Place managed to retain were not properly oriented or trained, with incompetent employees training new hires and even acting in managerial positions.  (*Id.* at ¶¶ 413, 419.)

In addition, Wilmington Place allegedly did not keep complete and accurate care plans and assessments for its residents.  For example, residents were not assessed as fall risks, several resident care plans had missing or incomplete diet information, and the facility did not perform resident skin assessments for wounds and pressure ulcers.  (*Id.* at ¶¶ 435-37, 441-44.)  Some residents had no care plan at all.  (*Id.* at ¶ 445.)  The facility's restraint assessments were incomplete, meaning that residents were physically restrained with no explanation of why doing so was necessary.  (*Id.* at ¶ 446.)  Residents were frequently released without a completed discharge summary.  (*Id.* at ¶ 432.)

The Government provides two specific examples of Medicare and Medicaid beneficiaries who allegedly received "grossly substandard care" at Wilmington Place.  The first is BF, who took antipsychotic medication but was not monitored for signs of irreversible nervous system damage that could be caused by that medication.  (*Id.* at ¶ 458.)  On February 13, 2017, Omnicare recommended that the facility evaluate and possibly discontinue that antipsychotic, but instead Wilmington Place doubled BF's dose.  (*Id.* at ¶ 459.)  Furthermore, Wilmington Place allegedly ignored BF's care plan calling for her pain to be managed without medication and instead provided her with Oxycodone.  (*Id.* at ¶ 460.)  The Government's other example, CC, was cognitively impaired and released by Wilmington Place to her home without a necessary discharge order for physical or occupational therapy or a referral for home health services.  (*Id.* at ¶¶ 433, 463-64.)  This resulted in CC being home alone for two days without these services. (*Id.* at ¶ 464.)

C.      Samaritan Nursing Home and Villa

The Government contends that, from October of 2016 through 2018, Samaritan Nursing

Home and Villa (Samaritan) neglected its residents' medical care and quality of life, lacked

infection control procedures, was understaffed, did not complete accurate care assessments, and

failed to maintain a habitable physical environment.

Beginning with medical care, residents at Samaritan frequently were not provided with

consultations with external medical providers due to transportation issues or other unspecified

reasons.  (Am. Compl. ¶ 472.)  When residents did see external physicians, the facility failed to

follow those physicians' orders.  (*Id.* at ¶ 474.)  Nearly one sixth of Samaritan's population

suffered from pressure ulcers because the facility failed to perform skin checks or document

pressure ulcer progression.  (*Id.* at ¶ 476.)  Samaritan also failed to perform interventions for falls

that were documented in resident care plans.  (*Id.* at ¶ 473.)

The Government also contends that resident dignity and quality of life were lacking at

Samaritan.  An external consultant reported that resident call lights were not answered in a

timely manner, with non-nursing staff simply ignoring call lights because they did not know how

to help.  (*Id.* at ¶ 483.)  The facility had no activities for residents (*id.* at ¶ 484) and failed to

respond to concerns raised in resident council meetings (*id.* at ¶ 486).  One Samaritan resident

was forced to wait 90 minutes after requesting help to clean himself from a bowel movement (*id.*

at ¶ 488), with another reporting that she had been mentally abused by facility staff (*id.* at ¶ 489).

As for infection control, Samaritan allegedly failed to clean isolation rooms.  In one

instance, a resident with a foot wound infected with MRSA was made to walk around barefoot in

such a room with a visibly dirty floor.  (*Id.* at ¶ 493.)  Colleen Johnson reported that she

observed open and non-sterile wound dressing supplies, a soiled feeding apparatus, and soiled

wound dressings that were not disposed of properly when she visited the facility.  (*Id.* at ¶ 495.)
Johnson also reported that staff members were not following hand-sanitization procedures when
handling food and assisting residents.  (*Id.* at ¶ 496.)  A survey by Ohio health inspectors
completed on August 15, 2018, summarized that Samaritan "failed to ensure adequate infection
control practices were maintained, including appropriate hand washing techniques during a
dressing change."  (*Id.* at ¶ 498.)

Like Cheltenham and Wilmington Place, Samaritan was understaffed during the relevant
time period.  An outside consultant reported that licensed nurses were quitting the facility within
30 days and nursing aides quitting within 14 days.  (*Id.* at ¶ 505.)  The fact that Samaritan paid
its nurses $5 per hour less than its competition was identified as the primary cause of this
retention problem.  (*Id.*)  Ohio health inspectors found Samaritan's staffing deficient because
there was not enough staff for the facility on weekends, and because it did not have a registered
nurse working for at least eight hours a day, seven days a week, which the NHRA requires.  (*Id.*
at ¶¶ 511, 515.)

Once again, the Amended Complaint alleges that Defendants attempted to cure their
staffing problems with temporary agency staff, but it was found that these temporary employees
did not answer resident call lights or provide adequate care.  (*Id.* at ¶ 512.)  One Samaritan
resident reported that he had to sit in soiled briefs for two and a half hours after notifying staff
that he soiled himself, with another claiming that she felt like her bladder was going to burst
before the staff helped her use the bathroom and that it took a long time for her to receive her
pain medication.  (*Id.* at ¶ 513.)  Other residents stated that Samaritan was "chronically
understaffed," and one reported that when she complained about the lack of care "staff always
told her they were short staffed so she gets what she can get."  (*Id.*)

Samaritan employees themselves also complained about the inadequate staffing.  One employee stated that Samaritan had a "hostile work environment" causing her to cry during her shifts.  (*Id.* at ¶ 509.)  Defendants were told that there was constant bickering among staff as a result of a lack of leadership, with a Samaritan administrator reporting that she had "never seen such arguing between nurses in [her] life."  (*Id.* at ¶ 521.)  The Amended Complaint also cites reviews from Indeed.com, with former nursing aides writing that the Samaritan was short staffed to the extent that aides had to do the job of two to three people, had an unfriendly working environment, and would assign one nurse and one assistant to the entire facility without any help. (*Id.* at ¶¶ 518-19.)

Next, the Government alleges that Samaritan failed to keep accurate and comprehensive care plans and assessments.  Many residents had multiple conflicting nutrition care plans, and some residents did not have a diet card, which indicated what types of food they should or should not eat.  (*Id.* at ¶¶ 530-31.)  Samaritan also failed to document weekly skin assessments and had numerous incident reports relating to resident falls that had not been completed or logged.  (*Id.* at ¶¶ 529, 532.)  One resident care plan called for her to attend out-of-room activities to promote socialization, but Samaritan staff had not gotten her out of bed for months.  (*Id.* at ¶ 534.) Similarly, Samaritan failed to update the care plan for a resident who suffered significant cognitive decline, weight loss, and a pressure ulcer.  (*Id.* at ¶¶ 536-37.)  Another resident was discharged without a discharge care plan.  (*Id.* at ¶ 535.)  Colleen Johnson reviewed 27 residents' records and reported that they were all missing a social work or activity assessment and complete immunization information.  (*Id.* at ¶ 538.)  Many also lacked pharmacist recommendation forms. (*Id.* at ¶ 539.)

Nurse Johnson also reported that quarterly assessments of residents were actually being done only three weeks apart and was told that this was done intentionally to increase the "case mix" at Samaritan.  (*Id.* at ¶ 540.)  Case mix, or "CMI," is a score that determines the resources necessary to care for residents.  (*Id.* at 112.)  A higher CMI therefore results in higher Medicare and Medicaid reimbursements.  (*Id.*).

Additionally, Samaritan's physical building and environment was allegedly unsafe and unsanitary.  The front door to the facility did not lock and the keypad and buzzer were broken, meaning that anyone could enter or exit the building.  (*Id.* at ¶ 545.)  Resident rooms were cluttered to the point that it caused at least one resident fall.  (*Id.* at ¶¶ 546-47.)  This clutter included incontinence brief bags and wet wipes.  (*Id.* at ¶ 549.)  Samaritan staff did not replace trash can liners, instead opting to throw debris in the unlined trash bins, causing an infection control issue.  (*Id.* at ¶ 550.)  Ohio health inspectors reported a strong urine smell in one resident's room—eventually determined to be from the resident hoarding dirty briefs in her closet—and told Samaritan that "the facility needed cleaning, repairs, and the grounds were not maintained . . . ."  (*Id.* at ¶¶ 553-54.)

Finally, the Government offers two specific examples of Medicare and Medicaid beneficiaries who allegedly received grossly substandard care at Samaritan.  One such beneficiary is MF, the resident who suffered from cognitive decline, weight loss, and stage 2 pressure ulcers.  (*Id.* at ¶ 558.)  Despite MF refusing medication and treatment, engaging in delusion behavior, and falling, Samaritan allegedly did not complete a change assessment, include these issues in her care plan, or inform her doctor or representative.  (*Id.* at ¶¶ 559-61.)  The Government also points to BB, who complained that she felt like her bladder would burst before she was taken to the bathroom, that the staff bathed her with stained washcloths also used

16

to provide incontinence care, that she was in constant pain because the facility did not acquire a prescription for pain medication from her doctor, and that she was mentally abused.  (*Id.* at ¶¶ 563-64.)  Samaritan did not address these complaints, record BB's allegation of mental abuse, or update her care plan with interventions for pain relief.  (*Id.* at ¶ 566.)

## II.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'"  *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A complaint has facial plausibility when there is enough factual content 'that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When considering a motion to dismiss, the Court must accept as true all factual allegations in the plaintiff's complaint and construe the facts alleged in the light most favorable to the plaintiff.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 677).

A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed.  *See id.* at 211.  Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . ." *Iqbal*, 556 U.S. at 678.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.  This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

In addition, in cases brought under the FCA, claimants alleging fraud must meet the higher pleading standard of Federal Rule of Civil Procedure 9(b), which requires them to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In interpreting the "particularity" standard, the Third Circuit has held that "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt.*, *LLC*, 754 F.3d 153, 156-157 (3d Cir. 2014). This requires a plaintiff to allege "all of the essential factual background that would accompany the first paragraph of any newspaper story— that is, the who, what, when, where, and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

## III.    DISCUSSION

Defendants move to dismiss the Government's FCA claim as well as its common law claims of payment by mistake and unjust enrichment. Defendants first argue that in order to meet the FCA's falsity element, they must have rendered entirely worthless services, and that they did not do so here because their conduct did not rise to the level of gross negligence. This argument fails for two reasons. First, the Government's factual allegations, accepted as true at this stage, demonstrate that Defendants rendered grossly negligent, and therefore worthless, long-term care. Second, even if Defendants' services were not worthless, the falsity element can also be met by making implied false certifications, which Defendants allegedly did here by falsely affirming that they were in compliance with federal regulations required to receive Medicare and Medicaid reimbursements.

Defendants next argue that the Government failed to plead a claim under the FCA because their failure to comply with federal nursing home regulations was not material to the Government's decision to pay them Medicare and Medicaid reimbursements. This argument fails because two of the three factors courts consider to determine materiality weigh heavily in the Government's favor. First, Defendants' compliance with the NHRA was an express condition of reimbursement which, while not dispositive, is highly relevant to whether that compliance was material. Second, Defendants' alleged noncompliance was so severe that a reasonable person could not conclude it would not have affected the Government's willingness to reimburse Defendants under the relevant common sense and holistic inquiry. With regard to the third factor, there is no evidence regarding the Government's payment decisions in similar circumstances in the past, or evidence that the Government had actual knowledge of Defendants' noncompliance prior to reimbursement here, rendering this factor at most neutral and insufficient to outweigh the other two.

Defendants also argue that the Government's common law claims of payment by mistake and unjust enrichment fail because they too require materiality. However, as discussed, we find that Defendants' alleged misrepresentations were material. Moreover, this Court has held that common law claims such as those advanced by the Government here are properly pled where the Government makes out a claim under the FCA.

### A.    Regulatory Scheme

Medicare and Medicaid reimbursement is regulated by the Centers for Medicare and Medicaid Services (CMS). In order to participate in and receive payments under these programs, a nursing home must execute form CMS-1561, through which it "agrees to conform to the provisions of section of 1866 of the Social Security Act and applicable provisions of 42 CFR,"

which are the statutes and regulations governing nursing home care.  *See* Health Benefit

Insurance Form, CMS-1561, https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-

Forms-Items/CMS012196.  Once a facility is deemed eligible, it will receive payment by

submitting Minimum Data Set (MDS) forms for each resident, in which it provides an

assessment of the resident's health and formulates a care plan.  42 C.F.R. § 483.315(e); 42

U.S.C. § 1395i-3(b)(A).  Nursing homes must submit MDS forms quarterly, must certify that the

"information was collected in accordance with applicable Medicare and Medicaid requirements,"

and acknowledge that it "is used as a basis for ensuring that residents receive appropriate and

quality care . . . as a basis for payment from federal funds," and that "payment of such federal

funds and continued participation in the government-funded health care programs is conditioned

on the accuracy and truthfulness of this information."  Minimum Data Set (MDS) - Version 3.0,

Resident Assessment and Care Screening, at 45, https://www.cms.gov/Medicare/ Quality-

Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/Downloads /Archive-

Draft-of-the-MDS-30-Nursing-Home-Comprehensive-NC-Version-1140.pdf.   Furthermore, the

drafter of the MDS must certify that he or she "may be personally subject to or may subject [his

or her] organization to substantial criminal, civil, and/or administrative penalties for submitting

false information."  *Id.*

It is incumbent on nursing homes submitting Medicare and Medicaid claims to comply

with the NHRA—found at 42 U.S.C. § 1395i-3(a) to (h) and § 1396r(a) to (h)—and its

implementing regulations—found in 42 C.F.R. §§ 483.1-483.95.  These regulations are vast, and

the Government outlines them thoroughly in its complaint.  In short, a nursing home must

generally "care for its residents in such a manner and in such an environment as will promote

maintenance or enhancement of the quality of life of each resident."  42 U.S.C. § 1395i-

3(b)(1)(A).  To that end, facilities must do the following: provide residents with competent medical, dental, pharmaceutical, and dietary services; create, follow, and review resident care plans within certain timeframes; ensure that residents receive care for pressure ulcers, respiratory care, and pain management; maintain resident grooming and hygiene; provide activities directed by qualified professionals that meet resident interests and encourage interaction; employ a sufficient number of nurses with necessary skills and competencies, including one registered professional nurse at least 8 hours per day, 7 days a week; provide appropriate mental health treatment and services and avoid overuse of psychotropic drugs; protect a resident's right to be free from abuse and restraints and investigate infringements on this right; provide a safe and orderly discharge from the facility; and maintain a physical facility that is safe and sanitary with an effective pest-control system and free from accident hazards.

Individual states are required to ensure compliance with the NHRA and conduct on-site surveys either at regular intervals or when there is a complaint against a facility.  42 U.S.C. § 1395i-3(g)(1)(A), (2)(A), (4)(A).  If the survey reveals that the facility "immediately jeopardizes" the health or safety of its residents, then the state must inform CMS.  42 U.S.C. § 139i-3(h)(1)(A).  CMS is then required to impose a remedy to correct the deficiencies, terminate the facility's participation in Medicare and Medicaid, or impose any of the remaining remedies provided for by statute, which include denial of payment and imposition of civil monetary penalties.  42 U.S.C. § 1395i-3(h)(2)(A)(i), (2)(B).  If the facility is not in substantial compliance with the NHRA within three months of the initial violation, or if it is found to have provided substandard care in three consecutive inspection surveys, then CMS must deny payments for all new admissions.  42 U.S.C. §§ 1395i-3(h)(2)(D), 1395(h)(2)(E).  If the facility is not in substantial compliance within six months, then CMS must terminate the facility's provider

agreement or discontinue Medicare and Medicaid payments to the facility.  42 C.F.R. §
488.450(d).

**B.      False Claims Act**

Where a facility misrepresents its compliance with the above requirements while
applying for Medicare and Medicaid reimbursements, it may be liable under the False Claims
Act.  31 U.S.C. § 3729, *et seq.*  A violation of the FCA requires proof of four elements: falsity,
causation, knowledge, and materiality.  *United States ex rel. Petratos v. Genetech, Inc*., 885 F.3d
481, 487 (3d Cir. 2017).  In their motion to dismiss, Defendants argue that the Government has
failed to plead the falsity and materiality elements.  We disagree.

　　　　　*1.      Falsity*

There are two types of false claims that fall under the FCA: factually false and legally
false.  "A claim is factually false when the claimant misrepresents what goods or services that it
provided to the Government and a claim is legally false when the claimant knowingly falsely
certifies that it has complied with a statute or regulation the compliance with which is a condition
for Government payment."  *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305
(3d Cir. 2011).  The Government has pled both types of falsity here.

　　　　　(i)      Legal Falsity

Legal falsity occurs when the claimant makes a "false certification," meaning that they
falsely claim to have met a prerequisite for Government payment.  The false certification can be
either express or implied.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar.*,
579 U.S. 176, 186-87 (2016) (upholding the implied false certification theory of liability).  While
an express false certification, as the name suggests, requires an affirmative certification of
compliance with Government regulations, the "more expansive" implied false certification

occurs "when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Wilkins*, 659 F.3d at 305.  In other words, "the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.* (quotations omitted).

The Government has made out a claim of implied false certification here.  Specifically, it pled that in order to participate in Medicare and Medicaid, Defendants were required to execute form CMS-1561, agreeing to conform to the NHRA and its implementing regulations.  (Am. Compl. ¶ 29.)  They were also required to submit MDS forms quarterly for each resident certifying the same.  (*Id.* at 33-36.)  Compliance with these regulations was required for Defendants to continue receiving Medicare and Medicaid payments.  The Government alleges that Defendants continued to submit reimbursement requests with full knowledge that their care fell well short of the NHRA's requirements.  Submitting these claims "implie[d] compliance with governing federal rules that are a precondition to payment," *Wilkins,* 659 F.3d at 305, and thus constituted impliedly false certifications.

Moreover, the Amended Complaint alleges that Nurse Colleen Johnson, Defendants' consultant, told vice president of operations Matt Lehman that Samaritan was performing quarterly assessments only three weeks apart.  (Am. Compl. ¶ 540).  Johnson "was told that this was done to increase the 'case mix' at the facility, which typically results in higher reimbursements from Medicare and Medicaid."  (*Id*.)  Accepting as true that Defendants' supposedly "quarterly" assessments, which are mandated under the NHRA, were in fact performed more frequently in order to artificially inflate their need for reimbursement, these assessments would certainly qualify as impliedly, if not expressly, false certifications.

Indeed, Defendants do not appear to contest falsity under the implied false certifications theory, arguing only that the implied certifications were not material and that they were not *factually* false.  However, legal and factual falsity are alternative theories for relief under the FCA, and because the Government made out a claim of legal falsity it need not also prove factual falsity.  *See United States ex rel. Greenfield v. Medco Health Solutions, Inc.,* 880 F.3d 89 (3d Cir. 2018) ("A false or fraudulent claim may be *either* factually false or legally false.") (emphasis added).  Nevertheless, we will also address Defendants' factual falsity arguments.

(ii)     Factual Falsity

A factually false claim requires proof that "the service the government was billed for was not provided."  *United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 494 (E.D. Pa. 2020).  This includes not only instances where services were literally not rendered, but also "worthless services" claims where "the service is so substandard as to be tantamount to no service at all."  *In re Genesis Health Ventures, Inc.*, 112 F. App'x. 140, 143 (3d Cir. 2004).  As this Court has previously held:

> [U]nder the theory of worthless services a claim can be maintained against a defendant that fails to comply with regulations that are intended to ensure that the services provided to the government have value. Under this theory, a defendant may be liable for noncompliance with a regulation that aims to prevent "Medicare waste, fraud, and abuse, i.e. paying out on claims that should not be paid." And a failure to comply with a regulation that informs the quality or the level of the service at issue can be the basis for a claim under a worthless services theory because "seriously deficient" service is akin to "a product that does not work."

*Jackson*, 454 F. Supp. 3d at 494-95 (citations omitted).  However, the worthless services theory requires more than "mere regulatory compliance;" the services rendered must be "grossly negligent with respect to the regulatory standard of care."  *Id.* at 495.  Gross negligence is defined as the "lack of even slight diligence or care[.]"  *Id.* at 496 n.19.

Defendants compare this case to others where this Court did not find long-term care homes to have been grossly negligent.  In *Jackson*, for example, a relator alleged that a nursing home was understaffed, which resulted in unanswered call bells and bed-ridden residents left in soiled sheets without being bathed.  454 F. Supp. 3d at 488.  The relator also provided three example residents: one who had scabies and was not quarantined, leading to an unreported outbreak; another who suffered from bedsores and was not always turned every two hours; and a third who suffered a fall that resulted in severe injuries.  *Id.* at 489.  This Court ultimately determined that "these incidents do not rise to the grossly negligent or significantly substandard care required to prove a claim under the worthless services theory."  *Id.* at 497.

Defendants also point to *Taylor v. Comhar, Inc.*, No. 16-1218, 2021 WL 3857799 (E.D. Pa. Aug. 30, 2021), where a relator alleged that residential treatment facilities for disabled individuals were understaffed such that they could not provide one-to-one care and that a staff member was regularly sleeping on the job.  *Id.* at *1-2.  The relator also claimed that she witnessed abuse and over-medication of residents, and that the facilities did not properly report this conduct to the state.  *Id.* at *2.  This Court dismissed the relator's complaint, holding that the lack of one-to-one care and the inattentive employee "are more suggestive of negligence than worthless services," and that the more serious allegations of abuse were not pled with sufficient particularity because the complaint did not "include information as to the frequency of the alleged abuse, the identities of the perpetrators and residents, the overall level of care provided to the residents, and whether Defendant sought Medicare and Medicaid reimbursement for services provided to the harmed residents."  *Id.* at *4.

These cases are distinguishable.  Defendants' reliance on *Jackson* is misplaced because, as the Government points out, that case survived a motion to dismiss and was only later disposed

of at the summary judgment stage.  454 F.Supp. at 490.  In addition, *Jackson* recognized that the

relator's example residents had received some level of care and distinguished itself from a case

in state court with facts like those pled here.  *Id.* at 497 n.23 (citing *Williams v. Terrace*, 2014

WL 10896964, at *7 (Pa. Super. Ct. July 31, 2014) (a nursing home's care was beyond grossly

negligent where its "facilities were chronically and continuously understaffed," its resident

suffering from bedsores was "routinely not repositioned" and died due to the bedsores, and there

was "pervasive and routine[ ] failure[s] at [its] facilities")).  With regard to *Taylor,* the lack of

specificity fatal to the relator's complaint in that case is not present here, where the

Government's allegations are thoroughly pled based on government surveys and example

residents who received Medicare and Medicaid reimbursements which identify the "who, what,

when, where, and how of the events at issue."  *Taylor,* 2021 WL 3857799, at *4 (quoting *U.S. ex*

*rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 307 (3d Cir. 2016)).

This case is more akin to the cases cited by the Government.  *See United States ex rel.*

*Scharber v. Golden Gate Nat'l Senior Care LLC,* 135 F. Supp. 3d 944 (D. Minn. 2015) (nursing

homes provided worthless services where they failed to provide adequate staffing, provide harm

prevention services, enhance residents' quality of life, properly administer drugs, prevent

pressure sores and infection, provide physician ordered treatment, or complete charting); *U.S. ex*

*rel. Academy Health Ctr., Inc. v. Hyperion Found., Inc.,* No. 10-552, 2014 WL 3385189 (S.D.

Miss. July 9, 2014) (nursing home provided worthless services where it rationed and reused

sterile supplies, was chronically understaffed, forced residents to shower in groups without

privacy, had an unsafe and unsanitary facility with pest and mold problems, failed to supervise

residents, failed to keep residents fed and washed, and the Government provided seven example

Medicare recipients who received grossly substandard care); *United States v. NHC Healthcare*

*Corp.,* 115 F. Supp. 2d 1149 (W.D. Mo. 2000) (nursing home provided worthless services where two patients suffered from pressure sores, weight loss, and unnecessary pain, and eventually died, due to inadequate staffing and substandard care).

Like in these cases, the Government's allegations here describe three nursing homes in which residents frequently did not receive adequate medical, dental, or psychiatric treatment, were left to sit in their own urine and feces, were not properly fed, were not cleaned or changed, were overmedicated, and suffered from an abnormally high rate of pressure ulcers and falls.  All the facilities lacked proper infection control, including a failure of staff to wash their hands or properly dispose of dirty bandages and diapers.  Residents lived in dirty, unsafe, and pest infested buildings, cleaned themselves in clogged showers with feces and blood on the walls, and had their possessions lost and stolen.  Moreover, the Government provides two examples of Medicare and Medicaid beneficiaries who died, one by hanging himself and another who pulled out her own breathing tube, both of which allegedly could have been prevented through adequate supervision made impossible by staffing shortages.  These allegations, taken as true at this stage, show that Defendant's care was grossly negligent and crossed "the proverbial line in the sand for purposes of determining when clearly substandard services become worthless." *Jackson*, 454 F. Supp. 3d at 495 (quotations omitted).

Defendants argue that, because they billed the government for a bundle of services, rather than an individual fee for each service, the government must prove that every service in the entire bundle was worthless.  We agree with the Government that this argument is illogical in that it would prohibit FCA liability where a nursing home provided literally no services except for one that did not fall below mere negligence.  A bundle of services can, on average, be worthless even if *some* of them were administered properly.  *See Sharber,* 135 F. Supp. 3d at 964

("Given the underlying purpose of the FCA to protect the federal fisc, it makes good sense that the statute would protect the government from paying for significantly deficient, even if not entirely non-existent, services."); *Hyperion*, 2014 WL 2285189, at 44 ("taken to its extreme, defendants' argument is that a nursing home is entitled to payment for doing nothing more than housing an elderly person and providing her with just enough bread and water for short-term survival . . . This cannot be the case and it is not the law.").  The bundle of services provided here meets that description, and defendant's representations therefore were factually false in addition to legally false.

### 2.     Materiality

Defendants also move to dismiss on the basis that the Government did not plead materiality.  The materiality inquiry "is a holistic, totality of the circumstances examination of whether the false statement has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.,* 5 F.4th 315 (3d Cir. 2021) (citing 31 U.S.C. § 3729(b)(4); *Escobar*, 579 U.S. at 194-95).  In conducting this examination, courts consider three factors: 1) whether compliance with the regulations was an express payment condition; 2) whether the noncompliance was minor or insubstantial; and 3) evidence of the Government's past action or inaction.  *See Farfield*, 5 F.4th at 342-47.

There is no doubt that compliance with the NHRA was an express condition of payment here, which the Supreme Court has held is "relevant, but not automatically dispositive" of whether it was material.  *See Escobar,* 589 U.S. at 194.  Apart from anything else, form CMS-1561, which providers must complete in order to receive Medicare and Medicaid payments, requires the provider to "agree[] to conform to the provisions of section 1866 of the Social

28

Security act and applicable provisions in 42 CFR," referring to the NHRA's implementing regulations.  CMS is then required to deny payments for future admissions in certain instances where providers are found to be noncompliant with those regulations.  *See* 42 C.F.R. §§ 488.412(c), 488.414(a)(1).  In other words, providers must expressly assent to comply with the NHRA in order to begin receiving payments and CMS is required to deny them upon repeated noncompliance.[2]

As for the second factor, we find that Defendants' alleged noncompliance was so substantial as to overcome any deficiency by the Government in meeting the other two factors. The Third Circuit has advised that the substantiality of noncompliance is not necessarily based on the dollar amount of the alleged fraud, but whether it goes "to the very essence of the bargain."  *Farfield*, 5 F.4th at 346 (quoting *Escobar*, 579 U.S. at 193 n.5).  As the Court stated, "[w]hether a contractor complied with the regulations that are central to decisions about how to spend public funds is a fact that a reasonable person would want to know."  *Id.* at 347 (citations and internal quotation marks omitted).

---

[2] Defendants' argument that these are mere conditions of *participation*, rather than conditions of payment, is unpersuasive.  This argument relies primarily on *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295 (3d Cir. 2011), which was decided pre-*Escobar*, when the rule in this circuit was that "a plaintiff *must* show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government." *Id.* (emphasis added).  Therefore, as the Third Circuit has subsequently explained, "[t]he Supreme Court's rejection of the distinction between 'conditions of payment' and 'conditions of participation' in effect overruled *Wilkins* insofar as *Wilkins* distinguished between these two types of conditions  . . . ." *Freedom Unlimited*, 728 F. App'x. 101, 106 (3d Cir. 2018)*.*  To the contrary, "[*Escobar*] explained that compliance with a condition of participation can be just as material to the government's payment decision as compliance with an express condition of payment." *Id. See Sharber*, 135 F. Supp. 3d at 962 (adopting in the context of an FCA claim the Ninth Circuit's holding that the distinction between conditions of payment and conditions of participation is "a distinction without a difference.").  Therefore, whether the NHRA regulations are conditions of payment or participation is ultimately irrelevant given that substantial noncompliance with either is indicative of materiality.

Any reasonable person would conclude that Defendants' allegedly substandard care in this case would be material to the Government's decision to reimburse them.  Whether Medicare and Medicaid recipients were fed, changed, washed, lived in a habitable environment, given proper medical care, and prevented by competent staff from killing themselves is certainly "central to the decision about how to spend public funds" and goes "to the very essence of the bargain" Defendants made with the Government.  *Farfield*, 5 F.4th at 346-47.  It is reasonable to conclude at this stage that if the Government had been aware of the alleged conditions to which its Medicare and Medicaid recipients were subjected, it would not have been willing to continue reimbursing Defendants for their long-term care.  *See Scharber*, 135 F. Supp. 3d at 963-64 (holding that "serious misconduct" under the NHRA "goes to the heart of [nursing home's] bargain with the government.").

Moving to the third factor, Defendants argue that their alleged misrepresentations, despite their severity, were not material because there is no evidence that the Government tends to deny payment in similar circumstances.  This is true; however, Defendants also have not made any showing that the Government reimbursed them "despite its actual knowledge that certain requirements were violated" or that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated . . . ."  *Escobar*, 579 U.S. at 2003-04.  Defendants claim that the Government continued to pay for Medicare and Medicaid beneficiaries even after Pennsylvania and Ohio conducted surveys finding serious deficiencies at their facilities.  (Motion to Dismiss at 16; ECF. No. 19.)  However, there is no evidence that the Federal Government had *actual* knowledge of the findings in these state surveys; the Government's claim is premised on the allegation that Defendants intentionally hid these findings in its own submissions.  Moreover, the Government claims that Defendants disguised

noncompliance that went beyond what was discovered by the states, citing to a Cheltenham employee suggesting that the facility was "fake" during state surveys.  (Gov. Resp. in Opp. at 18.)

At this stage, there is no evidence to suggest that the Government had actual knowledge of Defendants' noncompliance and decided to continue payments regardless or that it regularly ignores such noncompliance in similar cases.  In the absence of any evidence indicating the Government's past behavior either way, we are left only with the gravity of the allegations and the fact that reimbursement was expressly premised on compliance with the NHRA, both of which support a finding of materiality.  *See Farfield*, 5 F.4th at 346 (without any evidence of past government action or inaction, the relator's *prima facie* showing of materiality was "left intact.").

### C.    The Government's Common Law Claims

The Government also brings claims of payment by mistake and unjust enrichment. Defendants move to dismiss these claims on the sole basis that they also require a finding of materiality.  (Motion to Dismiss at 25.)  The Government does not contest this for payment by mistake, but disagrees on whether the prevailing law assigns an element of materiality for unjust enrichment.  (Gov. Resp. in Opp. at 26.)  We need not resolve this dispute at this juncture, because we do find that Defendants' alleged misrepresentations were material for the reasons stated above.  Since the Government's allegations supporting payment by mistake and unjust enrichment are the same as those supporting the FCA claim, and we hold the FCA claim to be adequately pled, we will deny Defendants' Motion to Dismiss these common law claims as well. *See Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 327 (E.D. Pa. 2017) (citing *U.S. ex rel. Monahan v. Robert Johnson Univ. Hosp.,* No. 02-5702, 2009 WL 1288962 (D.N.J. May 6, 2009)

(holding that claims for payment by mistake of fact and unjust enrichment were adequately pled where allegations state a claim for fraud under the FCA.)).

**IV.     CONCLUSION**

For the foregoing reasons, Defendants Motion to Dismiss the Government's Amended Complaint will be denied.  An appropriate Order follows.



**BY THE COURT:**


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**